IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                     :

JOHN HALEBIAN, Individually and on behalf of
all other similarly situated trust beneficiaries and   :
derivatively on behalf of CITIFUNDS TRUST III,

                     :

          Plaintiff,

                     :

          - against -

                     :

ELLIOTT J. BERV, DONALD M. CARLTON, A.    No. 06-cv-4099 (NRB)
BENTON COCANOUGHER, MARK T. FINN,   :
STEPHEN R. GROSS, DIANA R.
HARRINGTON, SUSAN B. KERLEY, ALAN G.   :
MERTEN, and R. RICHARDSON PETTIT,

                     :

          Defendants,

                     :

          - and -

                     :

CITIFUNDS TRUST III,

                     :

          Nominal Defendant.


**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS COMPLAINT**

*FILED ELECTRONICALLY*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

STATEMENT OF THE CASE................................................................................................3

     A.     The Citigroup-Legg Mason Transaction and the New Advisory Contracts. .......... 3

     B.     Plaintiff's Demand and Appointment of the Demand Review Committee. ........... 5

     C.     The Complaint. ........................................................................................... 7

     D.     The Committee's Report and Recommendations to the Board. ............................ 8

     E.     The Board's Consideration of the Committee's Recommendations and Rejection of Plaintiff's Demand. .......................................................................... 10

ARGUMENT ........................................................................................................................11

I.     Claim I Must Be Dismissed Under Massachusetts Law and Rule 23.1 for Failure to Plead Particular Facts Showing That Plaintiff's Demand Was Wrongfully Rejected..........................................................................................................................11

     A.     Dismissal of Claim I Is Required Under Massachusetts Law............................... 11

           1.     Plaintiff Has Not Pled and Cannot Plead Particularized Facts Showing That a Majority of the Board Was Not Independent. ................ 14

           2.     Plaintiff Has Not Pled and Cannot Plead Particularized Facts Showing That the Board Rejected the Demand in Bad Faith or Failed to Make a Reasonable Inquiry. ....................................................... 15

     B.     Claim I Must Be Dismissed Under Rule 23.1 for Failure to Plead With Particularity the Reasons for Plaintiff's Failure to Obtain Action From the Board. ................................................................................................................. 16

II.     Claims II and III Must Be Dismissed Because They Are Derivative in Nature and Plaintiff Has Not Made Demand as Required by Massachusetts Law. .............................17

     A.     Where a Claim Alleges Injury Directly to a Corporate Entity, It Is Derivative........................................................................................................... 18

     B.     Plaintiff's Claim of Proxy Statement Misrepresentation Is Not a Direct Claim. ............................................................................................................... 20

III.     Claim II Also Must Be Dismissed Because There Is No Private Right of Action Under § 20(a) of the ICA..............................................................................................22

IV. Claims II and III Also Must Be Dismissed Because Plaintiff Has Not Pled Fraud With Particularity and as a Matter of Law the Proxy Statement Was Not Materially Misleading. ...................................................................................................24

  A. Claims II and III Fail to Meet Rule 9(b)'s Heightened Pleading Standards. ........ 24

  B. As a Matter of Law, the Proxy Statement's Description of Voting Procedures Was Not False or Misleading. ............................................................. 25

    1. Plaintiff Does Not Allege That the Description of the Voting Procedures Was Inaccurate. ........................................................................ 25

    2. The Trustees Had No Duty to Provide a Legal Opinion Regarding the Lawfulness of the Voting Procedures. ................................................ 25

    3. Neither § 15(a) of the ICA nor Massachusetts Law Prohibits Echo Voting. ...................................................................................................... 26

  C. The Proxy Statement Did Not Include False or Misleading Statements or Omissions Regarding Any Diversion of Trust Assets. ......................................... 28

V. Plaintiff Lacks Standing to Assert Claims as to Funds in Which He Is Not a Shareholder. ....................................................................................................................29

CONCLUSION ....................................................................................................................29

ADDENDUM OF KEY STATUTORY AND REGULATORY PROVISIONS CITED IN MEMORANDUM

# TABLE OF AUTHORITIES

**CASES:**                                                                                          **Page**

*Abramowitz v. Posner*, 672 F.2d 1025 (2d Cir. 1982) ...................................................17

*Alexander v. Sandoval*, 532 U.S. 275 (2001)...........................................................22

*Ash v. LFE Corp.*, 525 F.2d 215 (3d Cir. 1975) ........................................................26

*Bessette v. Bessette*, 434 N.E.2d 206 (Mass. 1982) ...................................................19

*Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21 (D. Mass. 1996)...........................19

*Chamberlain v. Aberdeen Asset Mgmt. Ltd.*, No. 02 CV 5870(SJ),
    2005 WL 195520 (E.D.N.Y. Jan. 21, 2005) .........................................................24

*Cohen v. Beneficial Indust. Loan Corp.*, 337 U.S. 541 (1949).....................................13

*Comstock v. Dewey,* 83 N.E.2d 257 (Mass. 1949)........................................................28

*Cortec Indust., Inc. v. Sum Holding, L.P.*, 949 F.2d 42 (2d Cir. 1991) .........................13

*Crown Crafts, Inc. v. Aldrich*, 148 F.R.D. 547 (E.D.N.C. 1993) .................................13

*Everett v. Bozic*, No. 05 Civ. 00296 (DAB), 2006 U.S. Dist. LEXIS 55824
    (S.D.N.Y. Aug. 2, 2006) ................................................................. 19-20

*Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100 (D. Mass. 2006) .......................15, 18, 19, 29

*Freedman v. Barrow*, 427 F. Supp. 1129 (S.D.N.Y. 1976) ...........................................26

*Galfand v. Chestnutt Corp.*, 545 F.2d 807 (2d Cir. 1976) ...........................................23

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038
    (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982) ........................................23

*Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486 (N.D. Ill. 1999)...............................19

*Harhen v. Brown*, 730 N.E.2d 859 (Mass. 2000) .....................................................12,15

*ING Principal Protection Funds Derivative Litig.*, 369 F. Supp. 2d 163
    (D. Mass. 2005).................................................................................12, 18

*In re Davis Selected Mut. Funds Litig.*, No. 04 Civ. 4186 (MGC)
    (S.D.N.Y. Oct. 11, 2005) ..............................................................................24

*In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222 (S.D.N.Y.),
    *reh'g denied*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005) ...............................................18, 19, 24

*In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249 (S.D.N.Y. 2006) ...........................24

*In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567 (NRB),
    2006 U.S. Dist. LEXIS 1542 (S.D.N.Y. Jan. 17, 2006) ...............................................20, 23

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 272 F. Supp. 2d 243
    (S.D.N.Y. 2003) ...............................................................................................................24

*In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig.*, 218 F.R.D. 377 (E.D.N.Y.
    2003), *aff'd sub nom. Scalisi v. Fund Asset Mgmt., L.P.*,
    380 F.3d 133 (2d Cir. 2004) ...........................................................................................24

*In re Morgan Stanley & Van Kampen Mut. Funds Sec. Litig.*, No. 03 Civ. 8208(RO),
    2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) .................................................................24

*In re Oppenheimer Funds Fees Litig.*, 419 F. Supp. 2d 593 (S.D.N.Y. 2006) .............................24

*In re Salomon Smith Barney Mut. Funds Fee Litig.*, No. 04 Civ. 4055 (PAC)
    (S.D.N.Y. July 26, 2006) ................................................................................................24

*J. I. Case Co. v. Borak*, 377 U.S. 426 (1964) ...............................................................................22

*Jackson v. Stuhlfire*, 547 N.E.2d 1146 (Mass. App. Ct. 1990) ....................................................19

*Kamen v. Kemper Fin.*, 500 U.S. 90 (1991) .............................................................11, 18, 20, 23

*Krinsk v. Fund Asset Mgmt., Inc.*, 654 F. Supp. 1227 (S.D.N.Y. 1987)........................................23

*Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000) .................................................................... 20-21

*Levner v. Al Saud*, 903 F. Supp. 452 (S.D.N.Y. 1994),
    *aff'd*, 61 F.3d 8 (2d Cir. 1995) ......................................................................................16

*Mevc Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*,
    260 F. Supp. 2d 616 (S.D.N.Y. 2003)............................................................................24

*Mozes v. Welch*, 638 F. Supp. 215 (D. Conn. 1986)....................................................................17

*Olmsted v. Pruco Life Insurance Co.*, 283 F.3d 429 (2d Cir. 2002)................................. 2-3, 22, 23

*RCM Sec., Inc. v. Stanton*, 928 F.2d 1318 (2d Cir. 1991) ...........................................................11

*Recchion v. Kirby*, 637 F. Supp. 1309 (W.D. Pa. 1986)..............................................................17

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................................................24

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 622 F. Supp. 169 (S.D.N.Y. 1985)..................23

*Stegall v. Ladner*, 394 F. Supp. 2d 358 (D. Mass. 2005)...........................................12, 18, 19, 29

*Stoner v. Walsh*, 772 F. Supp. 790 (S.D.N.Y. 1991) ......................................................13, 15, 16

*Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002) .........................................................................18

## **STATUTES:**

Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1 et seq. .......................... *passim*

      § 2(a)(3), 15 U.S.C. § 80a-2(a)(3) ..............................................................14
      § 2(a)(19), 15 U.S.C. § 80a-2(a)(19) ..........................................................14
      § 2(a)(19)(A), 15 U.S.C. § 80a-2(a)(19)(A) ...............................................14
      § 2(a)(42), 15 U.S.C. § 80a-2(a)(42) ..........................................................21
      § 12(d)(1)(A), 15 U.S.C. § 80a-12(d)(1)(A) ..............................................24
      § 15, 15 U.S.C. § 80a-15.........................................................................3, 25
      § 15(a), 15 U.S.C. § 80a-15(a) ............................................................ *passim*
      § 15(c), 15 U.S.C. § 80a-15(c)......................................................................3
      § 20(a), 15 U.S.C. § 80a-20(a)............................................................ *passim*
      § 26(f), 15 U.S.C. § 80a-26(f).....................................................................22
      § 27(i), 15 U.S.C. § 80a-27(i)......................................................................22
      § 34(b), 15 U.S.C. § 80a-33(b) .............................................................23, 24
      § 35(b), 15 U.S.C. § 80a-34(b) ...................................................................23
      § 36(a), 15 U.S.C. § 80a-35(a)........................................................19, 23, 24
      § 36(b), 15 U.S.C. § 80a-35(b) ............................................................23, 24
      § 42, 15 U.S.C. § 80a-41............................................................................23
      § 48(a), 15 U.S.C. § 80a-47(a)....................................................................24

Mass. Gen. Laws ch. 156D, § 7.41 ...............................................................................................29

Mass. Gen. Laws ch. 156D, § 7.42 ...............................................................................................12
Mass. Gen. Laws ch. 156D, § 7.42(2) ..........................................................................................17

Mass. Gen. Laws ch. 156D, § 7.43 ...............................................................................................17

Mass. Gen. Laws ch. 156D, § 7.44(a)............................................................................................12
Mass. Gen. Laws ch. 156D, § 7.44(b)(1)........................................................................................12
Mass. Gen. Laws ch. 156D, § 7.44(c)............................................................................................15
Mass. Gen. Laws ch. 156D, § 7.44(d)............................................................................................14
Mass. Gen. Laws ch. 156D, § 7.44(e)............................................................................................12

Mass. Gen. Laws ch. 182 .................................................................................12
Mass. Gen. Laws ch. 182, § 2B ...................................................................14, 15


**FEDERAL RULES OF CIVIL PROCEDURE:**

Fed. R. Civ. P. 9(b) ...............................................................................3, 24, 25

Fed. R. Civ. P. 12(b)(6).................................................................................13

Fed. R. Civ. P. 23.1 ...................................................................11, 13, 16, 17


**SEC RULES:**

Rule 14a-9 under the Securities Exchange Act of 1934, as amended,
    17 C.F.R. § 240.14a-9 ......................................................................8, 26

Rule 6e-2(b)(10)(i)(B) under the Investment Company Act of 1940, as amended,
    17 C.F.R. § 270.6e-2(b)(10)(i)(B) .........................................................27

Rule 6e-3(T)(b)(10)(i)(B) under the Investment Company Act of 1940, as amended,
    17 C.F.R. § 270.6e-3(T)(b)(10)(i)(B) ....................................................27

Rule 20a-1 under the Investment Company Act of 1940, as amended,
    17 C.F.R. § 270.20a-1 ...........................................................................8


**OTHER AUTHORITIES:**

The First National Bank of Chicago, SEC No Action Letter,
    1992 SEC No-Act. LEXIS 968 ..............................................................27

"Hub-and-Spoke" Funds:  A Report Prepared by the Division of Investment
    Management, SEC No Action Letter, 1993 SEC No-Act. LEXIS 766 .............28

Investment Company Mergers, Investment Company Act Release No. IC-25666,
    67 Fed. Reg. 48512, 2002 SEC LEXIS 1837 (July 26, 2002) ...........................27

Defendants, CitiFunds Trust III and its Independent Trustees, submit this memorandum in support of their Motion to Dismiss the Complaint.[1]

## INTRODUCTION

CitiFunds Trust III (the "Trust") is an open-end investment company registered with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1 et seq. (the "ICA"). The Trust is organized as a business trust under Massachusetts law. It is comprised of six series portfolios, each of which is a separate mutual fund with a separate investment portfolio and separate shareholders (the "Funds"). Plaintiff, John Halebian, alleges that he is a shareholder in one of the Funds, the Citi New York Tax Free Reserves Fund (the "NY Tax Free Fund").

Plaintiff complains that the Independent Trustees, who are members of the Trust's Board of Trustees (the "Board"), acted improperly in approving and recommending that shareholders approve new contracts with the Funds' current investment adviser. He alleges that the new contracts injure the Funds because (a) the Board failed to obtain "more favorable" advisory fees, and (b) the contracts authorized payment of "higher than necessary brokerage commissions." He alleges that shareholder approval for the contracts was obtained through a misleading proxy statement. Plaintiff asserts one claim derivatively on behalf of the Trust. He purports to assert two other claims directly on behalf of a class of all shareholders in all of the Funds on August 22, 2005, the record date for the shareholder meeting relating to that proxy statement. All of Plaintiff's claims are fatally defective and must be dismissed.

Claim I of the Complaint, alleging breach of fiduciary duty by the Independent Trustees in recommending and approving new contracts without obtaining better terms, is asserted as a

---

[1]   The Independent Trustees are Elliott J. Berv, Donald M. Carlton, A. Benton Cocanougher, Mark T. Finn, Stephen Randolph Gross, Diana R. Harrington, Susan B. Kerley, Alan G. Merten and R. Richardson Pettit. CitiFunds Trust III is a nominal defendant in this action.

derivative claim.  This claim must be dismissed because, after Plaintiff made a pre-suit demand that the Board institute suit on behalf of the Trust, the Independent Trustees conducted an extraordinarily thorough investigation of Plaintiff's claims and rejected his demand.  Under governing Massachusetts law, the Independent Trustees' decision is presumptively protected by the business judgment rule.  To overcome this presumption, Plaintiff must plead with particularity facts showing that a majority of Board members were not independent and/or that the Independent Trustees rejected his demand in bad faith or without conducting a reasonable inquiry.  Because Plaintiff has not made (and cannot make) this showing, Claim I must be dismissed.

Claims II and III, alleging misrepresentations in a proxy statement, are styled as direct claims.  But these claims are, as a matter of law, derivative in character because they seek to redress an alleged injury to the Funds.  The theory of these claims is that shareholder approval of the advisory contracts was obtained by use of a misleading proxy statement.  But if that were true, the resulting injury would be an injury to the Funds—namely, the payment out of Fund assets of advisory fees or brokerage commissions provided for by an improperly-approved contract.  The injury to the shareholders of the Funds would occur only indirectly, according to their proportional ownership interests in the Funds.  Such claims are derivative under Massachusetts law.  Moreover, no demand was made on the Board as to Claims II and III.  Since Massachusetts requires pre-suit demand to be made in all derivative cases, these claims must be dismissed.

Claims II and III suffer from other fatal defects as well.  First, Claim II is asserted under § 20(a) of the ICA, 15 U.S.C. § 80a-20(a), which prohibits the solicitation of proxies in violation of SEC regulations.  But the Second Circuit's decision in *Olmsted v. Pruco Life Insurance Co.*,

283 F.3d 429 (2d Cir. 2002), compels a ruling that there is no private right of action under

§ 20(a).  Second, Claims II and III are both premised on alleged misrepresentations in the proxy

statement.  However, the portions of the proxy statement that Plaintiff identifies are, as a matter

of law, not false or misleading, and Plaintiff has not alleged fraud with the particularity required

by Fed. R. Civ. P. 9(b).

　　　　Finally, because Plaintiff is a shareholder only in the NY Tax Free Fund, he lacks

standing to assert claims on behalf of other Funds or shareholders in those Funds.

<u>**STATEMENT OF THE CASE**</u>

**A.      The Citigroup-Legg Mason Transaction and the New Advisory Contracts.**

　　　　Prior to December 2005, an affiliate of Citigroup, Inc., served as investment adviser to

each of the Funds.  In June 2005, Citigroup agreed to sell substantially all of its asset

management business to Legg Mason, Inc., which would cause the Funds' investment adviser to

become a Legg Mason subsidiary.  Compl. ¶ 32.  Consummation of this transaction would

automatically terminate the Funds' existing investment advisory contracts, requiring the Funds to

enter into new contracts.  Compl. ¶ 33.  Under § 15 of the ICA, each Fund's new contract had to

be approved by a majority of the Trustees who are not "interested persons" under the ICA and by

a vote of a majority of outstanding shares of that Fund.  *See* 15 U.S.C. § 80a-15(a), (c).

　　　　In August 2005, the Board approved new investment advisory agreements with Legg

Mason.  Compl. ¶ 39.  In September 2005, shareholders of the Funds were sent a proxy

statement, which recommended, on behalf of the Board, that the shareholders vote to approve the

new agreements (the "Proxy Statement").  Compl. ¶ 2, Declaration of Mark T. Finn ("Finn

Decl.") Ex. D.  Shareholders were given the options of voting "FOR" or "AGAINST" the new

agreements, or voting to "ABSTAIN."  *See id.* at 365 (form of proxy attached to Proxy

Statement).

      The Proxy Statement explained that a bank or other financial institution or

intermediary—known as a "service agent"—might be the record holder of the shares owned by

many shareholders.  *Id.* at 8.  It stated that a service agent would vote shares for which it received

instructions from its customers in accordance with those instructions.  It further stated:

> With respect to any shares for which a Citigroup-affiliated service agent (other
> than a broker-dealer) is the holder of record and for which it does not receive
> voting instructions from its customers, such service agent intends to vote those
> shares in the same proportion as the votes received from its customers for which
> instructions have been received.

*Id.*  In the world of corporate and mutual fund governance, this type of voting procedure is

referred to as "echo voting" or "proportional voting."  Use of this procedure is specifically

authorized in the Trust's charter and had been disclosed in the Funds' prospectuses.[2]

      The Proxy Statement also informed shareholders that the new advisory agreements—like

the existing advisory agreements—would permit the adviser to select brokers or dealers who

provide both brokerage and research services to the Funds even though the commissions charged

by such brokers or dealers might be higher than those charged by other brokers or dealers who

---

[2]    The Trust's charter is composed of three separate documents:  the Amended and Restated Declaration of Trust
dated September 28, 2001, the Certificate of Amendment dated August 22, 2003, and the Amendment to
Declaration of Trust dated August 15, 2005 (all three documents collectively, the "Trust Instrument").  The
three documents comprising the Trust Instrument, all of which are publicly available on the SEC's website, are
Exhibits A, B, and C to Mr. Finn's Declaration.  Mr. Finn's Declaration is filed herewith.  Section 6.8 of the
Trust Instrument (in Exhibit A to Mr. Finn's Declaration) provides

> [A] Shareholder Servicing Agent may vote any shares as to which such Shareholder Servicing
> Agent is the agent of record and for which no voting instructions are received, proportionately in
> accordance with the votes cast by holders of all shares otherwise represented at the meeting in
> person or by proxy as to which such Shareholder Servicing Agent is the agent of record. Any
> shares so voted by a Shareholder Servicing Agent will be deemed represented at the meeting for
> quorum purposes.

Similarly the December 31, 2004 Prospectus for the Trust in effect at the time of the Proxy Statement (available
at http://www.sec.gov/Archives/edgar/data/747576/000095015604000290/d61915.txt) discloses that "[i]f you
do not give your Service Agent voting instructions, your Service Agent may vote your shares proportionately in
accordance with the votes cast by other shareholders for whom your Service Agent acts."

provide execution only or execution and research services.  Such arrangements are commonly referred to as "soft dollar" arrangements.  Appendix D to the Proxy Statement set forth a detailed comparison of the existing and proposed advisory agreements.  That comparison indicated that for the NY Tax Free Fund, both the existing and the proposed advisory agreements permitted the payment of soft dollars, but that the proposed agreement, unlike the existing agreement, specifically authorized the Board to restrict the adviser's use of such payments.  See *id.* at 160.

At a subsequent shareholder meeting, each Fund's new advisory contract was approved by shareholders of that Fund.

**B.     Plaintiff's Demand and Appointment of the Demand Review Committee.**

On February 8, 2006, Plaintiff's counsel sent a letter to the Board (the "Demand Letter"). Finn Decl. Ex. E.  The Demand Letter alleged that in approving the new advisory contracts and recommending them to shareholders, the Board had placed the interests of Citigroup before those of the Funds and their shareholders.  *Id.*  The letter demanded that the Board institute an action for breach of fiduciary duty against "any and all persons who are responsible for the board's dereliction of its duties in connection with the Citigroup-Legg Mason transaction" and take other remedial measures.  *Id.* at 2.  The letter also stated that "shareholder approval [of the new contracts] does not appear to have been obtained properly," but that "as this issue gives rise to direct, rather than derivative, claims it will not be addressed in this letter."  *Id.* at 1 n.1.

In response, on March 24, 2006, the Board appointed Independent Trustees Mark T. Finn and Stephen R. Gross to serve as a Demand Review Committee (the "Committee").  Finn Decl. ¶ 16.  Board member R. Jay Gerken, a Citigroup employee, abstained from this vote because he is an "interested person" under the ICA.  *Id.*  Thus the vote was taken by the remaining nine

Independent Trustees—the defendants in this case—who are not "interested persons" under the ICA. *Id.*

The Committee retained independent counsel to assist in the inquiry into Plaintiff's demand. Finn Decl. ¶ 17. After interviewing three different law firms, the Committee selected LeBouef, Lamb, Greene and MacRae LLP ("LeBouef"). *Id.* LeBoeuf's legal team was led by Ralph C. Ferrara, an experienced and respected securities lawyer who formerly had served as General Counsel of the SEC. *Id.*

Under the Committee's guidance, counsel undertook an extensive review of the adoption of the new advisory agreements. Counsel devoted thousands of hours to the investigation, interviewed 21 people, and reviewed more than 20,000 pages of relevant documents. Finn Decl. ¶ 18. This review examined, for example, documents reviewed by the Trustees in preparation for discussing the advisory contract approvals, documents relating to the proxy materials, documents bearing on the independence of the Independent Trustees, and documents from the investment adviser provided to the Board or relating to the Board's deliberation and decisions. The Committee oversaw and closely monitored counsel's investigation through weekly telephone conferences, continually evaluating the progress of the inquiry and directing LeBouef how to proceed. *Id.* ¶ 19.

On April 10, 2006, on behalf of the Committee, Mr. Ferrara wrote to Plaintiff's counsel to invite him to provide any additional information that might support the Demand Letter. Finn Decl. Ex. F. Plaintiff's counsel responded on April 20, 2006, but did not provide any further information. *Id.* Ex. G. On April 28 and May 9, 2006, Mr. Ferrara wrote to Plaintiff's counsel, to invite Plaintiff and his counsel to meet with the Committee. *Id.* Exs. H, I. Plaintiff did not

respond.  Instead, on May 30, 2006, Plaintiff filed his complaint in this lawsuit ("the

Complaint").

**C.      The Complaint.**

The Complaint reiterates the allegations of the Demand Letter and adds allegations

concerning the Proxy Statement.  Plaintiff acknowledges (¶¶ 49-50) that he was advised, in

writing, of the appointment of the Demand Review Committee and its retention of counsel, but

asserts (¶ 51) that he nonetheless was entitled to file his Complaint once 90 days had elapsed

from the date of his demand.

The Complaint describes (¶¶ 32-34) the Citigroup-Legg Mason transaction and the

resulting requirement that new investment advisory agreements be approved.  The Complaint

asserts (¶¶ 35-44) that various passages in the Proxy Statement demonstrate that the Independent

Trustees placed the interests of Citigroup before those of the Trust.  In particular, Plaintiff

alleges that the Independent Trustees (i) failed to negotiate lower fees or seek bids from

competing advisers (¶¶ 35-36); (ii) spent insufficient time considering the new agreements and

merely "rubber-stamped" them (¶¶ 37-40); and (iii) should not have approved an agreement that

authorized "soft dollar" brokerage payments (¶¶ 43-44).  The Complaint further alleges (¶¶ 45-

47) that the "echo voting" procedure is illegal under Massachusetts law and §15(a) of the ICA,

and that the Proxy Statement was false and misleading because it did not disclose that the

procedure is illegal.

The Complaint asserts (¶ 52) that the Trust "has suffered substantial damages and has

been subjected to significant costs and expenses as a result of defendants' failure to obtain, or

even seek to negotiate, more favorable advisory and other fees."

Based on these allegations, the Complaint purports to assert three causes of action.  Claim I (¶¶ 53-56), styled as a derivative claim, alleges that the Independent Trustees breached their fiduciary duty by approving and recommending the new advisory agreements.  Claims II and III, styled as direct claims, allege that the Proxy Statement was misleading because it "fails to disclose material information, concerning the described voting procedure's failure to comply with ICA § 15(a) and Massachusetts law, as well as the diversion of CitiTrust assets for the benefit of others."  Compl. ¶ 60.  Claim II (¶¶ 57-62) asserts that the allegedly misleading statements violate § 20(a) of the ICA, which prohibits the solicitation of proxies in violation of SEC rules.[3]  Claim III (¶¶ 63-65) asserts that these allegedly misleading statements also constitute a breach of fiduciary duty under Massachusetts law.  Neither Claim II nor Claim III specifically identifies any injury arising out of the allegedly false statements.

As remedy, the Complaint seeks (i) a declaration that the Independent Trustees have breached their fiduciary duties, (ii) compensatory damages, (iii) equitable relief declaring the new advisory agreements void and directing the Independent Trustees to seek new agreements on better terms, and (iv) an award of attorneys' fees and costs.

**D.    The Committee's Report and Recommendations to the Board.**

Following receipt of the Complaint, the Committee broadened the scope of its review to consider the additional allegations concerning the Proxy Statement.  Finn Decl. ¶ 20.  Among other things, the Committee considered whether the portion of the Proxy Statement complained about were false or misleading, and examined the steps taken by the Independent Trustees and the Trust's counsel to assure the accuracy of the disclosures in the Proxy Statement.

---

[3]    Rule 20a-1, 17 C.F.R. § 270.20a-1, adopts by reference the SEC's proxy solicitation rules under Section 14(a) of the Securities Exchange Act of 1934.  Presumably, Plaintiff is relying on Rule 14a-9, 17 C.F.R. § 240.14a-9, under the Exchange Act, which prohibits false or misleading statements in proxy statements.

After thorough investigation, the Committee concluded that there was no merit to Plaintiff's allegations and that institution of an action would not be in the best interest of the Trust (or its constituent Funds).  In a lengthy report to the Board (the "Report"),[4] the Committee described its investigation and recommendations in detail.  Its detailed findings included among other matters discussion of the following:

- The independence of the Trustees.  (Report at 30-34.)

- The process employed by the Board in considering the new advisory contracts, including its meetings, the information supplied to the Board, its requests for additional information, and the responses to those requests.  (Report at 41-59.)

- The matters considered by the Board in the course of its consideration of the new advisory agreements, including for example fund performance, fees and expenses, compliance, adviser profitability, the economics of the Citigroup-Legg Mason transaction, adviser employee retention, and product branding related to that transaction.  (Report at 61-90.)

- The alleged Proxy Statement misrepresentations regarding echo voting and the steps taken to ensure the Proxy Statement's accuracy.  (Report at 91-100.)

- The thoroughness of the Committee's investigation.  (Report at 113-27.)

The Committee concluded that the Independent Trustees were independent and not unduly influenced by Citigroup, that they had reviewed appropriate information in considering the new advisory agreements, and that they had reached a reasonable business decision in approving those agreements.  The Committee concluded that there was no basis to assert a claim on behalf of the Funds for breach of fiduciary duty against the Independent Trustees for their approval of the advisory agreements.  Report at 103-04.

The Committee also concluded that there was no basis to bring claims against the Independent Trustees in connection with the Proxy Statement's disclosure regarding echo voting,

---

[4]   The Report and its 49 exhibits are Exhibit K to Mr. Finn's Declaration.  Due to the voluminous nature of the Report, with the Court's permission, this exhibit has been filed only in hard copy format, not on the Court's ECF system.

both because there was no legal authority indicating that echo voting was unlawful and because the Trustees had used appropriate diligence to ensure the accuracy of the Proxy Statement. Report at 104-06.  The Committee also concluded that the Complaint's allegations regarding soft-dollar payments were ill-founded as a matter of law and relied upon a faulty premise as a matter of fact, inasmuch as the pre-existing Citigroup advisory agreement had authorized soft-dollar payments and the new Legg Mason advisory agreement gave the Board greater oversight to restrict such payments.  Report at 89-90.

In addition, the Committee concluded that the litigation demanded by Plaintiff would not benefit the Trust.  It noted that the litigation would interfere with the Funds' relationships with their adviser, that any potential recovery would be limited, and that the Trust would likely be required to indemnify the Independent Trustees for their defense costs.  Report at 106-11.

**E.      The Board's Consideration of the Committee's Recommendations and Rejection of Plaintiff's Demand.**

The Committee delivered its Report to the Board at the end of June 2006.  Finn Decl. ¶ 21.  After allowing a reasonable period for review of the Report, the Board (with Mr. Gerken once again recusing himself) held a full-day in-person meeting on July 12, 2006 to consider the Report.  *Id.* ¶ 22.  At that meeting, the Board also considered a detailed resolution (the "Resolution") incorporating findings and conclusions based upon the Report.  *Id.*

After allowing themselves additional time to consider the matter, on July 18, 2006, the Board (with Mr. Gerken again recusing himself) adopted the Resolution.  Finn Decl. ¶ 23.  The Resolution summarized Plaintiff's demand, the scope of the Committee's inquiry, and information considered by the Board.  It also reflected upon the Board's independence, addressed each of the claims that Plaintiff purported to bring, and concluded that each such claim both lacked merit and was otherwise not in the Trust's interest.  The Resolution rejected

10

Plaintiff's demand, and directed counsel to seek the dismissal of the Complaint.  A copy of the

Resolution is Exhibit J to Mr. Finn's Declaration.

## ARGUMENT

**I.     Claim I Must Be Dismissed Under Massachusetts Law and Rule 23.1 for Failure to Plead Particular Facts Showing That Plaintiff's Demand Was Wrongfully Rejected.**

Claim I of the Complaint (¶¶ 53-56) is a derivative claim purportedly brought on behalf

of the Trust to redress an alleged breach of fiduciary duty by the Independent Trustees in

approving and recommending the Funds' new investment advisory contracts.  Both

Massachusetts law and Fed. R. Civ. P. 23.1 require any derivative claim to include particularized

allegations of fact that are legally sufficient to show that the shareholder plaintiff's demand was

wrongfully rejected, *i.e.*, that a majority of the Board was not independent and/or that the Board

acted in bad faith or failed to conduct a reasonable inquiry in response to Plaintiff's demand.

Because the Complaint fails to make, and could not make, any factual showing of lack of

independence, bad faith, or inadequate investigation, Claim I must be dismissed.

### A.     Dismissal of Claim I Is Required Under Massachusetts Law.

A derivative action "permits an individual shareholder to bring suit to enforce a corporate

cause of action against officers, directors, and third parties."  *Kamen v. Kemper Fin.*, 500 U.S.

90, 95 (1991) (citations and internal quotation marks omitted).  The substantive requirements for

such an action are determined by the law of the state of incorporation (or organization).  *E.g.*,

*RCM Sec. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1326 (2d Cir. 1991).  Since the Trust is a

Massachusetts business trust, Massachusetts law applies here.

Like most states, Massachusetts requires that before instituting a derivative action, a

shareholder must demand in writing that the board of directors (or comparable authority) take

suitable action.  Mass. Gen. Laws ch. 156D, § 7.42.[5]  This requirement reflects the "basic

principle of corporate governance" that "the board of directors . . . should set the corporation's

business policy, including the decision whether to pursue a lawsuit."  *Harhen v. Brown*, 730

N.E.2d 859, 865 (Mass. 2000).  The law in Massachusetts, as in other states, also presumes that

directors act in good faith and in the best interests of the corporation.  *Id.*  Accordingly, an

independent board's decision to refuse a plaintiff's demand is insulated from review by the

"business judgment rule," unless plaintiff can plead (and ultimately prove) particularized facts

showing that demand was wrongfully refused, *i.e.*, that the board did not act in good faith or

make a reasonable inquiry.  *Id.* at 865-66.

      The business judgment rule is codified in Massachusetts' business corporation law.

Mass. Gen. Laws ch. 156D, § 7.44(a) provides in relevant part that

> A derivative proceeding commenced after rejection of a demand shall be
> dismissed by the court on motion by the corporation if the court finds that . . . 1 of
> the groups specified in subsections (b)(1) or (f) has determined in good faith after
> conducting a reasonable inquiry upon which its conclusions are based that the
> maintenance of the derivative proceeding is not in the best interests of the
> corporation.[6]

Subsection (b)(1) provides that this determination may be made by "a majority vote of

independent directors present at a meeting of the board of directors if the independent directors

constitute a quorum."  Subsection (e) further provides that, if the majority of the board consists

---

[5]    Until the passage of ch. 156D in 2003, Massachusetts permitted demand to be waived when futile.  Chapter
156D eliminated the futility exception and made demand an absolute prerequisite to maintenance of a derivative
action.

[6]    Although Chapter 156D, by its terms, applies to business corporations, courts applying Massachusetts law have
uniformly held that these requirements also apply to business trusts organized under Mass. Gen. Laws ch. 182.
*See, e.g., ING Principal Protection Funds Derivative Litig.,* 369 F. Supp. 2d 163, 170 (D. Mass. 2005) (a
business trust "in practical effect is in many respects similar to a corporation," and therefore universal demand
requirement of ch. 156D applies to business trusts) (citation and internal quotation marks omitted); *Stegall v.
Ladner*, 394 F. Supp. 2d 358, 367 (D. Mass. 2005) (same).

of independent directors, the plaintiff bears the burden of proving that the requirements of subsection (a) have not been met.

To effectuate the substantive policy of Massachusetts' law regarding control of a corporation's legal claims, § 7.44(d) sets forth a procedure for the corporation to seek dismissal of a derivative claim.[7]  It provides:

> If the corporation moves to dismiss the derivative suit, it shall make a written filing with the court setting forth facts to show (1) whether a majority of the board of directors was independent at the time of the determination by the independent directors and (2) that the independent directors made the determination in good faith after conducting a reasonable inquiry upon which their conclusions are based.  Unless otherwise required by subsection (a), the court shall dismiss the suit unless the plaintiff has alleged with particularity facts rebutting the corporation's filing in its complaint or an amended complaint or in a written filing with the court.

Thus, a motion to dismiss under § 7.44(d) requires the Court to consider certain materials extrinsic to the Complaint.  For this reason, Defendants have submitted the Mr. Finn's Declaration (one of the Independent Trustees who served on the Demand Review Committee), the Committee's Report to the Board, and the Resolution adopted by the Board.[8]  These materials establish (i) that a majority of the Board was independent when it rejected Plaintiff's

---

[7]   Such procedural requirements apply in cases in federal court where, as here, they do not conflict with the requirements of the Federal Rules.  *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 556 (1949) (applying a New Jersey statute requiring a stockholder who institutes a derivative action to post a bond because the provisions of Rule 23.1 do not conflict with the statute); *Crown Crafts, Inc. v. Aldrich*, 148 F.R.D. 547, 549-50 (E.D.N.C. 1993) (state statute authorizing court to stay action to allow special litigation committee to review demand was applicable in federal action premised on diversity jurisdiction).

[8]   Other documents attached to Mr. Finn's Declaration may properly be considered in connection with the portions of this motion that seek dismissal under Fed. R. Civ. P. 12(b)(6) and 23.1.  On a Rule 12(b)(6) motion, the Court may consider, in addition to the allegations of the complaint itself, (i) any documents that are attached to or incorporated by reference in the complaint, (ii) public disclosure documents that are required by law to be and actually have been filed with the SEC, and (iii) other documents that the plaintiff knows of or has possession of and has relied on in bringing suit.  *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991); *see also Stoner v. Walsh*, 772 F. Supp. 790, 792 (S.D.N.Y. 1991) (demand letter and response thereto could properly be considered in motion to dismiss derivative action).  Thus, in connection with the Rule 12(b)(6) and/or Rule 23.1 portions of this motion, the Court may properly consider, among other things, the Trust Instrument (Finn Decl. Exs. A-C), the Proxy Statement (Finn Decl. Ex. D), and the Demand Letter and follow-up correspondence between Plaintiff's counsel and counsel for the Independent Trustees (Finn Decl. Exs. E-I).

demand and (ii) that the Independent Trustees rejected the demand in good faith after reasonable inquiry.  Because Plaintiff has not pled and cannot plead particular facts to rebut this showing, the Complaint must be dismissed under § 7.44(d).

>    **1.    Plaintiff Has Not Pled and Cannot Plead Particularized Facts Showing That a Majority of the Board Was Not Independent.**

Plaintiff does not allege anywhere in the Complaint that the Independent Trustees—who occupy nine seats on the Trust's 10-member Board—are not independent under Massachusetts law.  Nor could he make such an allegation.  Massachusetts law expressly provides with respect to a business trust registered as an investment company under the ICA:

> A trustee of a trust who with respect to the trust is not an interested person, as defined in [the ICA], shall be deemed to be independent and disinterested when making any determination or taking any action as a trustee.

Mass. Gen. Laws ch. 182, § 2B.

Applying this standard, each of the Independent Trustees must be deemed independent as a matter of law.  Section 2 of the ICA defines an "interested person" of an investment company to include an "affiliated person" of the company or its investment adviser or principal underwriter or a member of such person's immediate family.  15 U.S.C. § 80a-2(a)(19).  An "affiliated person" of an entity generally includes its officers, directors, employees, or persons owning or controlling more than 5% of its voting securities.  *Id.* § 80a-2(a)(3). But the ICA also provides that "no person shall be deemed to be an interested person of an investment company solely by reason of his . . . being a member of its board of directors."  *Id.* § 80a-2(a)(19)(A). Thus, the mere fact that the Independent Trustees are (in effect) directors of the Trust does not make them "interested persons."  None of the Independent Trustees is (or was during the relevant time period) a director, officer employee or other "interested person" of Citigroup, Legg Mason, or the Funds' principal underwriter.  Finn Decl. ¶ 5.  Moreover, as part of the Committee's

investigation into Plaintiff's demand, the Committee verified that none of the Independent

Trustees could be considered an "interested person" of the Trust on any other grounds.  Finn

Decl. Ex. K at 7-8.

Plaintiff may mean to suggest that the Independent Trustees are not independent because

they have been named as defendants.  But that argument is wrong for several reasons.  First,

under Mass. Gen. Laws ch. 182, § 2B, the ICA's "interested person" standard controls whether a

trustee is "independent."  *See, e.g.*, *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 109-10

(D. Mass. 2006) (trustee who is not an "interested person" is presumed independent as a matter

of law).  Second, and in any event, Massachusetts law expressly provides that "the naming of [a]

director as a defendant in the derivative proceeding or as a person against whom action is

demanded" shall not "by itself cause a director to be considered not independent."  Mass. Gen.

Laws ch. 156D, § 7.44(c).  Finally, the Massachusetts Supreme Judicial Court has expressly

recognized that a director or trustee is not deemed interested for derivative suit purposes due

merely to the fact that the individual is named as a defendant.[9]

### 2. Plaintiff Has Not Pled and Cannot Plead Particularized Facts Showing That the Board Rejected the Demand in Bad Faith or Failed to Make a Reasonable Inquiry.

Plaintiff also does not allege any facts to suggest that the Independent Trustees failed to

consider his demand in good faith or to make a reasonable inquiry.  Nor could he allege such

facts.  The record demonstrates that the Independent Trustees conducted a detailed and thorough

---

[9]   *See Harhen*, 730 N.E.2d at 842-43 & n.5 (adopting definition of "interested" director in ALI Principles of
Corporate Governance).  The ALI Principles provide that "the fact a director is named as a defendant does not
make the director interested under this section if the complaint against the director" is based solely on the fact
that the director approved the transaction or conduct that is the subject of the action and does not otherwise
allege with particularity facts raising a "significant prospect" that the director would be adjudged liable to the
corporation or shareholders.  *See also Stoner*, 772 F. Supp. at 802 (applying Massachusetts law) (simply naming
every director as a defendant along with conclusory allegations of wrongdoing is insufficient to make the
directors interested).

review, assisted throughout by highly experienced independent counsel, and reasonably
concluded Plaintiff's claims had no merit and that instituting legal action as demanded by
Plaintiff would not be in the best interests of the Trust (or its constituent Funds).

> **B.     Claim I Must Be Dismissed Under Rule 23.1 for Failure to Plead With
> Particularity the Reasons for Plaintiff's Failure to Obtain Action From the
> Board.**

Even without considering the process of Independent Trustee investigation, review, and
decision that is reflected in the Report and in the Resolution, dismissal of Claim I is required
under Fed. R. Civ. P. 23.1 due to Plaintiff's failure to plead with particularity reasons for his
failure to obtain action from the Board.

Rule 23.1 provides in relevant part that a derivative complaint:

> shall . . . allege with particularity the efforts, if any, made by the plaintiff to obtain
> the action the plaintiff desires from the directors or comparable authority . . . and
> the reasons for the plaintiff's failure to obtain the action.

Thus, under Rule 23.1, a plaintiff is required not only to allege that demand was rejected but also
to "allege with particularity legally sufficient reasons to call into question the validity of the
Board of Directors' exercise of business judgment."  *Levner v. Al Saud*, 903 F. Supp. 452, 457
(S.D.N.Y. 1994) (citation and internal quotation marks omitted), *aff'd*, 61 F.3d 8 (2d Cir. 1995).
This requires a plaintiff to "plead facts from which a reasonable person could infer that a
majority of the Board was other than disinterested or that a majority of the Board failed to
employ appropriate and sufficient investigative procedures in rejecting demand."  *Stoner*, 772 F.
Supp. at 801.  Here, the Complaint fails to plead any particular facts explaining why Plaintiff did
not obtain the relief demanded.  Instead, the Complaint merely alleges (¶ 48) that demand was
made.  While Plaintiff acknowledges (¶¶ 49-50) that the Board appointed the Committee to
investigate his claims, he does not allege facts showing that the Board wrongfully rejected his
demand.

One reason for Plaintiff's failure to plead wrongful rejection is, of course, the fact that he filed suit before the Committee had finished its investigation.[10]  The circumstances of this case are thus nearly identical to those in *Abramowitz v. Posner*, 672 F.2d 1025 (2d Cir. 1982), where the plaintiff filed a derivative complaint alleging that the board had not responded to her demand, then refused to withdraw the complaint after the board notified her that the demand was rejected.  *Id.* at 1028-29.  The district court in *Abramowitz* dismissed, noting that plaintiff had not produced any evidence challenging the board's good faith or independence, and the Second Circuit affirmed, finding "no basis to hold that the rejection of her demand was wrongful."  *Id.* at 1034.  In other cases, courts have held that filing suit before the board has completed its investigation of a shareholder demand is, by itself, grounds for dismissal of a derivative complaint.  *See, e.g.*, *Mozes v. Welch*, 638 F. Supp. 215, 220-22 (D. Conn. 1986) (dismissing complaint filed eight months after demand where plaintiff was notified that investigation was underway); *Recchion v. Kirby*, 637 F. Supp. 1309, 1319 (W.D. Pa. 1986) (noting that premature filing "frustrates the policy of Rule 23.1" and is "equivalent to failure to make a demand and warrants dismissal").

The other reason for Plaintiff's failure to plead particularized facts showing wrongful rejection of demand is, of course, that no such facts exist.

## II.    Claims II and III Must Be Dismissed Because They Are Derivative in Nature and Plaintiff Has Not Made Demand as Required by Massachusetts Law.

Claims II and III allege misrepresentations in the Proxy Statement that recommended shareholder approval of the new investment advisory contracts.  Though styled as direct claims,

---

[10]    Mass. Gen. Laws ch. 156D, § 7.42(2) provides that, in general, no shareholder may commence a derivative proceeding until after 90 days have elapsed from the date demand was made.  But the statute does not require that a Board's response must occur within that 90-day period.  Indeed, the statute recognizes that 90 days may not be sufficient for a corporation to adequately respond to a demand.  In particular, Mass. Gen. Laws ch. 156D, § 7.43 provides that "[i]f the corporation commences an inquiry into the allegations made in the demand or complaint, the court may stay any derivative proceeding for a period as the court considers appropriate."

these claims are derivative in nature as a matter of law because they seek to redress an alleged injury to the Funds. Accordingly, these claims must be dismissed because Plaintiff did not make demand on the Board with respect to them. *See Stegall*, 394 F. Supp. 2d at 367 (derivative claims improperly brought as direct actions dismissed where plaintiff made no demand); *ING Principal Protection Funds Derivative Litig.,* 369 F. Supp. 2d at 170 ("[t]here are no exceptions" to the demand requirement).

### A.    Where a Claim Alleges Injury Directly to a Corporate Entity, It Is Derivative.

It is well-settled that the form in which a claim is pleaded is not dispositive of whether it is direct or derivative. Rather, the character of the claim must be determined according to the law of the state of the corporate entity's organization. *See, e.g.*, *Strougo v. Bassini*, 282 F.3d 162, 167-69 (2d Cir. 2002); *In re Eaton Vance Mut. Funds Fee Litig.* ("*Eaton Vance I*"), 380 F. Supp. 2d 222, 233-34 & n.4 (S.D.N.Y.), *reh'g denied*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005) ("*Eaton Vance II*"). This is true for both for common-law claims and claims under the ICA. *Id.* at n.4.[11]

"Under Massachusetts law, if the wrong underlying [a] claim results in harm to a plaintiff shareholder only because the corporate entity has been injured, with the plaintiff's injury simply being his proportionate share of the entity's injury, the harm to the shareholder is indirect and his cause of action is derivative." *Forsythe*, 417 F. Supp. 2d at 112 (footnote omitted). Other cases applying Massachusetts law have phrased the same indirect injury test in slightly different language. *See, e.g.*, *Stegall*, 394 F. Supp. 2d at 364 ("In Massachusetts, [t]o determine whether a claim belongs to the corporation, a court must inquire whether the shareholder's injury is distinct

---

[11]    Massachusetts law governs determination of the character of claims under the ICA to the extent it is not inconsistent with the policy of the ICA, *see Kamen*, 500 U.S. at 98-99. Application of Massachusetts law to Plaintiff's § 20(a) claim is not in any way inconsistent with the policy of the ICA.

from the injury suffered generally by the shareholders as owners of corporate stock.") (citation and internal quotation marks omitted).[12]  Under either formulation, if the alleged injury affects shareholders only insofar as they are owners of corporate stock, a claim is derivative.  "[A] complaint alleging mismanagement or wrongdoing on the part of corporate officers or directors normally states a claim of wrong to the corporation: the action, therefore, is properly derivative."  *Jackson*, 547 N.E.2d at 1148 (citation and internal question marks omitted).[13]

Applying this indirect injury test, numerous decisions have held that claims alleging misapplication of mutual fund assets are properly characterized as derivative under Massachusetts law.  For example, in *Forsythe*, plaintiffs alleged that a fund's investment adviser and trustees had participated in a scheme whereby improper payments— including "soft dollar" payments—were made to brokers and excessive fees were charged.  417 F. Supp. 2d at 103-04.  The court held that these claims were derivative in nature, because the alleged wrongs "would occur primarily and directly to the [funds] and only indirectly to the plaintiffs by virtue of their status as investors."  *Id.* at 112.  Likewise, in *Stegall*, the court found that a plaintiff's allegations under § 36(a) of the ICA were derivative because they "relate[d] to a diminution in the total assets of the Funds and only derivatively did this injury harm each shareholder."  394 F. Supp. 2d at 364.  And in *Eaton Vance I*, this Court similarly held that claims under Massachusetts law and the ICA alleging mismanagement of mutual funds, misuse of fund assets and improper fees were derivative in nature because the plaintiff shareholders were injured only indirectly.  380 F. Supp. 2d at 233-36; *see also Everett v. Bozic*, No. 05 Civ. 00296 (DAB), 2006 U.S. Dist. LEXIS

---

[12]    *Accord Eaton Vance I*, 380 F. Supp. 2d at 233-34; *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 489 (N.D. Ill. 1999); *Jackson v. Stuhlfire*, 547 N.E.2d 1146 (Mass. App. Ct. 1990); *see also Bessette v. Bessette*, 434 N.E.2d 206 (Mass. 1982) (claims framed as direct were actually derivative).

[13]    *See also Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996) ("[I]f a plaintiff alleges mismanagement of funds, embezzlement or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor.").

55824 (S.D.N.Y. Aug. 2, 2006) (under Massachusetts and Maryland law, common law and ICA

claims involving mutual funds were derivative); *In re Goldman Sachs Mut. Funds Fee Litig.*, No.

04 Civ. 2567 (NRB), 2006 U.S. Dist. LEXIS 1542, at *18-*26 (S.D.N.Y. Jan. 17, 2006) (under

Delaware law, common-law and ICA claims were derivative).

Plaintiff's alleged injury in this case is similarly indirect.  Notably, neither Claim II nor

Claim III contains any explicit allegation of any injury resulting from the alleged misrep-

resentations in the Proxy Statement.  The only place in the Complaint where plaintiff alleges

injury at all is in Paragraph 52, captioned "Damage to the Fund," which provides:

> As a result of the breaches of fiduciary duty and wrongful acts of defendants as
> alleged herein, CitiTrust has suffered substantial damages and has been subjected
> to significant costs and expenses as a result of defendants' failure to obtain, or
> even seek to negotiate, more favorable advisory and other fees.

Thus, the only injury that Plaintiff has alleged is an injury to the Trust as a whole (or, more

accurately, to the Funds comprising the Trust).  This is precisely the type of injury that Plaintiff's

prayer for relief seeks to remedy, for he seeks an award of compensatory damages—presumably,

an award to the Funds of some portion of fees and costs they incurred—and equitable relief

voiding the new advisory contracts.  Compl. at 20-21 (Prayer for Relief).  These are remedies

designed to address an injury with a direct impact on the Funds, but only an indirect impact on

shareholders.[14]

## B. Plaintiff's Claim of Proxy Statement Misrepresentation Is Not a Direct Claim.

Some courts have held that a wrong involving "contractual rights as a shareholder, such

as the right to vote," are direct in nature.  *See, e.g.*, *Lapidus v. Hecht,* 232 F.3d 679, 683 (9th Cir.

---

[14]   Notably, similar claims alleging misrepresentations in proxy statements have generally been classified as
derivative.  For example, in *Kamen*, as in this case, the plaintiff sued under ICA § 20(a), alleging that
shareholder approval of an investment adviser contract was obtained through a misleading proxy statement.
500 U.S. at 94.  The complaint in *Kamen*, however, was properly framed as a shareholder derivative action—
not as a direct claim.  *Id.* at 93-94.

2000).  Plaintiff may seek to argue, based on this line of authority, that his allegations involving the "echo voting" procedure raise a direct claim.  But the argument is wrong.

Plaintiff's allegations do not implicate his voting rights as a Fund shareholder.  Plaintiff does not (and cannot) allege that he, or any other shareholder in the Funds, was denied the opportunity to vote on any proposed new advisory contract.  Instead, the Complaint asserts (¶ 3) that "[t]he only practicable means for [shareholders] to oppose the Citigroup/Legg Mason transaction . . . was to withhold their vote."  But this makes no sense: shareholders who opposed the transaction could have registered their opposition either (i) by voting against the transaction, or (ii) by returning the Proxy Card and checking the "ABSTAIN" box (which would have had the same effect as a "no" vote).

Plaintiff also alleges (¶ 3) that by withholding their votes, shareholders could have prevented the attainment of a quorum, presumably implying that echo voting deprived shareholders of the voting power of *not* voting.  However, as set forth in the Proxy Statement, a "quorum" for a Fund is "30% of [the] voting power entitled to vote."  Finn Decl. Ex. D at B-8.  Under the voting rules established in the ICA, however the contract could only be approved by either (a) an absolute majority of all outstanding shares (which is, by definition, more than a 30% quorum), or (b) 67% of the shares at a meeting, if more than 50% of the shares are present at the meeting either in person or by proxy.  *See* 15 U.S.C. §§ 80a-2(a)(42), 80a-15(a).  Thus, the smallest number of shares that could, theoretically, approve a contract is 33.5% of outstanding shares, which is also more than the 30% quorum.  Therefore, the presence of sufficient shares to approve the contract will always be more than the quorum, making the quorum requirement superfluous.  To put the matter another way, 50% of the outstanding shares could defeat approval

of any contract by voting against it, which is less than the 70% that would be required to prevent attainment of a quorum.

Finally, Plaintiff cannot complain that the use of echo voting somehow deprived him of a contractual right, given that the Trust Instrument—the source of his contractual rights as a shareholder—expressly authorizes the use of this procedure. *See* n.2 *supra*. Use of this procedure is also expressly disclosed in the Funds' prospectuses, including the one in effect at the time of the Proxy Statement. *See* n.2 *supra*.

## III.   Claim II Also Must Be Dismissed Because There Is No Private Right of Action Under § 20(a) of the ICA.

In *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), the Supreme Court held that "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress." Describing *J. I. Case Co. v. Borak*, 377 U.S. 426 (1964), as part of an "*ancien regime*," the Court made clear that it had abandoned *Borak's* reasoning, which had given courts latitude to find implied rights of action to effectuate congressional purpose. *Id.* at 287. Following *Sandoval*, the Second Circuit held in *Olmsted v. Pruco Life Insurance Co.*, 283 F.3d 429 (2d Cir. 2002), that there is no private right of action under §§ 26(f) and 27(i) of the ICA, 15 U.S.C. §§ 80a-26(f), 80a-27(i). The reasoning of these decisions compels the conclusion that there is no also no private right of action under § 20(a) of the ICA. Accordingly, Claim II must be dismissed.

In *Olmsted*, the Second Circuit noted that, because there was no explicit private right of action under § 26(f) or § 27(i), "we must presume that Congress did not intend one." 283 F.3d at 432. The court focused on three factors that supported this conclusion. First, it noted that §§ 26(f) and 27(i) did not contain "rights-creating language." *Id.* Instead, each of these provisions states that "[i]t shall be unlawful" to engage in certain proscribed conduct. Second,

§ 42 of the ICA, 15 U.S.C. § 80a-41, explicitly provides for SEC enforcement of ICA

provisions, suggesting Congress meant to preclude private enforcement.  *Id.* at 433.  Finally,

Congress expressly provided a private right of action in § 36(b) of the ICA, 15 U.S.C. § 80a-

35(b), indicating that the omission of a private remedy from other sections was intentional.  *Id.*

The court found no basis for rebutting the strong presumption raised by the text of the ICA that

Congress did not intend a private right of action.  *Id.* at 433-35.

As this Court has recognized, the "logic of the Court's holding in Olmsted . . . applies

equally" to other sections of the ICA.  *In re Goldman Sachs Mut. Funds Fee Litig.,* 2006 U.S.

Dist. LEXIS 1542, at *17 (finding no private right of action under ICA §§ 34(b) and 36(a)).  The

factors that the Second Circuit considered in *Olmsted* are all equally applicable to § 20(a).  First,

§ 20(a) does not contain "rights-creating language."  It simply provides that "[i]t shall be

unlawful for any person" to solicit a proxy in violation of SEC rules.  Second, the fact that the

ICA expressly provides for SEC enforcement suggests that Congress intended to preclude private

enforcement under §20(a) as much as under §§ 26(f) and 27(i).  Finally, the fact that Congress

explicitly created a private right of action in ICA § 36(b) again demonstrates that it did not

intend for other sections to be privately enforced. [15]

So far as we are aware, since *Olmsted* every district court in this Circuit to consider the

issue has held that there is no private right of action under any section of the ICA other than the

---

[15]     Prior to *Olmsted*, courts in this Circuit were divided as to whether a private right of action existed under § 20(a).
*Compare Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038 (S.D.N.Y. 1981) (no private right
of action), *aff'd*,  694 F.2d 923, 934 (2d Cir. 1982) *with Krinsk v. Fund Asset Mgmt., Inc.*, 654 F. Supp. 1227,
1233-34 (S.D.N.Y. 1987) (recognizing private derivative right of action) *and Schuyt v. Rowe Price Prime
Reserve Fund, Inc.*, 622 F. Supp. 169, 172-77 (S.D.N.Y. 1985) (same).  *See also Galfand v. Chestnutt Corp.*,
545 F.2d 807 (2d Cir. 1976) (affirming judgment in private derivative action under § 20(a), without discussing
existence of right of action).  The Supreme Court has never addressed whether a private right of action exists
under § 20(a).  *Kamen*, 500 U.S. at 97 n.4.

express rightof action provided in § 36(b).[16]  There is no principled basis for reaching a different conclusion as to § 20(a).

## IV.    Claims II and III Also Must Be Dismissed Because Plaintiff Has Not Pled Fraud With Particularity and as a Matter of Law the Proxy Statement Was Not Materially Misleading.

Claims II and III also must be dismissed because (i) Plaintiff has failed to plead fraud with the factual particularity required by Fed. R. Civ. P. 9(b); and (ii) as a matter of law, the statements in the Proxy Statement do not misleadingly omit the information that Plaintiff alleges.

### A.    Claims II and III Fail to Meet Rule 9(b)'s Heightened Pleading Standards.

Because Claims II and III allege materially false and misleading statements, both claims sound in fraud.  *See Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).  Accordingly, these claims are governed by the heightened pleading standard of Rule 9(b), which requires a plaintiff to "specify the statements that the plaintiff contends were fraudulent" and "explain why the statements were fraudulent."  *Id.*  at 170 (citation and internal quotation marks omitted).

Plaintiff has failed to meet this standard.  Claims II and III allege that the Proxy Statement failed to disclose material information concerning two matters:  first, "the described voting procedure's failure to comply with ICA Section 15(a) and Massachusetts law," and second, an unspecified "diversion of CitiTrust assets for the benefit of others."  Compl. ¶ 60.  These allegations do not come close to meeting the heightened pleading standard of Rule 9(b).

---

[16]    *See Eaton Vance I*, 380 F. Supp. 2d at 231-33 (ICA §§ 34(b), 36(a) and 48(a)); *Mevc Draper Fisher Jurvetson Fund I, Inc.  v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616, 621-25 (S.D.N.Y. 2003) (ICA § 12(d)(1)(A)); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255-59 (S.D.N.Y. 2003) (ICA § 34(b)); *In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig.*, 218 F.R.D. 377, 379-80 (E.D.N.Y. 2003), *aff'd sub nom. Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133 (2d Cir. 2004) (ICA § 36(a)); *Chamberlain v. Aberdeen Asset Mgmt. Ltd.*, No. 02 CV 5870 (SJ), 2005 WL 195520, at *2-*4 (E.D.N.Y. Jan. 21, 2005) (same); *In re Davis Selected Mut. Funds Litig.*, No. 04 Civ. 4186 (MGC), at *2 (S.D.N.Y. Oct. 11, 2005) (ICA §§ 34(b), 36(a) and 48(a)); *In re Oppenheimer Funds Fees Litig.*, 419 F. Supp. 2d 593, 595 (S.D.N.Y. 2006) (same); *In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 255-57 (S.D.N.Y. 2006) (ICA §§34(b) and 36(a)); *In re Morgan Stanley & Van Kampen Mut. Funds Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 WL 1008138, at *11 (S.D.N.Y. Apr. 18, 2006) (ICA §§ 34(b), 36(a) and 48(a)); *In re Salomon Smith Barney Mut. Funds Litig.*, No. 04 CIV. 4055 (PAC), at *9-10 (S.D.N.Y. July 26, 2006) (ICA §§ 34(b) and 48(a)).

The Complaint refers to no provision in the Trust Instrument or Funds' prospectuses that would prohibit echo voting, and it offers no explanation how or why echo voting violates ICA § 15(a) or Massachusetts law.  Nor does the Complaint identify what alleged "diversion of assets" is at issue, leaving us to assume that it refers to Plaintiff's vague allegations concerning "higher than necessary" soft dollar payments to brokers.

**B.    As a Matter of Law, the Proxy Statement's Description of Voting Procedures Was Not False or Misleading.**

Even if Plaintiff could add particulars, Claims II and III would still fail, because as a matter of law the Proxy Statement was not false or misleading.  First, Plaintiff alleges no factual inaccuracy in the description of the echo voting procedures; second, having set forth an accurate description of those procedures, the Independent Trustees had no obligation to characterize them as unlawful; and third, rather than being unlawful, echo voting is consistent with SEC-permitted procedures, in no way prohibited by Massachusetts law, and authorized by the Trust's charter.

**1.    Plaintiff Does Not Allege That the Description of the Voting Procedures Was Inaccurate.**

Plaintiff acknowledges—as he must—that the Proxy Statement disclosed that shares for which no voting instructions were received would be "echo voted" if the holder of record was a Citigroup affiliated service agent.  Compl. ¶ 46.  Plaintiff does *not* allege that the Proxy Statement inaccurately described the voting procedure to be used.

**2.    The Trustees Had No Duty to Provide a Legal Opinion Regarding the Lawfulness of the Voting Procedures.**

Rather than alleging an affirmative misrepresentation in the Proxy Statement's description of echo voting, Plaintiff alleges (¶¶ 47, 60) that the Proxy Statement was misleading because it omitted to state that such procedures violate ICA § 15 and unspecified requirements of Massachusetts law.  Even if an argument could be made that echo voting is illegal under § 15(a)

or Massachusetts law, the Board of Trustees was not obligated to express that legal theory in the Proxy Statement.  All they were required to do was to describe accurately the voting procedure that they understood would be employed by the record owners of the Funds' shares.  Plaintiff does not dispute that they did just that.

The Third Circuit addressed a situation squarely on point in *Ash v. LFE Corp.*, 525 F.2d 215 (3d Cir. 1975).  The plaintiff in *Ash* contended that a proxy statement disclosure that a pension plan provided for certain benefits was misleading because it failed to disclose that providing those benefits might be *ultra vires*.  The Third Circuit rejected the argument:

> [W]e hold that the proxy statement did not violate Rule 14a-9 when it failed to disclose a legal theory with which the corporation did not agree and which was never called to its attention.  The facts are disclosed . . . .  No case has been called to our attention requiring disclosure of speculative issues of state corporation law in a proxy solicitation.

525 F.2d at 220.  A court in this District has similarly held that the "[f]ailure to disclose a legal theory with which those soliciting do not agree . . . does not violate Rule 14a-9."  *Freedman v. Barrow*, 427 F. Supp. 1129, 1144 (S.D.N.Y. 1976).  In short, the Trustees were not obligated to characterize the lawfulness of the echo voting procedure, and their failure to do so cannot constitute a misrepresentation.

### 3. Neither § 15(a) of the ICA nor Massachusetts Law Prohibits Echo Voting.

ICA § 15(a) makes it "unlawful for any person to serve or act as investment adviser of [an investment company], except pursuant to a written contract, which contract . . . has been approved by the vote of a majority of the outstanding voting securities of such registered company."  15 U.S.C. § 80a-15(a).  Nothing in § 15(a) prescribes or proscribes how a mutual fund's securities are to be voted.  More specifically, nothing in this subsection purports to restrict the use of echo voting, and we are aware of no court decision holding that the use of echo voting violates § 15(a).

Nor has the SEC ever suggested that echo voting violates § 15(a).  To the contrary, the SEC requires echo voting in certain circumstances and recognizes the prevalence of the practice elsewhere.  For example, SEC regulations actually require insurance companies that are record owners of mutual fund shares relating to variable annuities and variable life insurance policies to echo vote those shares.[17]  Similarly, in a no-action letter issued to a bank that held in custodial accounts shares of mutual funds advised by a bank affiliate, the SEC staff conditioned no-action relief on the bank's affirmatively echo-voting shares for which it did not receive instructions from the beneficial owners.  The First National Bank of Chicago, SEC No Action Letter, 1992 SEC No-Act. LEXIS 968.

In other circumstances in which echo voting is not expressly required, the SEC has recognized, without criticism, its common use.  For example, in 2002, the SEC issued regulations governing the merger of investment companies.  While the SEC determined that it would not require the use of echo voting in such transactions (as it had initially proposed), it acknowledged that "it is a common practice for advisers with conflicting obligations to vote their shares in a manner similar to that which we proposed [*i.e.*, echo voting]."  Investment Company Mergers, Investment Company Act Release No. IC-25666, 67 Fed. Reg. 48,512, 48,513, 2002 SEC LEXIS 1837, at *11 (July 26, 2002).  Similarly, in a 1993 report to Congress, the SEC staff recognized that some investment companies organized in a structure known as "hub and spoke" "represent in their registration statements that they will vote shares for which they receive no voting instructions in the same proportion as the shares for which they do receive voting

---

[17]    *See* Rule 6e-2(b)(10)(i)(B) under the ICA, 17 C.F.R. § 270.6e-2(b)(10)(i)(B) ("the life insurer shall cast its votes for and against each matter which may be voted upon by contractholders in the same proportion as the votes cast by contractholders"); Rule 6e-3(T)(b)(10)(i)(B) under the ICA, 17 C.F.R. § 270.6e-3(T)(b)(10)(i)(B) (same for variable annuities).

instructions." "Hub-and-Spoke" Funds:  A Report Prepared by the Division of Investment

Management, SEC No Action Letter, 993 SEC No-Act. LEXIS 766, at *18.

Nor does Massachusetts law prohibit echo voting.  A business trust like the Trust is

governed by the procedures set forth in the trust instrument.  Here, as noted *supra* at 4 & n.2, the

Trust Instrument specifically authorizes the use of echo voting.  We are not aware of any

provision of Massachusetts law that would prohibit the Trust from following the voting

procedures set forth in its charter document.  To the contrary, the Massachusetts Supreme

Judicial Court has held that it does not offend public policy for a business trust to follow the

voting procedures set forth in the trust instrument. *See, e.g.*, *Comstock v. Dewey*, 83 N.E.2d 257,

259 (Mass. 1949).

### C.   The Proxy Statement Did Not Include False or Misleading Statements or Omissions Regarding Any Diversion of Trust Assets.

Plaintiff's only other allegation of a misleading statement is his assertion (¶ 60) that the

Proxy Statement "fail[ed] to disclose material information, concerning . . .  the diversion of

CitiTrust assets for the benefit of others."  Assuming that this claim is premised upon Plaintiff's

allegations (¶¶ 43-44) that the new advisory agreements give Legg Mason "the right to use

[fund] assets" to pay for "brokerage or research services" by "paying higher than necessary

brokerage commissions"—so-called "soft-dollar arrangements"—and that "plaintiff believes that

there are no possible 'research services' which could be provided that could offset the higher

costs of brokerage," the claim of misrepresentation is deficient.  Plaintiff does not challenge the

veracity of the Proxy Statement's disclosures about soft dollar arrangements.  Indeed, Plaintiff's

description of the soft dollar arrangements comes directly from the Proxy Statement disclosure.

## V.   Plaintiff Lacks Standing to Assert Claims as to Funds in Which He Is Not a Shareholder.

Finally, all of Plaintiffs' claims (direct or derivative) must be dismissed to the extent that he purports to assert them on behalf of Funds, or shareholders of Funds, in which he is not a shareholder.  Plaintiff alleges (¶ 7) that he is a shareholder in the NY Tax Free Fund.  He does not allege that he is, or ever was, a shareholder in any of the five other Funds comprising the Trust.  Accordingly, Plaintiff lacks standing to assert claims on behalf of other Funds or their shareholders.  *See, e.g.*, *Stegall*, 394 F. Supp. 2d at 362 (shareholder plaintiff  had "no standing to pursue claims for other funds within the Trust, but rather only for those he himself owns"); *accord Forsythe*, 417 F. Supp. 2d at 117-19; s*ee also* Mass. Gen. Laws ch. 156D, § 7.41 (only person who was shareholder at time of act or omission complained of may commence derivative proceeding).

### CONCLUSION

For the foregoing reasons, the Complaint must be dismissed.

Respectfully submitted,

s/ Matthew M. Hoffman
Michael K. Isenman  (*pro hac vice*)
Matthew M. Hoffman  (MH-2668)
GOODWIN PROCTER LLP
901 New York Ave., N.W.
Washington, DC 20001
Tel: (202) 346-4000
Fax: (202) 346-4444

James S. Dittmar (*pro hac vice*)
GOODWIN PROCTER LLP
Exchange Place
53 State St.
Boston, MA 02109
Tel: (617) 570-1000
Fax: (617) 523-1231

Jeffrey A. Simes (JS-7060)
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212)813-8800
Fax: (212) 355-3333

*Attorney for Defendants and for Nominal Defendant
CitiFunds Trust III*

Dated: October 23, 2006

## ADDENDUM OF KEY STATUTORY AND REGULATORY PROVISIONS CITED IN MEMORANDUM

**Investment Company Act of 1940, as amended**

15 U.S.C. § 80a-2 ................................................................................ A-1
15 U.S.C. § 80a-15 .............................................................................. A-5
15 U.S.C. § 80a-20 .............................................................................. A-8

**Securities and Exchange Commission Rules**

Rule 14a-9 under the Securities Exchange Act of 1934, as amended,
17 C.F.R. § 240.14a-9 .................................................................... A-9
Rule 20a-1 under the Investment Company Act of 1940, as amended,
17 C.F.R. § 270.20a-1 .................................................................. A-10

**Massachusetts General Laws**

Ch. 156D, §7.41 ................................................................................. A-12
Ch. 156D, §7.42 ................................................................................. A-13
Ch. 156D, §7.43 ................................................................................. A-14
Ch. 156D, §7.44 ................................................................................. A-15
Ch. 182, §2B .................................................................................... A-17

UNITED STATES CODE ANNOTATED
TITLE 15. COMMERCE AND TRADE
CHAPTER 2D—INVESTMENT COMPANIES AND ADVISERS
SUBCHAPTER I—INVESTMENT COMPANIES

### § 80a-2. Definitions

(a) When used in this subchapter, unless the context otherwise requires—

* * * * *

(3) "Affiliated person" of another person means (A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person; (E) if such other person is an investment company, any investment adviser thereof or any member of an advisory board thereof; and (F) if such other person is an unincorporated investment company not having a board of directors, the depositor thereof.

* * * * *

(19) "Interested person" of another person means—

(A) when used with respect to an investment company—

(i) any affiliated person of such company,

(ii) any member of the immediate family of any natural person who is an affiliated person of such company,

(iii) any interested person of any investment adviser of or principal underwriter for such company,

(iv) any person or partner or employee of any person who at any time since the beginning of the last two completed fiscal years of such company has acted as legal counsel for such company,

(v) any person or any affiliated person of a person (other than a registered investment company) that, at any time during the 6-month period preceding the date of the determination of whether that person or affiliated person is an interested person, has executed any portfolio transactions for, engaged in any principal transactions with, or distributed shares for—

(I) the investment company;

**(II)** any other investment company having the same investment adviser as such investment company or holding itself out to investors as a related company for purposes of investment or investor services;  or

**(III)** any account over which the investment company's investment adviser has brokerage placement discretion,

**(vi)** any person or any affiliated person of a person (other than a registered investment company) that, at any time during the 6-month period preceding the date of the determination of whether that person or affiliated person is an interested person, has loaned money or other property to—

**(I)** the investment company;

**(II)** any other investment company having the same investment adviser as such investment company or holding itself out to investors as a related company for purposes of investment or investor services;  or

**(III)** any account for which the investment company's investment adviser has borrowing authority,[*]

**(vii)** any natural person whom the Commission by order shall have determined to be an interested person by reason of having had, at any time since the beginning of the last two completed fiscal years of such company, a material business or professional relationship with such company or with the principal executive officer of such company or with any other investment company having the same investment adviser or principal underwriter or with the principal executive officer of such other investment company:

*Provided,* That no person shall be deemed to be an interested person of an investment company solely by reason of (aa) his being a member of its board of directors or advisory board or an owner of its securities, or (bb) his membership in the immediate family of any person specified in clause (aa) of this proviso;  and

**(B)** when used with respect to an investment adviser of or principal underwriter for any investment company—

**(i)** any affiliated person of such investment adviser or principal underwriter,

**(ii)** any member of the immediate family of any natural person who is an affiliated person of such investment adviser or principal underwriter,

**(iii)** any person who knowingly has any direct or indirect beneficial interest in, or who is designated as trustee, executor, or guardian of any legal interest in, any

---

[*]So in original.  Probably should be followed by the word "and".

security issued either by such investment adviser or principal underwriter or by a controlling person of such investment adviser or principal underwriter,

**(iv)** any person or partner or employee of any person who at any time since the beginning of the last two completed fiscal years of such investment company has acted as legal counsel for such investment adviser or principal underwriter,

**(v)** any person or any affiliated person of a person (other than a registered investment company) that, at any time during the 6-month period preceding the date of the determination of whether that person or affiliated person is an interested person, has executed any portfolio transactions for, engaged in any principal transactions with, or distributed shares for—

    **(I)** any investment company for which the investment adviser or principal underwriter serves as such;

    **(II)** any investment company holding itself out to investors, for purposes of investment or investor services, as a company related to any investment company for which the investment adviser or principal underwriter serves as such;  or

    **(III)** any account over which the investment adviser has brokerage placement discretion,

**(vi)** any person or any affiliated person of a person (other than a registered investment company) that, at any time during the 6-month period preceding the date of the determination of whether that person or affiliated person is an interested person, has loaned money or other property to—

    **(I)** any investment company for which the investment adviser or principal underwriter serves as such;

    **(II)** any investment company holding itself out to investors, for purposes of investment or investor services, as a company related to any investment company for which the investment adviser or principal underwriter serves as such;  or

    **(III)** any account for which the investment adviser has borrowing authority, [**]

**(vii)** any natural person whom the Commission by order shall have determined to be an interested person by reason of having had at any time since the beginning of the last two completed fiscal years of such investment company a material business or professional relationship with such investment adviser or principal underwriter or with the principal executive officer or any controlling person of such investment adviser or principal underwriter.

---

[**]]So in original.  Probably should be followed by the word "and".

A-3

For the purposes of this paragraph (19), "member of the immediate family" means any parent, spouse of a parent, child, spouse of a child, spouse, brother, or sister, and includes step and adoptive relationships.  The Commission may modify or revoke any order issued under clause (vi) of subparagraph (A) or (B) of this paragraph whenever it finds that such order is no longer consistent with the facts.  No order issued pursuant to clause (vi) of subparagraph (A) or (B) of this paragraph shall become effective until at least sixty days after the entry thereof, and no such order shall affect the status of any person for the purposes of this subchapter or for any other purpose for any period prior to the effective date of such order.

**(20)** "Investment adviser" of an investment company means (A) any person (other than a bona fide officer, director, trustee, member of an advisory board, or employee of such company, as such) who pursuant to contract with such company regularly furnishes advice to such company with respect to the desirability of investing in, purchasing or selling securities or other property, or is empowered to determine what securities or other property shall be purchased or sold by such company, and (B) any other person who pursuant to contract with a person described in clause (A) of this paragraph regularly performs substantially all of the duties undertaken by such person described in said clause (A);  but does not include (i) a person whose advice is furnished solely through uniform publications distributed to subscribers thereto, (ii) a person who furnishes only statistical and other factual information, advice regarding economic factors and trends, or advice as to occasional transactions in specific securities, but without generally furnishing advice or making recommendations regarding the purchase or sale of securities, (iii) a company furnishing such services at cost to one or more investment companies, insurance companies, or other financial institutions, (iv) any person the character and amount of whose compensation for such services must be approved by a court, or (v) such other persons as the Commission may by rules and regulations or order determine not to be within the intent of this definition.

\* \* \* \* \*

**(42)** "Voting security" means any security presently entitling the owner or holder thereof to vote for the election of directors of a company.  A specified percentage of the outstanding voting securities of a company means such amount of its outstanding voting securities as entitles the holder or holders thereof to cast said specified percentage of the aggregate votes which the holders of all the outstanding voting securities of such company are entitled to cast. The vote of a majority of the outstanding voting securities of a company means the vote, at the annual or a special meeting of the security holders of such company duly called, (A) of 67 per centum or more of the voting securities present at such meeting, if the holders of more than 50 per centum of the outstanding voting securities of such company are present or represented by proxy;  or (B) of more than 50 per centum of the outstanding voting securities of such company, whichever is the less.

UNITED STATES CODE ANNOTATED
TITLE 15. COMMERCE AND TRADE
CHAPTER 2D—INVESTMENT COMPANIES AND ADVISERS
SUBCHAPTER I—INVESTMENT COMPANIES

## § 80a-15. Contracts of advisers and underwriters

### (a) Written contract to serve or act as investment adviser;  contents

It shall be unlawful for any person to serve or act as investment adviser of a registered investment company, except pursuant to a written contract, which contract, whether with such registered company or with an investment adviser of such registered company, has been approved by the vote of a majority of the outstanding voting securities of such registered company, and—

(1) precisely describes all compensation to be paid thereunder;

(2) shall continue in effect for a period more than two years from the date of its execution, only so long as such continuance is specifically approved at least annually by the board of directors or by vote of a majority of the outstanding voting securities of such company;

(3) provides, in substance, that it may be terminated at any time, without the payment of any penalty, by the board of directors of such registered company or by vote of a majority of the outstanding voting securities of such company on not more than sixty days' written notice to the investment adviser; and

(4) provides, in substance, for its automatic termination in the event of its assignment.

* * * * *

### (c) Approval of contract to undertake service as investment adviser or principal underwriter by majority of noninterested directors

In addition to the requirements of subsections (a) and (b) of this section, it shall be unlawful for any registered investment company having a board of directors to enter into, renew, or perform any contract or agreement, written or oral, whereby a person undertakes regularly to serve or act as investment adviser of or principal underwriter for such company, unless the terms of such contract or agreement and any renewal thereof have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such party, cast in person at a meeting called for the purpose of voting on such approval.  It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company.  It shall be unlawful for the directors of a registered investment company, in connection with their evaluation of the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of

such company, to take into account the purchase price or other consideration any person may have paid in connection with a transaction of the type referred to in paragraph (1), (3), or (4) of subsection (f) of this section.

* * * * *

UNITED STATES CODE ANNOTATED
TITLE 15. COMMERCE AND TRADE
CHAPTER 2D—INVESTMENT COMPANIES AND ADVISERS
SUBCHAPTER I—INVESTMENT COMPANIES

**§ 80a-20. Proxies; voting trusts; circular ownership**

**(a) Prohibition on use of means of interstate commerce for solicitation of proxies**

It shall be unlawful for any person, by use of the mails or any means or instrumentality of interstate commerce or otherwise, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security of which a registered investment company is the issuer in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

* * * * *

Code of Federal Regulations
Title 17. Commodity and Securities Exchanges
Chapter II. Securities and Exchange Commission
Part 240. General Rules and Regulations, Securities Exchange Act of 1934
Subpart A. Rules and Regulations Under the Securities Exchange Act of 1934
Regulation 14A:  Solicitation of Proxies

## § 240.14a-9 False or misleading statements.

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

(b) The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders.  No representation contrary to the foregoing shall be made.

Note:  The following are some examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this section.

(a) Predictions as to specific future market values.

(b) Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation.

(c) Failure to so identify a proxy statement, form of proxy and other soliciting material as to clearly distinguish it from the soliciting material of any other person or persons soliciting for the same meeting or subject matter.

(d) Claims made prior to a meeting regarding the results of a solicitation.

Code of Federal Regulations
Title 17. Commodity and Securities Exchanges
Chapter II. Securities and Exchange Commission
Part 270. Rules and Regulations, Investment Company Act of 1940

### § 270.20a-1 Solicitation of proxies, consents and authorizations.

**(a)** No person shall solicit or permit the use of his or her name to solicit any proxy, consent, or authorization with respect to any security issued by a registered Fund, except upon compliance with Regulation 14A (§ 240.14a-1 of this chapter), Schedule 14A (§ 240.14a-101 of this chapter), and all other rules and regulations adopted pursuant to Section 14(a) of the Securities Exchange Act of 1934 that would be applicable to such solicitation if it were made in respect of a security registered pursuant to Section 12 of the Securities Exchange Act of 1934.  Unless the solicitation is made in respect of a security registered on a national securities exchange, none of the soliciting material need be filed with such exchange.

**(b)** If the solicitation is made by or on behalf of the management of the investment company, then the investment adviser or any prospective investment adviser and any affiliated person thereof as to whom information is required in the solicitation shall upon request of the investment company promptly transmit to the investment company all information necessary to enable the management of such company to comply with the rules and regulations applicable to such solicitation.  If the solicitation is made by any person other than the management of the investment company, on behalf of and with the consent of the investment adviser or prospective investment adviser, then the investment adviser or prospective investment adviser and any affiliated person thereof as to whom information is required in the solicitation shall upon request of the person making the solicitation promptly transmit to such person all information necessary to enable such person to comply with the rules and regulations applicable to the solicitation.

**Instruction.**  Registrants that have made a public offering of securities and that hold security holder votes for which proxies, consents, or authorizations are not being solicited pursuant to the requirements of this section should refer to section 14(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78n(c)) and the information statement requirements set forth in the rules thereunder.

MASSACHUSETTS GENERAL LAWS ANNOTATED
PART I. ADMINISTRATION OF THE GOVERNMENT (CH. 1-182)
TITLE XXII. CORPORATIONS (CH. 155-182)
CHAPTER 156D. BUSINESS CORPORATIONS
PART 7
SUBDIVISION D. DERIVATIVE PROCEEDINGS

### § 7.41. Standing

A shareholder may not commence or maintain a derivative proceeding unless the shareholder:

**(1)** was a shareholder of the corporation at the time of the act or omission complained of or became a shareholder through transfer by operation of law from one who was a shareholder at that time;  and

**(2)** fairly and adequately represents the interests of the corporation in enforcing the right of the corporation.

MASSACHUSETTS GENERAL LAWS ANNOTATED
PART I. ADMINISTRATION OF THE GOVERNMENT (CH. 1-182)
TITLE XXII. CORPORATIONS (CH. 155-182)
CHAPTER 156D. BUSINESS CORPORATIONS
PART 7
SUBDIVISION D. DERIVATIVE PROCEEDINGS

**§ 7.42. Demand**

No shareholder may commence a derivative proceeding until:

**(1)** a written demand has been made upon the corporation to take suitable action;  and

**(2)** 90 days have elapsed from the date the demand was made, or, if the decision whether to reject such demand has been duly submitted to a vote of the shareholders, not including the holders of those shares referred to in section 7.44(b)(3), within 60 days from the date when demand was made, 120 days have elapsed from the date the demand was made, unless in either case the shareholder has earlier been notified that the demand has been rejected by the corporation or irreparable injury to the corporation would result by waiting for the expiration of such 90-day or 120-day period.

MASSACHUSETTS GENERAL LAWS ANNOTATED
PART I. ADMINISTRATION OF THE GOVERNMENT (CH. 1-182)
TITLE XXII. CORPORATIONS (CH. 155-182)
CHAPTER 156D. BUSINESS CORPORATIONS
PART 7
SUBDIVISION D. DERIVATIVE PROCEEDINGS

## § 7.43. Stay of proceedings

If the corporation commences an inquiry into the allegations made in the demand or complaint, the court may stay any derivative proceeding for a period as the court considers appropriate.

MASSACHUSETTS GENERAL LAWS ANNOTATED
PART I. ADMINISTRATION OF THE GOVERNMENT (CH. 1-182)
TITLE XXII. CORPORATIONS (CH. 155-182)
CHAPTER 156D. BUSINESS CORPORATIONS
PART 7
SUBDIVISION D. DERIVATIVE PROCEEDINGS

### § 7.44. Dismissal

**(a)** A derivative proceeding commenced after rejection of a demand shall be dismissed by the court on motion by the corporation if the court finds that either:  (1) 1 of the groups specified in subsections (b)(1) or (f) has determined in good faith after conducting a reasonable inquiry upon which its conclusions are based that the maintenance of the derivative proceeding is not in the best interests of the corporation;  or (2) shareholders specified in subsection (b)(3) have determined that the maintenance of the derivative proceeding is not in the best interests of the corporation.

**(b)** Unless a panel is appointed pursuant to subsection (f), the determination in subsection (a) shall be made by:

> **(1)** a majority vote of independent directors present at a meeting of the board of directors if the independent directors constitute a quorum;

> **(2)** a majority vote of a committee consisting of 2 or more independent directors appointed by majority vote of independent directors present at a meeting of the board of directors, whether or not the independent directors constituted a quorum;  or

> **(3)** the vote of the holders of a majority of the outstanding shares entitled to vote, not including shares owned by or voted under the control of a shareholder or related person who has or had a beneficial financial interest in the act or omission complained of or other interest therein that would reasonably be expected to exert an influence on that shareholder's or related person's judgment if called upon to vote in the determination.

**(c)** None of the following shall by itself cause a director to be considered not independent for the purposes of this section:

> **(1)** the nomination or election of the director by a person who is a defendant in the derivative proceeding or against whom action is demanded;

> **(2)** the naming of the director as a defendant in the derivative proceeding or as a person against whom action is demanded;  or

> **(3)** the approval by the director of the act being challenged in the derivative proceeding or demand if the act resulted in no personal benefit to the director.

**(d)** If the corporation moves to dismiss the derivative suit, it shall make a written filing with the court setting forth facts to show (1) whether a majority of the board of directors was independent at the time of the determination by the independent directors and (2) that the independent directors made the determination in good faith after conducting a reasonable inquiry upon which their conclusions are based.  Unless otherwise required by subsection (a), the court shall dismiss the suit unless the plaintiff has alleged with particularity facts rebutting the corporation's filing in its complaint or an amended complaint or in a written filing with the court.  All discovery proceedings shall be stayed upon the filing by the corporation of the motion to dismiss and the filing required by this subsection until the notice of entry of the order ruling on the motion;  but the court, on motion and after a hearing and for good cause shown, may order that specified discovery be conducted.

**(e)** If a majority of the board of directors does not consist of independent directors at the time the determination by independent directors is made, the corporation shall have the burden of proving that the requirements of subsection (a) have been met.  If a majority of the board of directors consists of independent directors at the time the determination is made or if the determination is made by shareholders pursuant to clause (3) of subsection (b) or is made pursuant to subsection (f), the plaintiff shall have the burden of proving that the requirements of subsection (a) have not been met.

**(f)** The court may appoint a panel of 1 or more independent persons upon motion by the corporation to make a determination whether the maintenance of the derivative proceeding is in the best interests of the corporation.  In such case, the plaintiff shall have the burden of proving that the requirements of subsection (a) have not been met.

MASSACHUSETTS GENERAL LAWS ANNOTATED
PART I. ADMINISTRATION OF THE GOVERNMENT (CH. 1-182)
TITLE XXII. CORPORATIONS (CH. 155-182)
CHAPTER 182. VOLUNTARY ASSOCIATIONS AND CERTAIN TRUSTS

**§ 2B. Investment company trust;  trustee**

This section shall apply to a trust that is an investment company, as defined in the Investment Company Act of 1940, and that is registered thereunder with the United States Securities and Exchange Commission.

A trustee of a trust who with respect to the trust is not an interested person, as defined in said Investment Company Act of 1940, shall be deemed to be independent and disinterested when making any determination or taking any action as a trustee.