UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOHN HALEBIAN, individually and     :
on behalf of all other similarly     :
situated trust beneficiaries     :     **No. 06-cv-4099 (NRB)**
and derivatively on behalf of     :     **ECF CASE**
CITIFUNDS TRUST III,     :
     :
     Plaintiff,     :
     :
     -against-     :
     :
ELLIOT J. BERV, DONALD M. CARLTON,     :
A. BENTON COCANOUGHER, MARK T.     :
FINN, STEPHEN RANDOLPH GROSS,     :
DIANA R. HARRINGTON, SUSAN B.     :
KERLEY, ALAN G. MERTEN, and     :
R. RICHARDSON PETTIT,     :
     :
     Defendants,     :
     :
     -and-     :
     :
CITIFUNDS TRUST III,     :
     :
     Nominal Defendant.     :
-------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

Wechsler Harwood LLP
Joel C. Feffer
Daniella Quitt
James G. Flynn
488 Madison Avenue, 8th Floor
New York, New York 10022
Telephone:  (212) 935-7400
Facsimile:  (212) 753-3630

Attorneys for Plaintiff

*Filed Electronically*

# Table of Contents

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Demand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.    Defendants' Reliance On The Committee's Report Is Improper . . . . . . . . . . . . . 9

        A.    The Report Is Too Little, Too Late . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.    Defendants' Attack On The Derivative Claim Is
              A Motion For Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    II.    Claims II And III Are Direct, Not Derivative, In Nature . . . . . . . . . . . . . . . . . . 18

        A.    Interference with Voting Rights Is A Direct,
              Not Derivative, Claim Under Massachusetts Law . . . . . . . . . . . . . . . . . 18

        B.    Any Provision In The Trust Agreement Purporting
              To Allow  "Echo Voting" For Approval Of
              Advisory Agreements Is Contrary To Established Law . . . . . . . . . . . . . 24

        C.    The Complaint Satisfies All Pleading Requirements . . . . . . . . . . . . . . . 25

    III.    There Is A Private Right Of Action For A Misleading Proxy Statement . . . . . . 26

    IV.    Plaintiff Has Standing To Assert Claims On Behalf Of
          All Holders Of Beneficial Interests In CitiTrust . . . . . . . . . . . . . . . . . . . . . . . . 28

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## Table of Authorities

**Cases**                                                                                          **Page**

Abramowitz v. Posner,
     672 F.2d 1025 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Ash v. LFE Corp.,
     525 F.2d 215 (3d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bessette v. Bessette,
     434 N.E.2d 206 (Mass. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Blasberg v. Oxbow Power Corp.,
     934 F. Supp. 21 (D. Mass. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cohen v. Beneficial Indus. Loan Corp.,
     337 U.S. 541 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Comstock v. Dewey,
     83 N.E.2d 257 (Mass. 1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Cortec Indus., Inc. v. Sum Holding L.P.,
     949 F.2d 42 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

Crown Crafts, Inc. v. Aldrich,
     148 F.R.D. 547 (E.D.N.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Espinola v. Club Liberdade, Inc.,
     97 N.E.2d 202 (Mass. 1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Everett v. Bozic,
     No. 5 Civ. 00266 (DAB),
     2006 WL 2291083 (S.D.N.Y. Aug. 3, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fagin v. Gilmartin,
     432 F.3d 276 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Forsythe v. SunLife Fin., Inc.,
     417 F. Supp. 2d 100 (D. Mass. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19, 22,
                                                  28, 29

Freedman v. Barrow,
    427 F. Supp. 1129 (S.D.N.Y. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Galef v. Alexander,
    615 F.2d 51 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,
    528 F. Supp. 1038 (S.D.N.Y. 1981),
    aff'd, 694 F.2d 923 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Gerstle v. Gamble-Skogmo, Inc.,
    478 F.2d 1281 (2d Cir.1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Harhen v. Brown,
    431 Mass. 838, 730 N.E.2d 859 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Hasan v. CleveTrust Realty Investors,
    729 F.2d 372 (6th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

In re Consumers Power Co. Deriv. Litig.,
    132 F.R.D. 455 (E.D. Mich. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Dreyfus Aggressive Growth Mut. Fund Litig.,
    No. 98 CIV. 4318 (HB), 2000 WL 1357509
    (S.D.N.Y. Sept. 20, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

In re Eaton Vance Mut. Funds Fee Litig.,
    380 F. Supp. 2d 222 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

In re Goldman Sachs Mut. Funds Fee Litig.,
    No. 04 Civ. 2567(NRB),
    2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23, 27

In re Oracle Corp. Deriv. Litig.,
    824 A.2d 917 (Del. Ch. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

In re Salomon Smith Barney Mut. Fund Fees Litig.,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Jessie v. Boynton,
    361 N.E.2d 1267 (Mass. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Joy v. North,
    692 F.2d 880 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13, 14, 15

Kamen v. Kemper Fin. Serv., Inc.,
    500 U.S. 90 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 22, 27

Kaplan v. Wyatt,
    499 A.2d 1184 (Del. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Katz v. Pels,
    774 F. Supp. 121 (S.D.N.Y.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Klein ex rel. Klein v. FPL Group, Inc.,
    No. 02-20170-CIV,
    2003 WL 22768424 (S.D. Fla. Sept. 6, 2003) . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 16

Lapidus v. Hecht,
    232 F.3d 679 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Levner v. Al Saud,
    903 F. Supp. 452 (S.D.N.Y. 1994),
    aff'd, 61 F.3d 8 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Lewis v. Fuqua,
    502 A.2d 962 (Del. Ch. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Lichtenberg v. Besicorp Group, Inc.,
    43 F. Supp. 2d 376 (S.D.N.Y.1999),
    appeal dismissed, 204 F.3d 397 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Mozes ex rel. Gen'l Elec. Co. v. Welch,
    638 F. Supp. 215 (D. Conn. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Peller v. Southern Co.,
    No. 1:86-CV-975-RCF,
    1988 WL 90840 (N.D. Ga. Mar. 25, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

RCM Sec. Fund, Inc. v. Stanton,
    928 F.2d 1318 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Recchion ex rel. Westinghouse Elec. Corp. v. Kirby,
    637 F. Supp. 1309 (W.D. Pa. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

Rombach v. Chang,
    355 F.3d 164 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Rosenfeld v. Black,
    445 F.2d 1337 (2d Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Rosengarten v. Buckley,
    613 F. Supp. 1493 (D. Md. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

Sarin v. Ochsner,
    721 N.E.2d 932 (Mass. App. Ct. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Stegall v. Ladner,
    394 F. Supp. 2d 358 (D. Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 22, 28

Stoner v. Walsh,
    772 F. Supp. 790 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Strougo ex rel. Brazil Fund, Inc. v. Padegs,
    1 F. Supp. 2d 276 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15

Zapata Corp. v. Maldonado,
    430 A.2d 779 (Del. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 15

Zitin v. Turley,
    No. CIV 89-2061-PHX-CAM,
    1991 WL 283814 (D. Ariz. June 20, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 16

**Statutes & Regulations**

Federal Rules of Civil Procedure

    Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    Fed. R. Civ. P. 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

Investment Company Act of 1940

    Section 2(a), 15 U.S.C. § 80a-2(a)(42) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    Section 15a(a), 15 U.S.C. § 80a-15a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

Section 15(f), 15 U.S.C. § 80a-15(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Section 20(a), 15 U.S.C. § 80a-20(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 18, 25, 26, 27

Section 34(b), 15 U.S.C. § 80a-33(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Section 35(b), 15 U.S.C. § 80a-34(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Section 36(a), 15 U.S.C. § 80a-35(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Section 36(b), 15 U.S.C. § 80a-35(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Section 48(a), 15 U.S.C. § 80a-47(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Massachusetts General Laws, ch 156D

§ 7.41(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

§ 7.42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

§ 7.42(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

§ 7.43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

§ 7.44(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

§ 7.44(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

Securities Exchange Act of 1934

Section 14(a), 15 U.S.C. § 78n(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 25

SEC Rule 14a (b), 17 C.F.R. § 240.14a (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 25, 27

SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 25, 27

SEC Rule 20a-1, 17 C.F.R. § 270.20a-1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 27

**Miscellaneous**

Coffee & Schwartz,
>    The Survival of The Derivative Suit:
>    An Evaluation and a Proposal for Legislative Reform,
>    81 Columbia L. Rev. 261, 283 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

G.W. Dent, Jr.,
>    The Power of Directors to Terminate
>    Shareholder Litigation: The Death of the Derivative Suit?,
>    75 Nw. U.L. Rev. 96 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V. Brudney,
>    The Independent Director -
>    Heavenly City or Potemkin Village,
>    95 Harv. L. Rev. 597 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Comm. on Energy & Commerce U.S. House of Representatives,
>    SEC No-Action Letter, 1993 WL 199080 (June 2, 1993) . . . . . . . . . . . . . . . . . . . . . . . 23

Investment Company Mergers,
>    Investment Company Act Release No. 25666,
>     67 F.R. 48512-01, 2002 WL 1614825 (July 24, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 24

Note, Discovery in Federal Demand-Refused Derivative Litigation,
>    105 Harv. L. Rev. 1025, 1028 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

The First National Bank of Chicago,
>    SEC No-Action Letter, 1992 WL 277733 (Sept. 22, 1992) . . . . . . . . . . . . . . . . . . . . . . . 23

**Preliminary Statement**

> *Our investigation found no authority for the proposition that the 1940 Act or Massachusetts law forbids the use of echo voting by a record holder of shares as part of a fund shareholder vote to approve an investment advisor contract. . . . The U.S. Securities and Exchange Commission . . . and the New York Stock Exchange . . . have both recognized the utility of echo voting in analogous situations.*

> *The available facts also suggest that the Trust's counsel, in cooperation with Citigroup's counsel, thoroughly reviewed the issue, and consulted with the SEC concerning the description of the service agent voting procedures before filing the definitive proxy statement and received no comments or objections from the Agency respecting the proposed disclosures.*

Report of the Demand Review Committee at 15.

> *Ms. Kerly asked if the Securities and Exchange Commission (the "SEC") had reached a conclusion as to whether the Legg Transaction was a non-routine event from a proxy-voting standpoint. Mr. Gerken responded that the SEC and the New York Stock Exchange had both ruled that the Legg Transaction was a "non-routine event," and as such, brokers would not be able to cast shareholder votes (for or against the proposed transaction) on behalf of clients who fail to provide voting instructions.*

Excerpt from September 2, 2005 Board of Trustees' Meeting Minutes, Exhibit 38 to the above

Report.  Both members of the Demand Review Committee participated in this meeting.

> *The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the [SEC] shall not be deemed a finding by the [SEC] that such material is accurate or complete or not false or misleading, or that the [SEC] has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders.  No representation contrary to the foregoing shall be made.*

SEC Rule 14a-9(b), 17 C.F.R. § 240.14a-9(b)

*   *   *

In response to plaintiff's 21-page, 65-numbered paragraph complaint, defendants presented this Court with a "motion to dismiss" weighing 18 pounds, 6 ounces, and standing 8 inches tall. According to defendants, all this Court has to do is sign their form of order. The sheer volume of paper is somehow intended to persuade this Court that there is no need for discovery. After all, defendants already went to the trouble of investigating and exonerating themselves. The three quotations above, however, should be enough to reveal the travesty defendants are seeking to foist upon this Court.

Defendants apparently not only view the judicial branch of the government as superfluous, but regulatory authorities as well. Faced with investors who had the temerity to ignore their exhortation to provide voting instructions, defendants simply voted those interests on their behalf. As shown above, defendants afforded the SEC and New York Stock Exchange ("NYSE") the opportunity to endorse defendants' position that they could vote investors' shares. However, when the SEC and NYSE disagreed with defendants, they ignored them both and voted the shares anyway.

Defendants' Kafkaesque view of the law should be rejected and the pending motion either treated as a motion for summary judgment and denied as premature or adjourned pending discovery, or if treated as a motion to dismiss, denied.

## Background

**The Complaint**

The complaint asserts three claims. The first is a derivative claim for breach of fiduciary duty (Claim I). The next two are direct claims -- one for breach of Federal proxy rules (Claim II) and the other, a related claim for breach of the fiduciary duty of full and fair disclosure (Claim III). Plaintiff, a New York citizen, is the owner of shares of beneficial interest in one of the series of CitiFunds

Trust III ("CitiTrust").  Complaint, ¶ 7.  CitiTrust, a Massachusetts business trust headquartered in Maryland, is only a nominal defendant.  Complaint, ¶¶ 8, 9.  The individual defendants, none of whom is a New York citizen, are CitiTrust's trustees.  Complaint, ¶¶ 10-19.

The allegations of the complaint arise out of the 2005 sale by Citigroup Inc. ("Citigroup") of substantially all of its asset management business, including CitiTrust's investment adviser, to Legg Mason, Inc. ("Legg Mason").  Complaint, ¶ 1.  The crux of the derivative claim (Claim I) is that Citigroup and Legg Mason each engaged in a highly profitable transaction without considering any benefit to the CitiTrust beneficiaries.  As set forth in the complaint, while on the one hand, "[a]s a result of such transaction, Citigroup booked income in excess of $3.4 billion and Legg Mason booked income of approximately $1.1 billion," on the other hand "[t]he plaintiff and other CitiTrust beneficiaries received no benefit, notwithstanding that the transaction could not proceed without the approval of CitiTrust's Board of Trustees" (i.e., the defendants).  Id.  See also Complaint, ¶ 32.  Specifically, the complaint alleges that the Proxy Statement reveals that defendants elevated the interests of Citigroup over those of CitiTrust thereby breaching the fiduciary duties they owed to CitiTrust and its beneficiaries.  Complaint, ¶ 35.[1]  For example, defendants failed to avail themselves of the opportunity to negotiate lower fees or seek competing bids from other qualified investment

---

[1]     Under the Investment Company Act of 1940, as amended (the "ICA"), the sale of an investment adviser is deemed an assignment of its advisory agreement with a regulated investment company (such as CitiTrust) which triggers the automatic termination of the advisory agreement.  Complaint, ¶ 33.  Thus, in addition to board of trustee approval for a new advisory agreement effective in connection with the sale of the adviser to Legg Mason, the ICA also requires the approval of the holders of beneficial interests.  Complaint, ¶ 34.  The Proxy Statement, which is dated September 2, 2005, was filed with the SEC and mailed to beneficial holders on or about the same day, was necessary in order to solicit beneficial holder approval of the new advisory agreement.  A copy of the Proxy Statement is annexed to the Declaration of Mark T. Finn in Support of Defendants' Motion to Dismiss Complaint (the "Moving Decl."), as Exhibit D.  The Board Consideration section is found at pages 15 through 18 of the Proxy Statement.

advisers. Defendants' sole focus, as is abundantly evident from the "Board Considerations" section

of the Proxy Statement, was to facilitate consummation of the Citigroup/Legg Mason transaction by

limiting their consideration to compliance with ICA Section 15(f) to the exclusion of all else,

including defendants' fiduciary obligations to CitiTrust and CitiTrust's beneficiaries. Id.[2]  The

complaint then relies entirely upon defendants' extensive description of their consideration of the

transaction in the Proxy Statement (see, e.g., Complaint, ¶¶ 37-44) to support the following

allegation:

> Defendants limited their consideration to whether the
> Citigroup/Legg Mason transaction would be worse for CitiTrust's
> beneficiaries than their current situation under Citigroup's asset
> managers, i.e., whether the transaction was consistent with
> Section 15(f) of the ICA, 15 U.S.C. § 80a-15(f).  Defendants made no
> effort to investigate whether a transaction could be fashioned which
> would benefit CitiTrust's beneficiaries, either with Legg Mason or
> another asset manager.

Complaint, ¶ 36.  Among the specific reasons for the above allegation are (1) the short time frame

during which defendants "deliberated" and the few actual meetings they held (Complaint, ¶¶ 37, 39-

40), (2) that defendants permitted Citigroup and Legg Mason to delay providing them information

until the time and place of their few meetings thereby insuring that defendants had inadequate time

to consider the new information (Complaint, ¶ 38), (3) no adjustments were made to the advisory

fee schedules despite the defendants' acknowledgment of "possible economies of scale" (Complaint,

¶ 41), (4) defendants muddled the interests of Citigroup and Legg Mason with those of CitiTrust and

---

[2]        Congress adopted Section 15(f) in 1975 in order to reverse Rosenfeld v. Black, 445
F.2d 1337 (2d Cir. 1971).  Rosenfeld held that an investment adviser could not profit from the sale
of its fiduciary position.  Section 15(f) is a safe harbor which permits an investment adviser to sell
its position provided that certain conditions are met.  CitiTrust's investment adviser is not a
defendant in this action and Section 15(f) is not a defense to any of the allegations of the complaint
herein.

its beneficiaries (Complaint, ¶ 42), and (5) defendants permitted Legg Mason to shift part of its normal overhead to CitiTrust by allowing it to use CitiTrust assets in the form of paying higher-than-necessary brokerage expenses in order to purchase "research," a practice known as "soft dollars." Complaint, ¶¶ 43, 44.

The soft dollar issue is especially egregious, as one ought not to need "research" in order to operate a money market fund such as CitiTrust. Particularly disturbing is that the language of the new advisory agreement gives Legg Mason the right to use CitiTrust assets to benefit Legg Mason clients other than CitiTrust. It is especially noteworthy that while defendants were lavishing this soft dollar bonanza on Legg Mason, major mutual fund operators, such as Vanguard and Fidelity, the two largest in the United States, refused to engage in any soft dollar practices because of the obvious conflict of interest.

In addition to the derivative claim for breach of fiduciary duty outlined above, the complaint contains two direct causes of action based on the Proxy Statement's description of voting procedures employed by defendants. Complaint, ¶¶ 45-47. The Proxy Statement and follow-up correspondence to beneficial holders stated that if beneficial holders refused or failed to provide voting instructions to the Citigroup affiliate that held record title to such beneficial interests, the affiliate would vote their interests nevertheless in the same proportion as the vote of beneficial holders who did provide voting instructions (defendants describe this as "echo voting"). The complaint alleges that in making such statements, defendants materially misrepresented their authority as such voting procedure is unlawful under both Federal and Massachusetts law. Because of this material misrepresentation, plaintiff and CitiTrust's other beneficial holders were denied the right to cast an informed vote under

both Federal proxy rules (Claim II) and state fiduciary duty requirements of full and fair disclosure (Claim III).

The relief sought includes both equitable relief and compensatory damages.  Complaint, ¶¶ A, B, and C.

**The Demand**

CitiTrust is a Massachusetts business trust.  Complaint, ¶ 8.  Massachusetts is a "universal demand" state.  Accordingly, plaintiff made demand by letter dated February 8, 2006.  Moving Decl., Exhibit E; Complaint, ¶ 48.  By letter dated February 28, 2006, CitiTrust's counsel acknowledged receipt of plaintiff's demand letter and advised plaintiff "that the laws of  .  .  . Massachusetts prohibit a shareholder from commencing a derivative action before 90 days have passed from the date demand was made," citing Mass. Gen. Laws ch. 156D, § 7.42.  Complaint, ¶ 49.  A copy of this letter is annexed to the Declaration of Daniella Quitt in Opposition to the Motion to Dismiss ("Opposing Decl.") as Exhibit A.

By letter dated April 10, 2006, plaintiff was advised of the creation of a "Demand Review Committee" (the "Committee"), the retention of its counsel, and that he was requested to provide the Committee "with any additional information or support . . . for the assertions contained in [his demand] letter."  Moving Decl., Exhibit F.  By letter dated April 20, 2006, plaintiff responded asking (i) for the identity of the Committee members, (ii)  a description of the Committee's mandate and powers, and (iii) as the complaint's derivative claim is based solely on defendants' description of their activities set forth in the Proxy Statement, "[w]hat type of 'additional information or support' does the Committee believe could be either relevant or in [plaintiff's counsel's] possession?"  Id., Exhibit G.  By letter dated April 28, 2006, the Committee's counsel provided the information

concerning the Committee's members' identity (two of the defendants), the Committee's mandate

and powers, and while again asking plaintiff for "additional information or support," continued to

ignore plaintiff's request that, as all of plaintiff's information comes from the Proxy Statement, the

Committee apprise him of "[w]hat type of 'additional information or support' does the Committee

believe could be either relevant or in [plaintiff's counsel's] possession?" Id., Exhibit H; Complaint,

¶ 50.  Plaintiff's counsel responded to the foregoing letter by letter dated May 3, 2006 which, after

summarizing the previous correspondence, concluded with the following:

> I note that [the two defendant committee members] have been board
> members since the 1980s.  Presumably, they attended the board
> meetings and engaged in the other activities attributed to the board in
> their own September 2, 2005 proxy statement.  As such, they must be
> intimately familiar with the facts so that no "investigation" should be
> necessary and the [Committee] should promptly come to a result.  I
> do not know what I can add.  I can only repeat what I wrote in my
> April 20, 2006 letter: what type of "additional information or
> support" does the [Committee] believe could be either relevant or in
> my possession?

Opposing Decl., Exhibit B.  Defendants responded by letter dated May 9, 2006, which ignored

plaintiff's request for clarification.  Moving Decl., Exhibit I.

Plaintiff, (a) being informed that defendants appointed the Committee which consisted of

only two of the defendants to "investigate" their own inaction,[3] (b) believing that the Committee's

repeated requests for "additional information" were nothing other then posturing and thus,

---

[3]     The choice of Committee members is odd as it is unusual to place defendants in the
awkward position of investigating themselves.  The members of these committees are "usually
newly-elected directors who are not defendants . . . ." Joy v. North, 692 F.2d 880, 888 (2d Cir.
1982).  Under Mass. Gen. Laws ch. 156D, § 7.44(f), defendants could have directed CitiTrust to ask
this Court to "appoint a panel of 1 or more independent persons . . . to make a determination whether
the maintenance of the derivative proceeding is in the best interests of the corporation."  Defendants
could have but they did not.  They preferred to investigate themselves.

inconsistent with the conduct of an independent, good faith investigation, (c) knowing that defendants pointedly failed to provide plaintiff with any time frame for the completion of their "investigation," and (d) after waiting substantially longer than the statutory 90-day period, commenced this action on May 30, 2006.  Complaint, ¶ 51.

## Summary of Argument

The report (the "Report") of the Committee should not be considered because it was issued substantially beyond the 90-day period permitted by Massachusetts law.  Defendants have failed to offer any excuse for this tardiness, nor could they, as the two members of the Committee were both trustees at the relevant time and should already have been intimately familiar with the 47-day transaction under review.  If this Court considers the Report and the other extraneous material accompanying defendants' motion, then the motion should be treated as a motion for summary judgment and plaintiff afforded an opportunity for discovery.

Under Massachusetts law, interference with an investor's voting rights gives rise to direct, not derivative, claims.  The voting procedures employed by defendants violated applicable SEC and NYSE rules.  Defendants concealed this material information from CitiTrust's beneficiaries. Inexplicably, as detailed below, the Committee had personal knowledge of this matter as they participated in a board meeting at which all trustees were advised of the SEC's and NYSE's position prior to the filing and dissemination of the Proxy Statement.

ICA Section 20(a), and Rule 20a-1 adopted by the SEC thereunder, makes Section 14(a) of the Securities Exchange Act of 1934, as amended, applicable to registered investment companies such as CitiTrust.  For defendants to prevail on their claim that there is no private right of action under ICA Section 20(a) they would have to establish that (i) the SEC did not properly adopt

Rule 20a-1, or (ii) there is no private right of action under Rule 14a-9.  Defendants do not make either argument.

Plaintiff has standing to assert these claims on behalf of each series of CitiTrust because the claims are not specific to each series.  They arise under the same Proxy Statement for each series and the same course of conduct directed to each series.

**Argument**

**I.      Defendants' Reliance On The Committee's Report Is Improper**

**A.      The Report Is Too Little, Too Late**

Defendants view this as a "demand refused" case.  See, e.g., Memorandum in Support of Defendants' Motion to Dismiss Complaint ("Defts' Memo") at 12 ("an independent board's decision to refuse a plaintiff's demand is insulated from review").  Defendants are relying on Mass. Gen. Laws ch. 156D, § 7.44(a) (id.) which applies only to "[a] derivative proceeding commenced after rejection of a demand . . . ."  (Emphasis added.)  This action was not commenced after rejection of plaintiff's demand.  It was commenced after defendants failed to respond within the 90-day period set forth in Mass. Gen. Laws ch. 156D, § 7.42(2) for corporations to respond to demands.  See Complaint, ¶ 51.

If defendants believed that the presumptive 90-day period was insufficient, they should have applied for a judicial stay pursuant to Mass. Gen. Laws ch. 156D, § 7.43 ("If the corporation commences an inquiry into the allegations made in the demand or complaint, the court may stay any derivative proceeding for a period as the court considers appropriate.").  Remarkably, in light of CitiTrust's letter to plaintiff explicitly noting the 90-day period "prohibit[ing] a shareholder from commencing a derivative action" (Opposing Decl., Exhibit A), the Committee neither provided

9

plaintiff with a time frame for the completion of its investigation nor requested plaintiff not to file a complaint. Defendants did not move for a section 7.43 stay nor could they have received such a stay even had they moved as the statutory 90-day period was clearly more than sufficient.

In Recchion ex rel. Westinghouse Elec. Corp. v. Kirby, 637 F. Supp. 1309, 1319 (W.D. Pa. 1986), a case cited by defendants, the court, surveying relevant authorities, held as follows: "There is no precise rule as to how much time a board must be given to respond to a demand. . . . Generally, the amount of time needed for a response will vary depending upon the complexity of the issues raised." Here, the facts demonstrate that the statutory presumptive 90-day period was more than adequate.

The derivative claim is very simple. Defendants are alleged to have ignored the interests of CitiTrust and its beneficiaries during the Citigroup/Legg Mason transaction. The two members of the Committee were trustees at all relevant times and, thus, should have needed no time to "get up to speed." According to defendants, the Citigroup/Legg Mason transaction was first disclosed to them, by telephone, on June 21, 2005, and they approved the transaction and new advisory agreements on August 7, 2005, or 47 days later. Moving Decl., Exhibit K at 44 and 56.

One would think that 90 days ought to be more than sufficient to review a transaction that took only 47 days, especially if the ones entrusted with the review were already intimately familiar with the transaction. Instead, according to defendants, the "review" lasted from CitiTrust's receipt of the demand on February 16, 2006 to June 29, 2006, the date of the Committee's Report, or 133 days. The Committee was supposed to review the allegations in the demand, not review the Citigroup/Legg Mason transaction de novo. That the Committee took almost three times longer to complete its review of plaintiff's demand than it originally took defendants to approve the

10

Citigroup/Legg Mason transaction is potent evidence that the defendants were asleep at the switch when they initially considered the Citigroup/Legg Mason transaction.

**B.    Defendants' Attack On The Derivative Claim
Is A Motion For Summary Judgment**

Assuming, arguendo, that defendants can establish that the statutory presumptive 90-day review period was insufficient and the Court is willing to consider defendants' proffer of the Committee's Report, defendants' attack on the derivative claim is actually a motion for summary judgment, not a motion to dismiss, and should be denied as premature or adjourned pending discovery.

Defendants are relying on the Committee's Report to establish that they "determined in good faith after conducting a reasonable inquiry" that this action should be terminated.  Defts' Memo at 12 (relying on the language of Mass. Gen. Laws ch. 156D, § 7.44).  According to defendants, the voluminous "materials [they submitted with their motion to dismiss] establish (i) that a majority of the Board was independent when it rejected Plaintiff's demand and (ii) that the Independent Trustees rejected the demand in good faith after reasonable inquiry."  Id. at 13-14.  The problem with defendants' position is that they fail to see the absurdity of their simultaneously acting as defendants, judge, and jury.

Defendants have not cited any authority for the proposition that this Court can consider their submission without first affording plaintiff discovery.  The authority is all to the contrary.  Fed. R. Civ. P. 12(b) provides, in part, with respect to a Rule 12(b) motion, that if:

> matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given

> reasonable opportunity to present all material made pertinent to such
> a motion by Rule 56.

Among other reasons, discovery is necessary to address the "danger of allowing the board of directors to appoint a few 'good ol' boys' as a special litigation committee" and have legitimate claims "whitewashed" through the "relative ease" of constructing a "record of apparently diligent investigation." Rosengarten v. Buckley, 613 F. Supp. 1493, 1499 (D. Md. 1985); see also Zapata Corp. v. Maldonado, 430 A.2d 779, 788 (Del. 1981) ("the moving party should be prepared to meet the normal burden under Rule 56"); Lewis v. Fuqua, 502 A.2d 962, 971 (Del. Ch. 1985)("Even if the conclusions and recommendations of the Special Litigation Committee had a reasonable basis, this suit should still not be dismissed at this preliminary stage of the proceedings before the plaintiffs have had an opportunity to conduct discovery.").

As recently confirmed by the Third Circuit in Fagin v. Gilmartin, 432 F.3d 276, 285 n.2 (3d Cir. 2005), the issue of discovery in connection with a demand refusal procedure is a procedural matter and, therefore, "federal law applies here." Federal courts often apply the standards set forth in Zapata in determining the scope of discovery into a special committee's investigation.[4] Under Zapata, the first step is whether the corporation has satisfied its burden of establishing that the committee is independent, acted in good faith, and had reasonable bases for its conclusion. 430 A.2d

---

[4]       The Second Circuit granted the plaintiffs an opportunity to obtain limited discovery in Galef v. Alexander, 615 F.2d 51, 56 (2d Cir. 1980). Other Federal courts determining the wrongful refusal claim also allowed plaintiffs to obtain relevant discovery. See Fagin, 432 F.3d at 285 n.2 (pointing out that discovery was in order "in the factual context of this case"); In re Consumers Power Co. Deriv. Litig., 132 F.R.D. 455, 462 (E.D. Mich. 1990) (emphasizing "this Court's inherent power to allow limited discovery on the independence, good faith, and procedural adequacy of the Consumers Advisory Committee"). See also Note, Discovery in Federal Demand-Refused Derivative Litigation, 105 Harv. L. Rev. 1025, 1028 (1992) (suggesting that Federal courts should grant plaintiffs limited discovery on relevant issues).

at 788-89.  If so, the court, applying its own business judgment, must then determine whether the motion should be granted.  Id. at 789.  The second part of the inquiry is "intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest."  Id.

Federal courts routinely permit discovery when defendants seek to terminate a derivative action based on the recommendation of a special committee.  In Strougo ex rel. Brazil Fund, Inc. v. Padegs, 1 F. Supp. 2d 276, 282 (S.D.N.Y. 1998), for example, on a motion to dismiss or in the alternative for summary judgment based on a special committee report, Judge Sweet adjourned the special committee's motion to permit discovery into the special committee's activities.  Similarly, in Rosengarten, the court endorsed the Delaware Supreme Court's sensitivity to the danger of "allowing the board of directors to appoint a few 'good ol boys' as a special committee and to be accordingly whitewashed pursuant to the majority rule."  613 F. Supp. at 1499.  Other Federal courts have also recognized the need for discovery into a special committee's independence, good faith, and investigation.  See Hasan v. CleveTrust Realty Investors, 729 F.2d 372, 379-80 (6th Cir. 1984); Joy v. North, 692 F.2d at 891 (applying Connecticut law).[5]

These decisions recognize that there is a strong potential for structural bias in special litigation committees.  In Joy v. North, the Second Circuit noted:  "The reality is . . .  that special litigation committees created to evaluate the merits of certain litigation are appointed by the

_____

[5]     Klein ex rel. Klein v. FPL Group, Inc., No. 02-20170-CIV, 2003 WL 22768424, at *7-8 (S.D. Fla. Sept. 6, 2003); Zitin v. Turley, No. CIV 89-2061-PHX-CAM,1991 WL 283814, at *2-4 (D. Ariz. June 20, 1991); Peller v. Southern Co., No. 1:86-CV-975-RCF, 1988 WL 90840, at *2 (N.D. Ga. Mar. 25, 1988).

defendants to that litigation.  It is not cynical to expect that such committees will tend to view derivative actions against the other directors with scepticism." Id. at 888.[6]

Similarly, here there is a very serious danger that the Committee consisting of two of the defendants would be inherently biased and fail to investigate plaintiff's allegations against them and their fellow trustees in good faith.  As noted earlier, Massachusetts law gave CitiTrust the right to ask this Court to "appoint a panel of 1 or more independent persons . . . to make a determination whether the maintenance of the derivative proceeding is in the best interests of the corporation." Mass. Gen. Laws ch. 156D, § 7.44(f).  Rather than doing so, defendants set up the Committee comprised of two of them.  Under the circumstances, it is not unreasonable to suspect that defendants have something to hide.  At the very least, the circumstances here make it extremely likely that the Committee would attempt to cover up their own and their fellow board members' wrongdoings.

Not surprisingly, discovery invariably focuses on the special committee's independence, good faith, and reasonableness in conducting an investigation and arriving at its conclusions.  In In re Oracle Corp. Deriv. Litig., 824 A.2d 917, 928-29 (Del. Ch. 2003), the Delaware Chancery Court elaborated on Zapata's standard by explaining that the court is required to "determine whether, on the basis of the undisputed factual record, [the court is] convinced that the [special litigation committee] was independent, acted in good faith, and had a reasonable basis for its recommendation."  In Joy v. North, the Second Circuit noted:  "This showing is to be based on the

---

        [6]     The inherent structural bias of special litigation committees is also noted by many other courts as well as commentators.  See Strougo, 1 F. Supp. 2d at 281; Rosengarten, 613 F. Supp. at 1499-1500; Hasan, 729 F.2d at 376; Brudney, V., The Independent Director – Heavenly City or Potemkin Village, 95 Harv. L. Rev. 597 (1982); Coffee & Schwartz, The Survival of The Derivative Suit:  An Evaluation and a Proposal for Legislative Reform, 81 Columbia L. Rev. 261, 283 (1981); G.W. Dent, Jr., The Power of Directors to Terminate Shareholder Litigation:  The Death of the Derivative Suit?, 75 Nw. U.L. Rev. 96 (1980).

14

underlying data developed in the course of discovery and of the committee's investigation and the committee's reasoning, not simply its naked conclusions." 692 F.2d at 892. The Second Circuit further emphasizes this point by stating that "if the special litigation committee recommends termination and a motion for judgment follows, the committee must disclose to the court and the parties not only its report but all underlying data." Id. at 893.[7]

Thus, it is well established that the court reviewing the determination of a special litigation committee to dismiss a shareholders' derivative cause of action typically orders limited discovery to facilitate its inquiry into "the independence and good faith of the committee and the bases supporting its conclusions." Zapata, 430 A.2d at 788. In Strougo, the plaintiff was given an opportunity to "(1) inspect the thirty boxes and any other documents made available to the [special litigation committee], (2) inspect the notes of interviews and drafts of the Report; and (3) depose the members of the [special litigation committee]." 1 F. Supp. 2d at 282. In Joy v. North, 692 F.2d at 893-94, the Second Circuit also endorsed a broad approach to discovery. Likewise in Oracle Corp.:

> The plaintiffs were granted discovery focusing on three primary topics: the independence of the SLC, the good faith of its investigative efforts, and the reasonableness of the bases for its conclusion that the lawsuit should be terminated. Additionally, the plaintiffs received a large volume of documents comprising the materials that the SLC relied upon in preparing its Report.

824 A.2d at 928. See also Kaplan v. Wyatt, 499 A.2d 1184, 1192 (Del. 1985) ("discovery may be ordered to facilitate inquiries into independence, good faith, and the reasonableness of the investigation"); Peller, 1988 WL 90840, at *3 (ordering limited discovery "in order to address the

---

[7]     See also Klein, 2003 WL 22768424, at *7-10 (noting that "[c]ourts which have considered the scope of discovery have generally recognized the need to inquire into the depth of investigation"); Zitin, 1991 WL 283814, at *3 (ordering discovery on the issues of the committee's independence, good faith, and the bases supporting its conclusions).

court's particular concerns"); <u>Zitin</u>, 1991 WL 283814, at *5 (ordering discovery and holding that "the committee must disclose to the court and the parties not only its report but all underlying data"); <u>Klein</u>, 2003 WL 2268424, at *17-18 (granting plaintiffs' motions to compel discovery).

In contrast to all of the authority requiring discovery, defendants fail to cite any authority to the contrary.  <u>Kamen v. Kemper Fin. Serv., Inc.</u>, 500 U.S. 90 (1991), <u>RCM Sec. Fund, Inc. v. Stanton</u>, 928 F.2d 1318 (2d Cir. 1991), and <u>Forsythe v. SunLife Fin., Inc.</u>, 417 F. Supp. 2d 100 (D. Mass. 2006), are demand futility cases and, hence, there were no committees appointed.  In <u>Harhen v. Brown</u>, 431 Mass. 838, 839, 730 N.E.2d 859, 862 (2000), the court limited its consideration to "facts as alleged in the plaintiff's complaint and in the documents attached and incorporated in the complaint."  Similarly, in <u>Stegall v. Ladner</u>, 394 F. Supp. 2d 358, 360 (D. Mass. 2005), the court limited its consideration "to 'documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint.'" (Citation omitted.)

<u>Cohen v. Beneficial Indus. Loan Corp.</u>, 337 U.S. 541 (1949), is irrelevant as it involves diversity jurisdiction only and the issue was limited to a state security for expenses statute.  In <u>Crown Crafts, Inc. v. Aldrich</u>, 148 F.R.D. 547 (E.D.N.C. 1993), another diversity action which, like here, contained both derivative and direct claims, the state statute gave the court the power to appoint a special committee.  The court, however, refused to appoint a special committee because it was "satisfied that the appointment of a committee would likely only delay litigation and not prevent it." 148 F.R.D. at 552.

The other authorities cited by defendants also do not support their position.  <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 47-48 (2d Cir. 1991), does not involve a special litigation

16

committee but does discuss the types of documents a court can consider on a motion to dismiss, none of which would encompass the Committee's Report.  In <u>Stoner v. Walsh</u>, 772 F. Supp. 790, 800 (S.D.N.Y. 1991), the court refused to consider the special litigation committee's report on a motion to dismiss.  In <u>Levner v. Al Saud</u>, 903 F. Supp. 452, 456-57 (S.D.N.Y. 1994), <u>aff'd</u>, 61 F.3d 8 (2d Cir. 1995), the court held that the demand itself was inadequate and the refusal was prior to the time the amended complaint was served.  <u>Abramowitz v. Posner</u>, 672 F.2d 1025, 1029 (2d Cir. 1982), is not relevant because there the plaintiff did not seek any "discovery with respect to the good faith and independence of the Board members  .  .  .  ."  In <u>Mozes ex rel. Gen'l Elec. Co.  v. Welch</u>, 638 F. Supp. 215 (D. Conn. 1986), there was no response to the demand and the reason for the eight-month delay was that there was a criminal proceeding pending which effectively prevented a civil investigation into the same facts.  Nevertheless, in <u>Mozes</u>, the court limited its factual consideration to "the complaint and documents annexed thereto .  .  .  ."  638 F. Supp. at 217

n.1.  In <u>Recchion</u>, there also appears not to have been a response to the demand, but the court was dealing with a clearly inadequate plaintiff.  637 F. Supp. at 1315.

Earlier this year in the Eastern District, mutual fund defendants also tried to secure the dismissal of a derivative claim prior to discovery based upon a special committee's report. Judge Platt rejected the attempt in no uncertain terms:

> THE COURT:  Look, they've had no discovery on this question.  You've prevented them from having any discovery.
>
> As to whether this was basically a purely formatic decision made by the board themselves or whether there was an independent and credible investigation.  You've made summary judgment not without any discovery at all and I don't understand it.  What are you trying to cover up?

17

> MR. DUNBAR:  We're not trying to cover up anything.
>
> THE COURT:   Apparently you are.   You are going to extraordinary lengths to cover up what this board did and I don't understand why.

Opposing Decl., Exhibit C, at 17-18.  Here, as will be shown below, we already know that the Committee is attempting to cover up the fact that the directors permitted the use of a voting procedure (echo voting) <u>after</u> they were advised that both the SEC and NYSE ruled that such procedure could not be used.  It is likely that discovery will result in more skeletons tumbling from defendants' proverbial closets.

## II.   Claims II And III Are Direct, Not Derivative, In Nature

Defendants assert that Claims II and III are derivative, not direct, claims that must be dismissed because no demand was made.  As demonstrated below, however, Claims II and III state direct harm to shareholders arising out of misrepresentations and omissions to investors in the Proxy Statement.  Claim II alleges that defendants violated Federal law, Section 20(a) of the ICA, for false and misleading proxy statements.  Claim III alleges that defendants breached their fiduciary duty of disclosure under Massachusetts law.[8]

### A.   Interference with Voting Rights Is A Direct, Not Derivative, Claim Under Massachusetts Law

The crucial distinction in determining whether a claim is derivative or direct is whether it is the corporation itself or the shareholder who has suffered the injury.  "Under Massachusetts law, if

---

[8]      Claim II alleges that the Proxy Statement is materially false and misleading because it fails, <u>inter alia</u>, to disclose that the voting procedure's failed to comply with ICA Section 15(a) and Massachusetts law.  Complaint, ¶ 60.  Claim III alleges, <u>inter alia</u>, that, in connection with defendants' attempt to seek approval of the new advisory agreements, defendants failed to disclose the impropriety of their voting procedures.  Complaint, ¶ 65.

the wrong underlying claim results in harm to a plaintiff shareholder only because the corporate entity has been injured, with the plaintiff's injury simply being his proportionate share of the entity's injury, the harm to the shareholder is indirect and his cause of action is derivative."  <u>Forsythe</u>, 417 F. Supp. 2d at 112 (citations omitted).  On the other hand, "'a shareholder may bring a direct action for injuries done to him in his individual capacity if he has an injury which is separate and distinct from that suffered by other shareholders.'"  <u>Sarin v. Ochsner</u>, 721 N.E.2d 932, 934 (Mass. App. Ct. 2000) (quoting <u>Litman v. Prudential-Bache Prop., Inc.</u>, 611 A.2d 12, 15 (Del. Ch. 1992)).

Under Massachusetts law, claims that interfere with an investor's voting rights are unmistakably direct, not derivative, in nature.  In <u>Lapidus v. Hecht</u>, 232 F.3d 679 (9th Cir. 2000), the Ninth Circuit, applying Massachusetts law, held that interference with a shareholder's voting rights was a direct harm to the shareholders:

> To bring a direct action under Massachusetts law, a plaintiff must allege an injury distinct from that suffered by shareholders generally or a wrong involving one of his or her contractual rights as a shareholder, <u>such as the right to vote</u>.  <u>Sarin v. Ochsner</u>, 48 Mass. App. Ct. 421, 721 N.E.2d 932, 934 (Mass. App. Ct. 2000)(applying Delaware law to determine whether claims were direct or derivative). In the present case, the plaintiffs allege violations of their <u>contractual rights as shareholders to vote</u> on proposed changes to the short sale and senior security restrictions spelled out in the registration statement filed with the SEC.  These allegations are sufficient to satisfy the injury requirement for a direct action under Massachusetts law.  Under the plain language of the injury test, which is written in the disjunctive, <u>it is unnecessary to allege an injury distinct from that suffered by shareholders generally if the alleged injury is predicated upon a violation of a shareholder's voting rights</u>.

232 F.3d at 683 (emphasis added) (citations omitted).

Similarly, the court in <u>Blasberg v. Oxbow Power Corp.</u>, 934 F. Supp. 21 (D. Mass. 1996), addressed whether a claim that a general partner had misled or defrauded an investor was direct or derivative. Applying Massachusetts law, the court held that the claim was direct:

> if a plaintiff alleges that she, as an individual investor, was misled or defrauded in the purchase of her investment, this kind of claim is a "direct" one. That many investors might have been misled, as the plaintiff was, or that the plaintiff might only be minimally injured, does not convert the claim to a derivative one. <u>The claim remains a direct one for wrongs to individual investors rather than to the corporate entity.</u>

<u>Id.</u> at 26 (emphasis added).

More recently, in <u>In re Eaton Vance Mut. Funds Fee Litig.</u>, 380 F. Supp. 2d 222 (S.D.N.Y. 2005), the court determined that a claim against directors of certain mutual funds for material misrepresentations and omissions regarding their management of the funds stated a direct, not a derivative, claim. The court, applying Massachusetts law, held that a claim of material misrepresentation, as here, "alleges an injury to the investors separate and distinct from any injury to the [funds] . . . ." <u>Id.</u> at 235 n.5.

The direct nature of the voting claims here is underscored by the express and direct determinations (which defendants attempt to hide from the Court) by both the SEC and NYSE that a vote seeking shareholder approval of advisory agreements is not a "routine" matter because the issue was one for the shareholders alone, not the funds. Both the SEC and NYSE explicitly told the funds -- as defendants acknowledged at their own board meeting <u>prior</u> to the filing and dissemination of the Proxy Statement -- that the Citigroup/Legg Mason transaction "was a non-routine event from a proxy-voting standpoint" and "as such, <u>brokers would not be able to cast shareholder votes</u> (for or

against the proposed transaction) <u>on behalf of clients who fail to provide voting instructions</u>." Opposing Decl., Exhibit E at 3 (emphasis added).

Remarkably, defendants argue that they were not required to disclose the clear stance of the regulators, asserting that the trustees were "not obligated to express that legal theory in the Proxy Statement." Defts' Memo at 26. The authorities upon which defendants rely undermine this say-no-evil approach. The Third Circuit in <u>Ash v. LFE Corp.</u>, 525 F.2d 215 (3d Cir. 1975), held that no disclosure was required for a legal theory that represented "<u>speculative issues</u> of state corporation law in a proxy solicitation." <u>Id.</u> at 220. Similarly, the legal theory in <u>Freedman v. Barrow</u>, 427 F. Supp. 1129 (S.D.N.Y. 1976), "presents a question of law <u>which had not been definitely settled by the SEC</u> at the time the Proxy Statement was sent out <u>and may still be in doubt</u>." <u>Id.</u> at 1143-44 (emphasis added). Here, in contrast, the regulators' interpretation of defendants' proposed use of "echo voting" was not "speculative," but was instead "definitely settled" or not otherwise "in doubt."

Nevertheless, the Proxy Statement states, in violation of these clear and explicit interpretations, that the funds intend to engage in "echo voting." <u>See</u>, <u>e.g.</u>, Moving Decl., Exhibit D at 8, 9, 55. Furthermore, the NYSE's interpretation of its own Rule 452 was formally proposed on the same date that the Proxy Statement was filed with the SEC (and defendants knew the positions of both the SEC and NYSE). The interpretation was declared effective on October 6, 2005 (Opposing Decl., Exhibit D) and <u>prior</u> to defendants' dissemination of the December 21, 2005 letter to shareholders insisting that the funds "intend[ed] to exercise its right to vote your Fund shares at the Meeting <u>in the same proportion as its customers who have voted</u>." Moving Decl., Exhibit 46 at NYTFR-Bingham 00004876. Specifically, the Board of Trustees' meeting began at 2:00 p.m. (<u>see</u> Opposing Decl., Exhibit E), and the Proxy Statement was filed at 4:34:36 p.m. Opposing Decl.,

Exhibit F (time-stamped version of the SEC Edgar Filing, Form Definitive 14A, filed 2 1/2 hours after meeting began).  Defendants  purported to seize a right that, by definition, belonged to the shareholders alone in order to further their own purposes.  The disclosure-related claims are direct.[9]

Defendants cite no cases involving interference with voting rights or direct misrepresentations or omissions to investors.  Rather, the litany of cases cited by defendants deals with classic derivative claims, each involving claims against the corporate assets.  For example, the claims in <u>Forsythe</u>, 417 F. Supp. 2d at 111, included excessive compensation and improper kickbacks to be paid out of the assets of the funds.  The court held that the alleged wrongs "would occur primarily and directly to the MFS Funds and <u>only indirectly</u> to the plaintiffs by virtue of their status as investors."  <u>Id.</u> at 112 (emphasis added).  Similarly, the plaintiff in  <u>Stegall</u>, 394 F. Supp. 2d at 361, alleged that the trustees of mutual funds had breached their fiduciary duties to shareholders by failing to participate in various class action settlements that would have "increased the overall assets held by the Funds."  The court held that, under Massachusetts law, these claims were derivative because they "relate to a diminution in the total assets of the Funds and <u>only derivatively did this injury harm each shareholder</u>."  <u>Id.</u> at 364 (emphasis added).  In contrast to the usurped voting rights of plaintiff here, the alleged disclosure claims in <u>In re Goldman Sachs Mut.</u> <u>Funds Fee Litig.</u>, No. 04 Civ. 2567(NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006), related to the

---

[9]      Defendants, based on a gross misreading of the United States Supreme Court's 1991 opinion in <u>Kamen</u>, <u>supra</u>, assert that "similar claims alleging misrepresentations in proxy statements have generally been classified as derivative."  Defts' Memo at 20 n.14.  In fact, <u>Kamen</u> specifically <u>refused</u> to rule on the issue because it had not been raised by the parties.  Footnote 4 of <u>Kamen</u> states that the Supreme Court has "<u>never addressed the question</u> whether § 20(a) creates a shareholder cause of action, <u>either direct or derivative</u>" and "<u>we leave this question for another day</u>."  500 U.S. at 97 (emphasis added).  <u>See also</u> <u>In re Salomon Smith Barney Mut. Fund Fees Litig.</u>, 441 F. Supp. 2d 579, 596 (S.D.N.Y. 2006) ("The [Supreme] Court in <u>Kamen</u>, however, declined to reach this issue.").

mismanagement of mutual funds through the use of excessive kickbacks to brokerage firms to steer new investors into the funds. 2006 WL 126772, at *2. This Court held that the gravamen of the action was a claim "of <u>mismanagement of assets</u> by defendants which fail to allege any injury independent of the alleged injury to the Funds." <u>Id.</u> at *6 (emphasis added). Here, however, the alleged misrepresentations related to voting rights belonging to the shareholders, not the funds.[10]

Defendants also do not cite any controlling authority as to whether "echo voting" on advisory agreements is permitted.[11] Instead, defendants cite a series of "analogous" SEC no-action letters in which certain "echo voting" is permitted, none of which deal with the issue here.

Defendants insist that the Proxy Statement and the follow-up correspondence caused no harm because they did not deny shareholders the right to vote. Rather, according to defendants, implementation of "echo voting" still permitted shareholders to affirmatively vote for or against the advisory contracts. As demonstrated above, however, defendants had no right to usurp or otherwise restrict the voting rights of shareholders in "non-routine" matters because those rights belonged to the shareholders alone. Opposing Decl., Exhibit D.

---

[10]    See also Everett v. Bozic, No. 5 Civ. 00266 (DAB), 2006 WL 2291083, at *4 (S.D.N.Y. Aug. 3, 2006)(alleged failure of mutual fund to participate in securities class action settlements derivative, not direct, insofar as right to assets belongs to fund, not shareholder); Bessette v. Bessette, 434 N.E.2d 206, 208 (Mass. 1982)(claim of excessive salary and payments derivative in nature).

[11]    See, e.g., The First National Bank of Chicago, SEC No-Action Letter, 1992 WL 277733 (Sept. 22, 1992) (permitting echo voting where shares held in fiduciary capacity); Comm. on Energy & Commerce U.S. House of Representatives, SEC No-Action Letter, 1993 WL 199080 (June 2, 1993)(no action taken on echo voting in hub-and-spoke arrangements); and Investment Company Mergers, Investment Company Act Release No. 25666, 67 F.R. 48512-01, 2002 WL 1614825 (July 24, 2002)(echo voting permitted in merger of affiliated investment companies "when the merger may not raise significant issues for shareholders"). Here, in contrast, the SEC and the NYSE have in fact determined that the disputed echo voting is not "routine" and does relate to significant issues for shareholders.

Defendants also assert that "echo voting" did not affect the funds' ability to achieve a 30%

quorum under the Trust Agreements because the ICA rendered that percentage "superfluous."  The

ICA imposes, in effect, a higher quorum for approval of advisory agreements (namely, 33.5% where

a majority of the eligible shares voted are present at a meeting, or over 50% of all shares eligible to

vote).  15 U.S.C. §§ 80a-2(a)(42), 80a-15a(a); Complaint, ¶ 47.  This argument dodges the issue

completely and fails to address why defendants undertook to usurp the voting rights of shareholders

who were entitled to vote, or not vote, their shares as they pleased.

> **B.**     **Any Provision In The Trust Agreement Purporting
>             To Allow  "Echo Voting" For Approval Of
>             Advisory Agreements Is Contrary To Established Law**

Finally, defendants assert that they were free to impose "echo voting" -- notwithstanding the

explicit and direct prohibition by two regulatory agencies -- because the trust instrument, the source

of his contractual rights as a shareholder, permitted it.  However, no corporation may enforce a

corporate provision that is contrary to an express rule of law or public policy.  As the Supreme

Judicial Court of Massachusetts declared in Comstock v. Dewey, 83 N.E.2d 257 (Mass. 1949), a case

cited by defendants, the board may select voting rules "unless forbidden by some positive rule of law

or violative of public policy."  Id. at 259 (emphasis added).  See also Espinola v. Club Liberdade,

Inc., 97 N.E.2d 202, 204 (Mass. 1951)("provided such alteration when effected by amendment to

the by-laws is not contrary to public policy") (emphasis added).  Indeed, Massachusetts' highest

court also declared that the "right to vote [in corporate matters] should not be taken away except in

accordance with lawful procedures and practices."  Jessie v. Boynton, 361 N.E.2d 1267, 1274 (Mass.

1977) (emphasis added).

"Echo voting" on the approval of advisory agreements was contrary to a "positive rule of law" and "public policy." Comstock, 83 N.E.2d at 259; Espinola, 97 N.E.2d at 204. The attempted arrogation of these rights was not "in accordance with lawful procedures and practices." Jessie, 361 N.E.2d at 1274. Accordingly, any contrary provisions in the Trust Agreement violate Massachusetts law.

### C.     The Complaint Satisfies All Pleading Requirements

Finally, defendants argue that Claims II and III sound in fraud and are thus subject to the heightened pleading requirements under Fed. R. Civ. P. 9(b). Defendants are incorrect. Rule 9(b) only applies to claims premised on fraud. Rombach v. Chang, 355 F.3d 164, 171(2d Cir. 2004).

Fraud is not an element of either claim, and defendants cite no authority to the contrary. Claim II is premised on Section 20(a) of the ICA. As demonstrated in Point III, below, Section 20(a) is a "pass through" statute to SEC Rule 14a-9 pursuant to Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a). Fraud is not an element of a claim under Rule 14a-9. See, e.g., Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1298-1301 (2d Cir.1973); Lichtenberg v. Besicorp Group, Inc., 43 F. Supp. 2d 376, 384-85 (S.D.N.Y.1999), appeal dismissed, 204 F.3d 397 (2d Cir. 2000); Katz v. Pels, 774 F. Supp. 121, 126 (S.D.N.Y.1991) ("In order to establish liability under the proxy laws, it is sufficient to show that the corporate officers and directors who authorized the proxy statement negligently failed to adhere to the rules requiring full disclosure."). Indeed, liability and damages under Rule 14a-9 are established upon a showing that the proxy misrepresented or omitted material information. Id. at 126 (citing Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384-85 (1970)). Claim III is a parallel claim under Massachusetts law. Accordingly, only a plain statement complying with Fed. R. Civ. P. 8(a) is required.

To the extent, however, that the Court construes these claims to be premised on fraud, not negligence, the Committee's Report with its annexed exhibits would provide more than sufficient detail to support the allegation of voting improprieties, namely, that:

(a)    Defendants were aware that NYSE Rule 452 prohibited "echo voting" for shareholder approval of "non-routine" matters, Moving Decl., Exhibit 42;

(b)    Defendants sought a favorable interpretation from both the SEC and NYSE that echo voting for shareholder approval of advisory agreements was "non-routine" under NYSE Rule 452 (thus, permitting such "echo voting"), Opposing Decl., Exhibit E;

(c)    Both the SEC and NYSE rejected this interpretation before the Proxy Statement was filed, id.;

(d)    Each of the defendants, at a Board of Trustees meeting held the same day as and prior to filing of the Proxy Statement with the SEC, was expressly informed that the SEC and NYSE both rejected this interpretation, id.;

(e)    The Proxy Statement was filed later that very day, Opposing Decl., Exhibit F; and

(f)    On December 21, 2005, unable to extract the desired shareholder vote, and long after the SEC had declared its interpretation of Rule 452 effective, see Opposing Decl., Exhibit D, defendants informed the shareholders that they intended to "echo vote" the shares.  Moving Decl., Exhibit 46.

## III.    There Is A Private Right Of Action For A Misleading Proxy Statement

Claim II of the complaint alleges the issuance of a materially false Proxy Statement in violation of Section 20(a).  Section 20(a) is a unique "pass through" statute.  It provides, in relevant part, as follows:

> It shall be unlawful for any person,  .  .  . to solicit . . . any proxy or consent or authorization in respect of any security of which a registered investment company is the issuer in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

As the Supreme Court explained:  "SEC regulations require proxy statements issued by a registered investment company to comply with the proxy statement rules promulgated under the Securities Exchange Act of 1934.  See 17 C.F.R. § 270.20a-1(a) (1990).  The latter rules prohibit materially misleading statements.  See § 240.14a-9."  Kamen, 500 U.S. at 94 n.1.  Thus, the key to the validity of Claim II is SEC Rule 14a-9, not ICA Section 20(a).  Defendants understand this quite well.  "Rule 20a-1 . . . adopts by reference the SEC's proxy solicitation rules under Section 14(a) of the Securities Exchange Act of 1934.  Presumably, Plaintiff is relying on Rule 14a-9 . . . which prohibits false or misleading statements in proxy statements."  Defts' Memo at 8 n.3.  Thus, for defendants to prevail they would have to argue successfully either that (i) the SEC did not properly adopt Rule 20a-1, or (ii) there is no private right of action under Rule 14a-9.  Defendants do not make either argument.

In view of the "pass through" nature of ICA Section 20(a), there are relatively few cases dealing with ICA Section 20(a) and all those from this Circuit have found a private right of action.  See Defts' Memo at 23 n.15.[12]  Because of the unique structure of ICA Section 20(a), the reasoning behind holding that other ICA provisions do not create implied private rights of action is not analogous.  Defendants' reliance on this Court's decision in Goldman Sachs, supra, is misplaced as the ICA Sections considered -- 34(b), 36(a), and 48(a) -- are stand-alone provisions and do not incorporate the provisions of other laws unlike the structure of ICA Section 20(a).

---

[12]    Defendants contend that the district court's decision in Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 528 F. Supp. 1038 (S.D.N.Y. 1981), aff'd, 694 F.2d 923 (2d Cir. 1982), holds that there is no private right of action under ICA Section 20(a).  Not so.  What the district court held is that one cannot use Section 20(a) for conduct relating to compensation which is covered by the express private remedy set forth in ICA Section 36(b).  528 F. Supp. at 1067.  Otherwise, for example, and as the Second Circuit pointed out, plaintiffs would be able to circumvent Section 36(b)'s short one-year statute of limitations.  See 694 F.2d at 934.

**IV.    Plaintiff Has Standing To Assert Claims On Behalf Of
All Holders Of Beneficial Interests In CitiTrust**

As described above, plaintiff's claims arise out of the 2005 Citigroup/Legg Mason transaction and the Proxy Statement issued in connection therewith.  A condition precedent to the completion of the Citigroup/Legg Mason transaction was the approval of the holders of beneficial interests in CitiTrust.  One Proxy Statement was disseminated to all holders of every series of beneficial interests in CitiTrust and thus plaintiff is similarly situated to all the holders of the various series of beneficial interests in CitiTrust.  Contrary to defendants' assertions, under the facts present here, plaintiff has standing to pursue claims on behalf of all the holders of beneficial interests in CitiTrust who received the same Proxy Statement.  This is a far cry from Stegall, 394 F. Supp. at 361-62, where a holder sued the managers of an entire group of funds issued by John Hancock for failing to participate in various class action settlements.  Stegall is readily distinguishable as the court relied upon the existence of "'separate management contracts and share distribution plans'" to hold that plaintiff's "beneficial interest extends only to the investment decisions of the Small Cap Fund and does not permit him to bootstrap claims arising out of investment decisions made in relation to other funds in which he was not a participant."  Id. at 362, 363.  That missing link -- separate investment decisions –  is not present here as what is at issue here is one board review at joint meetings and one Proxy Statement applicable to all the series of CitiTrust.  See also Opposing Decl., Exhibit F.  Moreover, the injuries are not unique to the holders of a specific series.  The other case relied on by defendants, Forsythe, 417 F. Supp. 2d at 117-19, involved standing to assert an ICA Section 36(b) claim (15 U.S.C. § 80a-35(b)), which is not at issue here.  Section 36(b) has its own standing requirements ("a security holder of such registered investment company") and the Forsythe

28

court specifically noted "the unique nature of the § 36(b) cause of action." Id. at 118.  Finally, Mass.

Gen. Laws ch. 156D, § 7.41(1) is primarily concerned with the temporal aspect of derivative action

standing.  The complaint alleges that plaintiff was a holder of beneficial interests in CitiTrust at all

relevant times.  Complaint, ¶ 7.

> More apposite is the following observation by Judge Baer, although in a different context:

> > Courts have repeatedly held that on allegations such as these, class representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security.  Courts have not addressed this concern vis a vis the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement.

In re Dreyfus Aggressive Growth Mut. Fund Litig., No. 98 CIV. 4318 (HB), 2000 WL 1357509, at

*3 (S.D.N.Y. Sept. 20, 2000) (emphasis added).

## Conclusion

Defendants' motion to dismiss should be denied.

Dated: December 7, 2006

Respectfully submitted,

Wechsler Harwood LLP

_____/s/_____

Joel C. Feffer (JF-2608)
Daniella Quitt (DQ-1963)
James G. Flynn (JF-5929)
488 Madison Avenue, 8th Floor
New York, New York 10022
Telephone:  (212) 935-7400
Facsimile:  (212) 753-3630

Attorneys for Plaintiff