UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

JOHN HALEBIAN, individually and on
behalf of all other similarly
situated trust beneficiaries and
derivatively on behalf of CITIFUNDS
TRUST III,

               Plaintiff,

      - against -

ELLIOT J. BERV, DONALD M. CARLTON,     **MEMORANDUM AND ORDER**
A. BENTON COCANOUGHER, MARK T.
FINN, STEPHEN RANDOLPH GROSS, DIANA     06 Civ. 4099 (NRB)
R. HARRINGTON, SUSAN B. KERLEY,
ALAN G. MERTEN, and R. RICHARDSON
PETTIT,

               Defendants,

      - and -

CITIFUNDS TRUST III,

           Nominal Defendant.

----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     Plaintiff John Halebian ("plaintiff") brings this action individually and on behalf of all other similarly situated beneficiaries of the Citifunds Trust III ("CitiTrust" or the "Trust") against its trustees ("defendants" or "trustees"). Plaintiff's claims arise out of the trustees' decision to approve new advisory agreements. Plaintiff asserts that the trustees ignored the best interests of the Trust and its

beneficiaries and issued a false and misleading description of voting procedures in their proxy statement (the "Proxy Statement") in order to facilitate the approval of the new agreements. Defendants now move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1, and under Massachusetts law governing derivative suits. For the reasons set forth below, we dismiss the complaint in its entirety.

<u>BACKGROUND</u>[1]

CitiFunds Trust III is an open-ended investment company registered with the Securities and Exchange Commission ("SEC"), under the Investment Company Act of 1940 ("the ICA"), as amended, 15 U.S.C. § 80a-1 <u>et</u> <u>seq.</u> The Trust is organized as a business trust under Massachusetts law, and is comprised of six series portfolios (the "Funds"), each of which is a separate mutual fund with a separate investment portfolio and separate shareholders. Plaintiff states that he is a shareholder in one of the Funds, the Citi New York Tax Free Reserves Fund (the "NY Tax Free Fund"). <u>See</u> Complaint ("Compl.") ¶ 7. The named

---

[1] Except where indicated, there are no genuine issues regarding the following facts. Further, we note at the outset that the documents cited herein to establish the background of this case are relied upon in accordance with Second Circuit caselaw governing Rule 12(b)(6). <u>See</u> discussion <u>infra.</u> Since some of the claims made in the complaint aim to redress the alleged harm caused by the materially false and misleading description of voting procedures set forth in defendants' Proxy Statement, we have incorporated references to documents provided by defendant which plaintiffs implicitly rely upon in making these claims, including the Proxy Statement and relevant portions of the Trust's charter which describe voting procedures.

defendants are members of the Trust's Board of Trustees (the "Board"). CitiTrust is named as a nominal defendant in a derivative capacity; plaintiff's claims are brought on CitiTrust's behalf. See id. ¶ 9.

## I.  The Citigroup-Legg Mason Agreement and New Investment Advisory Contracts

Prior to December 2005, an affiliate of Citigroup, Inc. served as an investment adviser to each of the Funds. On June 23, 2005, Citigroup entered into an agreement with Legg Mason pursuant to which Citigroup agreed to sell substantially all of its asset management business, including CitiTrust's investment adviser subsidiaries, to Legg Mason. Id. ¶ 32. Consummation of this transaction is considered an "assignment" under the ICA, resulting in the automatic termination of the Funds' existing investment advisory contracts, and requiring the Funds to enter into new contracts. See id. ¶ 33. Section 15 of the ICA requires that each Fund's new contract must be approved by a majority of the trustees who are not "interested persons" under the ICA and by a vote of a majority of outstanding shares of that Fund. See 15 U.S.C. § 80a-15(a), (c).

In August of 2005, the Board approved new investment advisory agreements with Legg Mason. Compl. ¶ 39. In September of 2005, shareholders of the Funds were sent a proxy statement recommending, on behalf of the Board, that the shareholders vote

to approve of these new agreements.  See Compl. ¶ 2; Declaration
of Mark T. Finn ("Finn Decl.") Ex. D ("Proxy Statement").
Shareholders were given the option of voting for or against the
new agreements, or voting to abstain.  See Proxy Statement
("Form of Proxy Card" attached to end of Proxy Statement).  The
Proxy Statement explained that a bank or other financial
institution or intermediary -- known as a "service agent" --
might be the record holder of the shares owned by many
shareholders.  See id. at 8.  In addition, pursuant to the
voting procedures as set forth in the Trust's charter and the
Funds' prospectus in effect at the time,[2] the Proxy Statement
specified that the service agent would vote according to a

---

[2] Section 6.8 of the Trust Instrument provides that:
At any meeting of shareholders of the Trust or any series
or class of the Trust, a Shareholder Servicing Agent may
vote any shares as to which such Shareholder Servicing
Agent is the agent of record and for which no voting
instructions are received, proportionately in accordance
with the votes cast by holders of all shares otherwise
represented at the meeting in person or by proxy as to
which such Shareholder Servicing Agent is the agent of
record.  Any shares so voted by a Shareholder Servicing
Agent will be deemed represented at the meeting for quorum
purposes.
Finn Decl. Ex. A ("Amended and Restated Declaration of Trust of
Citifunds Trust III, Dated as of September 28, 2001"), at 25.  In
addition, the December 31, 2004 Prospectus for the Trust in effect
at the time of the Proxy Statement states to shareholders that "[i]f you
do not give your Service Agent voting instructions, your Service Agent
may vote your shares proportionately in accordance with the votes cast
by other shareholders for whom your Service Agent acts."  See
Prospectus for Citifunds Trust III as filed with SEC on December 29,
2004, available at http://www.sec.gov/Archives/edgar/data/747576/
000095015604000290/d61915.txt.

procedure known as "echo voting" or "proportional voting." Specifically, the Proxy Statement said:

> With respect to any shares for which a Citigroup-affiliated service agent (other than a broker-dealer) is the holder of record and for which it does not receive voting instructions from its customers, such service agent intends to vote those shares in the same proportion as the votes received from its customers for which instructions have been received.

Id.  The Proxy Statement also informed shareholders of the details surrounding the new advisory agreements, and compared the provisions of the new agreements with those of the existing advisory agreements.[3]  In particular, the Proxy Statement noted the new advisory agreements in question, like the existing advisory agreements, would permit the advisor to select brokers or dealers who provide both brokerage and research services to the Funds, even though the commissions charged by such brokers or dealers might be higher than those charged by other brokers or dealers who provide execution only or execution and research services -- a practice known as the payment of "soft dollars." See Proxy Statement at 11-12, 21.  In Appendix D to the Proxy Statement, which compared in detail the existing "Current Management Agreement" to the "New Management Agreement" to

---

[3] At oral argument, plaintiff conceded that from a shareholder's perspective, the new advisory agreements were immaterially different from the existing advisory agreements, and that the crux of plaintiff's complaint centered around the failure of the Board to avail itself of the opportunity presented by the Citigroup-Legg Mason transaction to have negotiated more favorable terms for its shareholders.  Transcript of Oral Argument dated June 21, 2007 ("Tr.") at 5.

govern the NY Tax Free Fund, the section relating to Brokerage Transactions showed that both the existing and the new agreements allowed for the payment of "soft dollars" in excess of the actual execution price of the trades, as described above, but that the proposed agreement, unlike the existing agreement, specifically allowed the Board to adopt policy and procedures to modify and restrict the adviser's use of such payments.  See Id. App. D ("Comparison of Terms of Management Agreement") at D-3.

## II.  Plaintiff's Demand Letter and Appointment of the Demand Review Committee

On February 8, 2006, plaintiff's counsel sent a letter to the Board (the "Demand Letter").  See id. Ex. E.  The Demand Letter stated that "[a] review of the lengthy discussion of the [B]oard's deliberations over the new advisory agreements set forth in the [P]roxy [S]tatement fails to disclose that the [B]oard ever considered the best interests of the Fund.  For example, it appears that the [B]oard failed to avail itself of the opportunity presented to seek to negotiate lower fees or to seek competing bids from other qualified investment advisors."  Id. at 1-2.  It further alleged that in approving the new advisory contracts and recommending them to shareholders, the Board had "placed the interests of Citigroup before those of the Fund and their shareholders, notwithstanding that it owes fiduciary duties to the latter and not to Citigroup," and that

the Board's sole focus appeared to be assisting Citigroup to comply with the requirements of Section 15(f) of the ICA.  Id. The letter demanded that the Board institute an action for breach of fiduciary action against "any and all persons who are responsible for the [B]oard's dereliction of its duties in connection with the Citigroup-Legg Mason transaction" and take other appropriate remedial measures, including seeking bids for the advisory contract from other qualified investment advisers, negotiating new terms more favorable to the Fund, or both.  Id. at 2.  The letter also stated that "shareholder approval [of the new contracts] does not appear to have been obtained properly," but that "as this issue gives rise to direct, rather than derivative, claims it will not be addressed in this letter." Id. at 1 n.1.

On March 24, 2006, the Board voted to appoint independent trustees Mark T. Finn and Stephen R. Gross to serve as a Demand Review Committee ("DRC").  Finn Decl. ¶ 16.  Board member R. Jay Gerken, a Citigroup employee, abstained from this vote because he is an "interested person" under the ICA.  Id.  Thus, the vote was taken by the remaining nine independent trustees -- the defendants in this case -- who are not "interested parties" as defined by the ICA.  The Committee retained independent counsel, Leboeuf, Lamb, Greene & MacRae LLP ("LeBoeuf"), led by Ralph C. Ferrara, former General Counsel of the SEC, to assist in the

inquiry of the Plaintiff's demand, and counsel undertook a review of the adoption of the new advisory agreements. Id. ¶¶ 17-18. During the investigation, Mr. Ferrara wrote to plaintiff's counsel on April 10, 2006, to inform him of the appointment of the DRC and to invite him to provide any additional information which might support the assertions made in the Demand Letter. Id. Ex. F. Plaintiff's counsel, Joel C. Feffer, sent a response dated April 20, 2006 to Mr. Ferrara, noting that he was "unclear" about the DRC's mandate, members, and powers in light of "the obvious anomaly of appointing people to consider suing themselves or their colleagues." Id. Ex. G. After asking "[w]hat type of 'additional information or support' does the Committee believe could be either relevant or in my possession", Mr. Feffer declined to provide any further information. Id. Accordingly, on April 28, Mr. Ferrara sent a letter enclosing the resolution appointing the DRC which was passed by the Board of Trustees in response to the Demand Letter, and invited plaintiff and his counsel to meet with the DRC towards the end of the review process. Id. Ex. H. Plaintiff's counsel's response, dated May 3, 2006, again asked what "additional information or support" was necessary. Declaration of Daniella Quitt, Ex. B. Mr. Ferrara's letter, dated May 9, 2006, once again invited plaintiff and counsel to meet with the DRC to discuss the demand. Finn Decl. Ex. I.

Plaintiff did not respond to said correspondence, and instead filed his complaint in this lawsuit on May 30, 2006.

## III.  Plaintiff's Complaint

Plaintiff's complaint alleges that the Board acted improperly in approving and recommending that shareholders approve new advisory agreements with Legg Mason subsequent to the sale of the investment adviser, Citigroup. Specifically, plaintiff argues that the new advisory contracts injure the Funds because defendants failed to avail themselves of the opportunity to negotiate more favorable advisory fees or seek competing bids from other qualified investment advisers.[4]  See, e.g., Compl. ¶¶ 32, 36.  According to plaintiff, shareholder approval of the contracts was obtained through a misleading proxy statement.  Id. ¶¶ 37-47.  Plaintiff brings three claims as a result of these events.  Claim I is a derivative claim on behalf of the Trust, alleging a breach of fiduciary duty by the trustees in considering the Citigroup-Legg Mason transaction and in recommending the new advisory agreements.  See Compl. ¶¶ 53-56.  Claim II is brought as a direct claim pursuant to ICA Section 20(a), alleging that the Proxy Statement used was materially false and misleading, and failed to disclose material

---

[4] Although it is not clear from the complaint as pled, we believe that plaintiff is claiming, in essence, that the Board should have attempted to eliminate the provisions allowing for the payment of "soft dollars," and/or tried to negotiate more favorable "soft dollar" provisions.

information concerning the voting procedure's compliance with the ICA Section 15(a) and Massachusetts law, "as well as the diversion of CitiTrust assets for the benefit of others." Id. ¶ 60.  Claim III, another direct claim, alleges that the Trustees breached their fiduciary duties as trustees of Massachusetts business trusts to CitiTrust's shareholders by failing to fully and fairly disclose all material information within their control.  Plaintiff claims that in seeking to have CitiTrust's holders of beneficial interests approve the new advisory agreements, the Trustees "failed to adequately disclose material information concerning the propriety of their voting procedures, as well as the diversion of CitiTrust assets for the benefit of others." Id. ¶¶ 63-65.

## DISCUSSION

## I.  Standards of Review and Applicable Law

A derivative action "permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties." Kamen v. Kemper Financial, 500 U.S. 90, 95 (1991) (internal quotations and citations omitted).  In assessing a 12(b)(6) motion in the context of a derivative action, we look to the Federal Rules which set forth the procedural requirements that apply to the pleadings as well as the underlying state substantive law governing the viability of the derivative claims.  The law of

10

the state of incorporation or organization governs the
substantive requirements for a derivative action.  See, e.g.,
RCM Securities Fund, Inc. v. Stanton, 928 F.2d 1318, 1326 (2d
Cir. 1991).  Since CitiTrust is a Massachusetts business trust,
the parties correctly conclude that Massachusetts substantive
law governs this action.  Thus, we shall examine the adequacy of
plaintiff's complaint in light of Federal Rules 12(b)(6) and
23.1 of Civil Procedure, as well as Massachusetts substantive
law governing derivative claims.

### A.  Rule 12(b)(6)

When deciding a 12(b)(6) motion to dismiss, the Court must
take as true the facts as alleged in plaintiff's complaint, Bolt
Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir.
1995), and draw all reasonable inferences in plaintiff's favor.
Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir.
2004).  Although a complaint attacked by a 12(b)(6) motion to
dismiss "does not need detailed factual allegations, a
plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action will not do."  Bell Atlantic Corp. v. Twombly,
550 U.S. ---, 127 S.Ct. 1955, 2007 WL 1461066, at *8 (May 21,
2007).  Plaintiffs' factual allegations must be sufficient to
raise a right to relief above the speculative level on the

assumption that all the allegations in the complaint are true, even if doubtful in fact. Id.

In our consideration of this motion, we are to examine "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken." Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993). For purposes of dismissal, the complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002). However, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." Id. at 153 (internal citations omitted). Accordingly, in the context of a derivative action, we may consider, in addition to the allegations of the complaint itself:  (1) any documents attached to or incorporated by reference in the complaint; (2) public disclosure documents that are required by law to be filed with the SEC, and have actually been filed; and (3) other documents the plaintiff has actual notice of and has relied upon in framing the complaint. See Cortec Industries, Inc. v. Sum Holding, L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).

**B.  Rule 23.1**

Rule 23.1 requires that the complaint in a derivative proceeding "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority . . . and the reasons for the plaintiff's failure to obtain the action."  Fed.R.Civ.P. 23.1.  Thus, derivative suits in federal court must meet "a pleading standard higher than the normal standard applicable to analysis of a pleading challenged under Rule 12(b)(6)."  See Halpert Enterprises, Inc. v. Harrison, No. 06 Civ. 2331 (HB), 2007 WL 486561, at *4 (S.D.N.Y. Feb. 14, 2007) (quoting Fink v. Weill, No. 02 Civ. 10250 (LTS), 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 19, 2005)).  Pursuant to Rule 23.1, we are to review the allegations of a derivative complaint to determine whether the relevant requirements under Massachusetts law have been satisfied.  See RCM, 928 F.2d at 1329.  Complaints which do not plead with particularity the efforts made to make a demand upon a board and the reasons for the failure of the demand must be dismissed.  See Mintz v. Baron, No. 05 Civ. 4904 (LTS), 2006 WL 2707338, at *6 (S.D.N.Y. Sept. 19, 2006) (applying Massachusetts law to dismiss count without prejudice for failure to satisfy requirements of Rule 23.1).  However, the demand letter and subsequent correspondence may be considered in evaluating plaintiff's satisfaction of Rule 23.1, in light of the

underlying policy behind requiring that plaintiffs detail with particularity their exhaustion of internal corporate remedies with respect to the actions which plaintiff desires. See Stoner v. Walsh, 772 F.Supp. 790, 797 (S.D.N.Y. 1991).

**C.   Massachusetts Law Governing Derivative Actions**

Although Rule 23.1 governs whether plaintiff's complaint details the efforts to make a demand with requisite particularity, state law governs the separate inquiry into whether the efforts made by plaintiffs in securing board action through a demand were substantively sufficient to sustain a derivative action.  To put it differently, "Rule 23.1 creates a federal standard as to the specificity of facts alleged with regard to efforts made to urge a corporation's directors to bring the action in question.  However, the adequacy of those efforts is to be determined by state law . . ." RCM, 928 F.2d at 1318.

In 2003, the Massachusetts legislature enacted Chapter 156D, governing derivative proceedings (effective July 1, 2004) to "reflect[] a judgment that a new statute should, in light of public expectations of corporate accountability and other provisions of this statute addressing board independence and responsibility, address more fully derivative litigation." Mass. Gen. Law Pt. I, Tit. XXII, ch. 156D, Pt. 7, introductory cmt.   Under Section 7.42 of Chapter 156D of Massachusetts

14

Corporations Law, no shareholder may commence a derivative proceeding until:

> (1) a written demand has been made upon the corporation to take suitable action; and
> (2) 90 days have elapsed from the date the demand was made, or, if the decision whether to reject such demand has been duly submitted to a vote of the shareholders, . . . within 60 days from the date when the demand was made, 120 days have elapsed from the date the demand was made, unless in either case the shareholder has earlier been notified that the demand has been rejected by the corporation or irreparable injury to the corporation would result by waiting for the expiration of such 90-day or 120-day period.

Mass. Gen. Laws ch. 156D, § 7.42. Although prior to the enactment of Chapter 156D, Massachusetts permitted demand to be waived when futile, see Harhen v. Brown, 431 Mass. 838, 844 (2000), section 7.42 makes a written demand an absolute prerequisite to the maintenance of a derivative action. See Mass. Gen. Law ch. 156D § 7.42; see also Mass. Gen. Law ch. 156D § 7.42, cmt. background ("Section 7.42 requires a written demand on the corporation in all cases."). Consequently, section 7.43 of the chapter allows for a court to stay a derivative proceeding for a period that it deems appropriate in situations where a corporation has commenced an inquiry into the allegations made in the demand or complaint. Id. § 7.43. In addition, section 7.44 provides for dismissal of a derivative suit as follows:

> A derivative proceeding commenced after rejection of a
> demand shall be dismissed by the court on motion by
> the corporation if the court finds that [a majority
> vote of independent directors present at a meeting of
> the board of directors if the independent members
> constitute a quorum] has determined in good faith
> after conducting a reasonable inquiry upon which its
> conclusions are based that the maintenance of the
> derivative proceeding is not in the best interests of
> the corporation.

Id. § 7.44(a), (b)(1).

With regard to Claim I, defendants move to dismiss under both Rule 23.1 and section 7.44.  With regard to Claims II and III, which plaintiff asserts are direct claims, defendants move to dismiss on the basis that they are not direct claims but instead derivative claims, and thus must be dismissed under Massachusetts law for failure to conform to section 7.42.  We shall address each claim in turn.[5]

## II.  Plaintiff's Claims

### A.   Claim I and Adequacy of Pleading under Massachusetts Law and Rule 23.1

Claim I is a derivative claim which plaintiff brings on behalf of the Trust alleging a breach of fiduciary duty by the Board in approving and recommending the Funds' new investment advisory contracts.   Although plaintiff concedes that the differences between the existing investment advisory contracts

---

[5] Although defendants also argue that plaintiff lacks standing to assert claims on behalf of Funds or shareholder of Funds in which he is not a shareholder, we decline to address the issue in light of our conclusions with regard to defendants' other arguments.

and the new contracts are wholly immaterial in that they consisted simply of a change of investment advisors and a slightly different investment management agreement, see, e.g., Tr. 5, plaintiff objects to the fact that the CitiTrust Board did not take the Citigroup-Legg Mason transaction as an opportunity to negotiate more favorable terms on behalf of their shareholders. See, e.g., Compl. ¶ 36. Defendants argue that this claim must be rejected because both Massachusetts law and Rule 23.1 require plaintiff to plead particular facts showing that his demand was wrongfully rejected. In evaluating this claim, we have looked to submissions incorporated by reference in the complaint, including the Trust Instrument, the Proxy Statement, and the Demand Letter and follow-up correspondence between plaintiff's counsel and independent counsel for the DRC. See Stoner, 772 F.Supp. at 792 (considering the demand letter and response thereto in the context of a motion to dismiss a derivative action pursuant to Rule 12(b)(6), concluding that such documents had been incorporated by reference into the complaint). Plaintiff asserts that the text of the section of Massachusetts law which defendants rely upon for their motion is not applicable to the present case.

> **1.   Applicability of Section 7.44 to the Present Action in Light of Demand Rejection After the Filing of Complaint**

Defendants argue that they are entitled to avail themselves of section 7.44's provisions for dismissal. <u>See</u> Def. Mem. Supp. at 11-14. Plaintiff argues that defendants are not entitled to dismissal under section 7.44, as the section applies to "derivative proceeding[s] <u>commenced after</u> rejection of a demand," <u>see</u> Mass. Gen. Law ch. 156D § 7.44(d). Since this suit was commenced after defendants did not respond within 90-days as provided for under section 7.42, but before the rejection of plaintiff's demand, plaintiff argues that section 7.44 does not apply. <u>See</u> Plaintiff's Memorandum in Opposition ("Pl. Mem. Opp.") at 9.

We disagree with plaintiff's reading of the relevant sections of Massachusetts business corporation law. Instead, we conclude that in a case where the corporate board decides to reject the demand after a shareholder has filed a derivative suit, defendants may avail themselves of the provisions for dismissal set forth in section 7.44 as long as they rejected the demand after a good faith review. It appears that there is no case law from any jurisdiction on this precise issue.[6] However,

---

[6] Although it appears that no court has dealt with the specific question of whether section 7.44 applies to a derivative proceeding filed prior to the rejection of a demand, we note that other courts have encountered similar questions with regard to construing the term "commences" for purposes of chapter 156D. For example, in <u>ING Principal Protection Funds Derivative Litigation</u>, 369 F.Supp.2d 163, 170-71 (D. Mass 2005), plaintiffs had initially filed a complaint in the matter in November of 2003, before the new law took effect on July 1, 2004. On July 30, 2004, without making a pre-suit demand,

the Massachusetts legislature's comments to section 7.44 state
that "[a] derivative action must be dismissed by the court upon
motion by the corporation if either the board or the other
shareholders promptly determine not to proceed.    That
determination can be made prior to the commencement of the suit
in response to a demand <u>or after commencement upon examination
of the allegations of the complaint.</u>"   <u>See</u> Mass. Gen. Law ch.
156D § 7.44, cmt. background (emphasis added).   In other words,
the state legislature expressly contemplated that section 7.44
could be applicable to cases such as the one before us now,
where a plaintiff has waited the requisite ninety days after the
written demand to file a complaint, but the corporation did not
reject the demand until after the filing of the complaint.   This
interpretation is further supported by the comments to section
7.42, which expressly note that although "[n]inety . . . days
ha[s] been chosen as a reasonable minimum time[] within which

---

plaintiffs amended their complaint, adding seven independent trustees
as defendants and bringing a claim against those trustees for breach
of fiduciary duty under Massachusetts law.   The trustees argued that
this new claim should be dismissed for failure to comply with the
universal demand requirement, whereas plaintiffs argued the amendment
adding the trustees should be treated as relating back to the initial
complaint.   In concluding that the amendment should not be treated as
relating back to the original complaint, the court stated that "the
question of when a derivative proceeding 'commences' under the
universal demand statute is a question of state law.   The statute,
though, does not define when a derivative proceeding commences with
respect to a demand."   <u>Id.</u> at 170.   Accordingly, the district court
considered the purposes underlying the new statute, including the
universal demand requirement, in order to determine the proper
construction of the term "commences."   <u>Id.</u> at 171.   Similarly, we
choose to look to the reasons behind section 7.44 in order to properly
determine what is meant by the term "commences" in this context.

the board of directors of the shareholders can meet, direct the necessary inquiry into the charges, receive the results of the inquiry, and make its or their decision, . . . [i]n some instances a longer period may be required," in which case the corporation "may request counsel for the shareholder to delay filing suit until the inquiry is completed or, if [the] suit is commenced, the corporation can apply to the court for a stay under § 7.43." See Mass. Gen. Law ch. 156D § 7.42, cmt. 3. Thus, the new statute was worded to accommodate situations in which a board would need more than ninety days to evaluate a shareholder's demand before determining whether to pursue the litigation. Construing section 7.44 in the way plaintiff urges would render a curious result whereby defendants in derivative actions who had not completed a good faith, reasonable inquiry into the efficacy of the maintenance of the derivative proceeding after ninety days would not be able to avail themselves of Massachusetts' codification of the business judgment rule, thus rendering meaningless section 7.43's provisions for a stay in proceedings.[7] Plaintiff's reading would

---

[7] Plaintiff's argument that defendants in this case could have availed themselves of section 7.44's dismissal provisions had they petitioned this Court for a stay under section 7.43 is unsupportable. The provisions for a stay under section 7.43 contemplate a court issuing a stay after the suit had already been filed. Indeed, even had defendants petitioned for a stay in this case, it would not have resolved the issue concerning the applicability of section 7.44 here, since in any event the demand would have been rejected after the commencement of the proceeding. In addition, defendants could not

also result in a race to the courthouse for shareholder plaintiffs, as filing on the ninety-first day after a written demand would automatically foreclose corporate boards that otherwise were proceeding appropriately in response to the demand from availing themselves of section 7.44. In addition, it would leave courts with no guidance whatsoever in applying the business judgment rule to a Massachusetts corporation's efforts to respond to a demand if a shareholder decides to file suit prior to the demand's rejection, since no other provision of chapter 156D governs such actions. We find it unlikely that the legislature meant for the timing of plaintiff's filing to have such a dispositive consequence upon defendants' capacity to invoke the business judgment rule, and accordingly conclude that section 7.44 applies to the present controversy.

### 2. Dismissal under Section 7.44 and Rule 23.1

As mentioned above, section 7.44(a) provides for dismissal of a derivative action if we find that an independent group as described in subsection (b)(1) has determined in good faith after conducting a reasonable inquiry that the maintenance of the proceeding is not in the corporation's best interest. See Mass. Gen. Law ch. 156D § 7.44(a). In the one case to date which interprets the term "independent" in the context of

---

have preemptively petitioned for the stay prior to plaintiff's having filed suit since plaintiff could have filed in any number of courts.

section 7.44(b), a Massachusetts appeals court determined that although the statute contains no definition of independence, "the term 'independent' as used in Section 7.44 . . . encompasses both 'disinterest' which is a lack of personal interest in the challenged transaction as opposed to a benefit upon the corporation or shareholders generally, and 'independent' which is freedom from influence in favor of the defendants due to personal or other relationships." Blake v. Friendly Ice Cream Corp., No. 30003, 2006 WL 1579596 (Mass. Super. May 24, 2006) (citing Mass. Gen. Law ch. 156D § 7.44, cmt., and Aronson v. Lewis, 473 A.2d 805, 812-16 (Del. 1984)). In addition, subsection (c) lists three conditions, none of which shall by itself cause a director to be considered not independent:  (1) the director's nomination or election by a defendant or one against whom action is demanded; (2) the naming of the director as a defendant in the derivative proceeding or as a person against whom action is demanded; or (3) the approval by the director of the act being challenged in the derivative proceeding or demand if the act resulted in no personal benefit to the director.  See Mass. Gen. Law ch. 156D § 7.44(c).

Defendants argue that subsection (b)(1) applies to the present controversy, since the demand was rejected by "a majority vote of independent directors present at a meeting of the board of directors," and those independent directors occupy

nine seats of the Trust's ten-member Board, thus constituting a quorum. See Def. Mem. Supp. at 13-14; Mass. Gen. Law ch. 156D § 7.42(b)(1). In such cases, the decision to dismiss is "a business judgment to which the business judgment rule's presumption of validity should apply." Mass. Gen. Law ch. 156D § 7.44, cmt. 2. Accordingly, "the derivative plaintiff must plead and prove that the directors making the determination were not independent or did not act in good faith after reasonable inquiry" in order to preclude the application of the business judgment rule. Id.

Plaintiff neither pleads nor proffers any reason why the Board's decision to reject the demand was illegitimate, as plaintiff argues neither that the board was not duly constituted of independent directors at the time it made its decision, nor that they did not act in good faith after conducting a reasonable inquiry.[8] Plaintiffs instead argue that this Court

---

[8] We realize that the complaint could not have pled reasons why the Board's decision to reject the demand was improper in light of the fact that the complaint was filed prior to the rejection. However, at the very least, the complaint could have asserted various reasons as to why the Board was constituted of interested trustees, or why the DRC, as constituted, was inadequate as a review mechanism for the Board. Despite having actual knowledge of the appointment of the DRC and the identity of the individual Board trustees, plaintiffs made no such attempt in their complaint, aside from plaintiff's assertion that it is problematic that the Committee was led by two named defendant trustees, see Pl. Opp. at 14, a condition that the Massachusetts legislature deemed insufficient to establish that a trustee is not independent. See Mass. Gen. Law ch. 156D § 7.44(c). Further, we find it notable that even in opposing defendants' motion, plaintiff explicitly declines to offer any reason why the rejection of the demand was

cannot consider section 7.44 or Rule 23.1's applicability without first allowing for limited discovery to take place. The requested discovery is denied. "The purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists. The pleadings provide no basis for speculating that something might be caught in a fishing expedition." <u>Stoner</u>, 772 F.Supp. at 800; <u>see</u> <u>also</u> <u>Brody v. Chemical Bank</u>, 482 F.2d 1111, 1114 (2d Cir. 1973) ("In any event, the [pleading] must comply with Rule 23.1 . . . . . After pleading in compliance with Rule 23.1 the question of whether or not discovery should be permitted rests in the discretion of the trial court . . . .") (citations omitted). Since plaintiff has not pled that the defendant directors making the determination were not independent or did not act in good faith after reasonable inquiry, plaintiff has failed to clear the initial hurdle of an adequate pleading so as to provide a basis for discovery.[9]   In addition, the complaint asserts no basis for

---

illegitimate. Although we need not pass judgment as to whether the Board's rejection of the demand was proper at this time, we are concerned by plaintiff's unwillingness to even attempt to engage this issue.

[9] We note that the authorities upon which plaintiff relies to support his request for additional discovery are not contrary to our conclusion, or are set in a different procedural posture. We detail these cases because we are concerned with the cavalier nature of plaintiff's citations to authorities in their submission, and thus believe it prudent to distinguish those cases.

To begin, the majority of the cases plaintiff cites are based on the Delaware Supreme Court's decision in <u>Zapata Corp. v. Maldonado</u>, 430 A.2d 779, 786 (Del. 1981), which applied a heightened standard of

review where a demand was rejected by a "Special Litigation Committee" or "SLC," appointed by an interested board which had delegated decision making authority over the litigation to the committee.  The interested nature of the board and the delegation of powers to accept or reject a demand create the additional need for discovery and scrutiny prior to applying the business judgment rule.  <u>See</u>, <u>e.g.</u>, <u>Rosengarten v. Buckley</u>, 613 F.Supp. 1493, 1499 (D.Md. 1985) (concluding that Maryland law would follow the rule set forth in <u>Zapata</u> in evaluating the adequacy of SLC); <u>Strougo ex rel. Brazil Fund, Inc. v. Padegs</u>, 1 F.Supp.2d 276, 282 (S.D.N.Y. 1998) (following the <u>Rosengarten</u> approach in applying the <u>Zapata</u> standard to SLC under Maryland law); <u>Lewis v. Fuqua</u>, 502 A.2d 962, 971-72 (Del. Ch. 1985) (requiring discovery when applying <u>Zapata</u> test to evaluate a SLC); <u>In re Oracle Corp. Deriv. Litig.</u>, 824 A.2d 917, 928-29 (Del. Ch. 2003) (applying <u>Zapata</u> in review of SLC decision).  This case does not involve a Special Litigation Committee as existed in these other cases.  Although the Board here established a committee to investigate the demand, the Board did not delegate to the committee the ultimate decision to reject the demand.  The rejection of the demand was made by a majority vote of presumptively independent directors, who evaluated the report of the committee, and thus § 7.44(b)(1) applies to the present case. <u>See also</u> <u>Stoner</u>, 772 F.Supp. at 800 (emphasizing distinction between a special litigation committee appointed by a board with full power to continue or terminate a shareholder suit, as opposed to a committee with the power only to recommend acceptance or rejection of a demand).  Further, had the board in this case appointed such an SLC, it would be governed Mass. Gen. Law. ch. 156D § 7.44(b)(2) and not the law of the states in the cases cited by plaintiff.

In addition, Massachusetts has expressly rejected the Delaware approach as set forth in <u>Zapata</u> to judicial scrutiny of decisions of special litigation committees, or other decision-makers.  <u>See</u> Mass. Gen. Law. ch. 156D § 7.44, cmt. 2.  Since plaintiff has not pled facts to suggest that a majority of the board was not independent in the present controversy, the rule in <u>Harhen v. Brown</u>, 730 N.E.2d 859, 867 (Mass. 2000) applies here, and defendants may avail themselves of the business judgment rule, with the burden of proof on the plaintiff. <u>See</u> Mass. Gen. Law. ch. 156D § 7.44, cmt. 2.

Further, the cases plaintiff relies upon stand for the proposition that a court is not barred from requiring further discovery, not that it is obligated to allow it.  <u>See</u>, <u>e.g.</u>, <u>Fagin v. Gilmartin</u>, 432 F.3d 276, 285-86 & n.2 (3d Cir. 2005) (concluding that the district court in applying New Jersey derivatives law was not bound to the New Jersey Supreme Court's decision mandating limited discovery in demand refused cases).

The other cases cited by plaintiff are inapplicable here.  In <u>Hasan v. CleveTrust Realty Investors</u>, 729 F.2d 372, 379-80 (6th Cir. 1984), the Sixth Circuit needed to predict the level of scrutiny a Massachusetts court would have applied in considering an SLC's review of a demand, a question which has now been resolved by Massachusetts

"plaintiff's failure to obtain the action" from the board as is required by Rule 23.1.    Fed.R.Civ.P. 23.1.    Further, it is unclear to this Court what more plaintiff would achieve from additional discovery.    Defendants have submitted thousands of pages detailing the backgrounds of the directors at issue, as well as the extensive efforts made by the independent counsel in preparing its review of the demand for the committee and the Board.    Absent a specific allegation in the complaint as to why the Board was not disinterested, nor why the demand was refused, and absent a specific argument from plaintiff as to what more discovery would yield, we decline to allow plaintiff to avail himself of a premature opening of the floodgates to discovery in an effort to cure the deficiencies of his complaint.

**B.    Claims II and III**

Plaintiff describes Claims II and II as "two direct causes of action based on the Proxy Statement's description of voting procedures employed by defendants," a method of voting known as echo voting.    Pl. Mem. Opp. at 5; see also Compl. ¶¶ 45-47.    As mentioned above, plaintiff alleges that defendants secured the approval of the new advisory agreements by issuing a materially false and misleading Proxy Statement which failed to disclose

---

courts as discussed above.    The court in Joy v. North, 692 F.2d 880, 892 (2d Cir. 1982), specifically noted that its holding was limited to cases determining, on summary judgment, whether a board's action, as evaluated by an SLC, was more likely than not to be against the interests of the corporation.

information concerning the voting procedure's compliance with ICA section 15(a), 15 U.S.C. § 80a-15(a), and Massachusetts law, as well as an alleged diversion of CitiTrust assets. See Compl. ¶¶ 47, 57-61; see also Pl. Mem. Opp at 5. Specifically, plaintiff states that a vote by a Citigroup affiliant, an interested party in the underlying transaction, rather than by the holders of beneficial interests, pursuant to "echo voting" violates the express language of section 15(a). See Compl. ¶ 47. Accordingly, plaintiff argues that because of the material misrepresentation concerning the propriety of the echo voting procedure, "plaintiff and CitiTrust's other beneficial holders were denied the right to cast an informed vote under both Federal proxy rules (Claim II) and state fiduciary duty requirements of full and fair disclosure (Claim III)." Pl. Mem. Opp at 5-6; see also Compl. ¶¶ 59, 64-65. Plaintiffs bring Claim II as a direct claim pursuant to ICA section 20(a) of the ICA, Compl. ¶ 58, and Claim III as a direct claim of breach of fiduciary duties under Massachusetts business trusts law. Compl. ¶¶ 64-65.

Defendants move to dismiss these claims on two grounds. First, defendants argue that since there is no private right of action under section 20(a) of the ICA, Claim II should be dismissed. Second, defendants assert that Claims II and III are not direct claims but instead derivative claims under

27

Massachusetts law, and thus must be dismissed since plaintiff failed to meet the universal demand requirement. Third, defendants argue that plaintiff has not pled fraud with particularity, as is required under Rule 9(b), and that as a matter of law the Proxy Statement was not materially misleading. We will examine these arguments *seriatim*.

### 1.   Whether a Private Cause of Action Exists under Section 20(a) of the ICA

Section 20(a) of the ICA provides, in relevant part, as follows:

> It shall be unlawful for any person . . . to solicit . . . any proxy or consent or authorization in respect of any security of which a registered investment company is the issuer in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 80a-20(a). The Supreme Court's decision in Alexander v. Sandoval, 532 U.S. 275 (2000), established that courts must look to Congressional intent to determine whether a federal private right of action exists for violations of a federal statute, and held that "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress." Id. at 286. Following the Court's lead in Sandoval, which severely restricted the "ancien regime" affording courts latitude to find implied rights of action to effectuate the congressional purpose expressed by statutes, id.

at 287, the Second Circuit in _Olmstead v. Pruco Life Insurance Co._, 283 F.3d 429 (2d Cir. 2002), held that no implied right of action exists under sections 26(f) and 27(i) of the ICA. Although no court in this Circuit, after _Sandoval_ and _Olmstead_, has decided the precise issue before us here, defendants argue that "[t]he reasoning behind these decisions compels the conclusion that there is [ ] also no private right of action under § 20(a) of the ICA." Def. Mem. Supp. at 22. Plaintiff argues that ICA section 20(a) is a "pass through" statute which relies upon SEC Rule 20a-1, 17 C.F.R. § 270.20a-1(a), requiring that all proxy statements issued by registered investment companies must comply with proxy statement rules promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, _see_ _Kamen v. Kemper Financial Services, Inc._, 500 U.S. 90, 94 n.1 (1991), and SEC Rule 14-a9, 17 C.F.R. § 240.14a-9, which prohibits false and materially misleading proxy statements. _See_ Pl. Mem. Opp. at 26-27. Accordingly, plaintiff argues that for defendants to prevail, they would need to argue successfully either that (1) the SEC did not properly adopt Rule 20a-1, or (2) there is no private right of action under Rule 14a-9. _See_ Pl. Mem. Opp. at 27. Plaintiffs assert this argument without supporting authority for their proposition, and without mentioning either _Sandoval_ or _Olmstead_.

We disagree with plaintiff's reading of the relevant statute. Sandoval stands for the principle that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." 532 U.S. at 286 (emphasis added). In reaching its conclusion, the Court explicitly rejected the argument that regulations which may contain rights-creating language could be the basis for the endowment of privately enforceable rights upon the plaintiff. Plaintiff's "argument skips an analytical step. Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." Id. at 291 (internal citations omitted). Thus, although plaintiff's argument may hold weight where "a statute has provided a general authorization for private enforcement of regulations . . . it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress." Id. Accordingly, we turn to the factors outlined by the Second Circuit in Olmstead, and more recently in Bellikoff v. Eaton Vance Corp., 481 F.3d 110 (2d Cir. 2007) (per curiam), in examining whether a statutory private right of action exists under section 20(a) of the ICA. The Olmstead factors are: (1) whether the provision explicitly provides for a private right of

action; (2) whether the provision contains "rights-creating language" for those protected under the statute; (3) whether the statute has provided an alternative method of enforcement; and (4) whether Congress provided a private right of action for enforcement of any other section of the statute.  <u>Olmstead</u>, 283 F.3d at 432-34.

First, since no provision of the ICA explicitly provides a private right of action for violations of section 20(a), "we begin with the presumption that Congress did not intend one." <u>Eaton Vance</u>, 481 F.3d at 110.  Second, there is an absence of "rights-creating" language which implies a lack of congressional intent to create private rights of action.  "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."  <u>Olmstead</u>, 283 F.3d at 433 (quoting <u>Sandoval</u>, 532 U.S. at 289) (internal quotation and citation omitted).  Further, "even where a statute is phrased in . . . explicit rights-creating terms, a plaintiff suing under the implied right of action still must show that the statute manifests an intent to create not just a private <u>right</u> but also a private <u>remedy</u>."  <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 284 (2002) (quoting <u>Sandoval</u>, 532 U.S. at 286) (emphasis in original).  Section 20(a) focuses on regulating entities who solicit proxies, and not on shareholders.  Although the section

31

does mention investors, it does so in the context of describing the type of rules which the Commission may prescribe, and it is not the focus of the section, nor the object of the proscription.  Applying plaintiff's "pass through" argument in this context is problematic, since "[s]uch an expansive reading of the statutory text would find implied rights of action in every section of the ICA.  This was clearly not Congress's intent." Eaton Vance, 481 F.3d at 110.

Third, section 42(a) of the ICA explicitly provides for enforcement of "any provision of this subchapter or of any rule, regulation, or order hereunder," including section 20(a), by the Securities and Exchange Commission through investigations and civil suits for injunctions and penalties.  15 U.S.C. § 80a-41. Such an "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others . . . Sometimes the suggestion is so strong that it precludes a finding of congressional intent to provide a private right of action, even though other aspects of the statute . . . suggest the contrary." Sandoval, 532 U.S. at 290; see also Olmstead, 283 F.3d at 433; Eaton Vance, 481 F.3d at 110.

Fourth, "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of any explicit private right to enforce other sections was intentional." Olmstead, 283 F.3d at 433.  As noted in

<u>Olmstead</u> and <u>Eaton Vance</u>, section 36(b)[10] of the ICA creates a private right of action for investors in regulated investment companies alleging that investment advisors breached certain fiduciary duties.   <u>See</u> 15 U.S.C. § 80a-35(b).   Since "[o]bviously . . . when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly," <u>Touche Ross & Co. v. Redington</u>, 442 U.S. 560, 572 (1979), it seems apparent that the omission of an explicit private right of action for section 20(a) was an intentional Congressional decision.   <u>See Olmstead</u>, 283 F.3d at 433; <u>Eaton Vance</u>, 481 F.3d at 110.   On the basis of these four factors, we conclude that Congress did not intend to create a private right of action for violations of section 20(a), and accordingly dismiss Claim II.[11]

---

[10] For purposes of clarification, we note that section 80a-35(b) of the ICA is commonly referred to as section 36(b), as it is herein. <u>See</u> <u>Stegall v. Ladner</u>, 394 F.Supp.2d 358, 369 n.9 (D.Mass 2005).

[11] Although the Supreme Court has never explicitly addressed the issue of whether section 20(a) of the ICA provides for a private right of action for either a direct or derivative claim, <u>see</u> <u>Kamen v. Kemper Financial Services, Inc.</u>, 500 U.S. 90, 97 n.4 (1991), we acknowledge that pre-<u>Sandoval</u> decisions by district courts in this Circuit concluded that a private right of action existed under section 20(a). <u>See</u>, <u>e.g.</u>, <u>Krinsk v. Fund Asset Management</u>, 654 F.Supp. 1227 (S.D.N.Y. 1987); <u>Schuyt v. Rowe Price Prime Reserve Fund, Inc.</u>, 622 F.Supp. 169 (S.D.N.Y. 1985).   However, these pre-<u>Sandoval</u> cases relied on the progeny of <u>J.I. Case Co. v. Borak</u>, 377 U.S. 426 (1964), a case which stood for the proposition that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" expressed by a statute.   <u>Id.</u> at 433; <u>see also</u> <u>Krinsk</u> 654 F.Supp. at 1233 (citing <u>Borak</u>).   The Court made clear in <u>Sandoval</u> that <u>Borak</u> was part of the "<u>ancien regime</u>," and that a new era has arrived, with more limited discretion for courts to read private causes of action into statutes which do not explicitly so provide.   <u>See</u> <u>Sandoval</u>, 532 U.S. at 287-288; <u>see also</u> <u>id.</u> at 286-87 ("Statutory intent . . . is determinative.   Without it, a cause of

2.   **Whether Claims II and III are Direct or Derivative under Massachusetts Law**

The nature or character of a claim against a corporation is determined according to the law of the state of the corporation, and not dictated by the form the plaintiff chooses to plead in his or her complaint.  See, e.g., Strougo v. Bassini, 282 F.3d 162, 167-69 (2d Cir. 2002).   Whether a claim is individual or derivative in nature is determined from the nature of the harm inflicted and the nature of the rights violated.   To bring a direct action under Massachusetts law,[12] a plaintiff must allege either an injury which is separate and distinct from that suffered by shareholders generally, or a wrong involving one of his or her contractual rights as a shareholder.   See Sarin v. Ochsner, 721 N.E.2d 932, 934-35 (Mass. App. Ct. 2000); Lapidus v. Hecht, 232 F.3d 679, 693 (9th Cir. 2000) (relying on Sarin while interpreting Massachusetts law).   To put it differently,

---

action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.  Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." (internal citation and quotation omitted)). Although plaintiff relies on these prior precedents in its papers, without mention of Sandoval or Olmstead, we agree with defendants' conclusion that that these newer decisions lead to one conclusion with regard to section 20(a) and the claim asserted by plaintiff: "[s]ince Congress did not create a private right of action by statute, the SEC cannot create one by regulation." Def. Mem. Supp. at 9.

[12] We note that Massachusetts courts often rely upon Delaware authority to distinguish between derivative and direct claims.  See, e.g., Sarin v. Ochsner, 721 N.E.2d 932, 934-35 (Mass. App. Ct. 2000) (applying principles of Delaware law in determining distinction between direct and derivative claims under Massachusetts law).

"[u]nder Massachusetts law, if the wrong underlying [a] claim results in harm to a plaintiff shareholder only because the corporate entity has been injured, with the plaintiff's injury simply being his proportionate share of the entity's injury, the harm to the shareholder is indirect and his cause of action is derivative." <u>Forsythe v. Sun Life Financial, Inc.</u>, 417 F.Supp.2d 100, 112 (D. Mass. 2006). Thus, whether a claim is derivative turns on whether the shareholders were injured only insofar as they owned corporate stock, since a claim "alleging mismanagement or wrongdoing on the part of corporate officers or directors normally states a claim of wrong to the corporation: the action, therefore, is properly derivative." <u>Jackson v. Stuhlfire</u>, 547 N.E.2d 1146, 1148 (Mass. App. Ct. 1989).

Defendants claim that since the basis for Claims II and III are alleged misrepresentations in the Proxy Statement with regard to defendants' capacity to use echo voting as a procedure under Federal and Massachusetts law, these claims are derivative in nature because they seek to redress an alleged injury to the Funds. Accordingly, argue defendants, these claims must be dismissed since plaintiff failed to make a demand on the Board with respect to these claims prior to filing suit. <u>See</u> Def. Mem. Supp. at 17-18. We agree.[13] Although plaintiff

---

[13] The derivative nature of Claim II may be construed as an alternative ground for its dismissal, in light of our conclusions

characterizes this as being a case where defendants interfered with shareholders' voting rights, plaintiff's self-styled characterization is insufficient to give rise to the inference that Claims II and III are direct claims.   Under Lapidus, the plaintiff must allege "an injury distinct from that suffered by shareholders generally or a wrong involving one of his or her contractual rights as a shareholder, such as the right to vote."[14]   232 F.3d at 683 (emphasis added).   In addition, those cases which have found there to be direct claims based on interference of voting rights have involved situations where plaintiffs allege a dilution of the shareholder's voting rights in contravention of the shareholder's contractual rights.   See, e.g., Gentile v. Rossette, 906 A.2d 91, 100 (Del. Supr. 2006). Plaintiff's complaint does not assert that the use of echo voting deprived him of a contractual right to vote.   Nor could

---

above with regard to the lack of an implied private right under section 20(a) of the ICA.
[14]   Although plaintiff cites to two cases in which claims of material misrepresentation resulted in direct as opposed to derivative claims, both dealt with situations in which the misrepresentation led individuals to make investments in companies which they would not have done absent the misrepresentation, a harm which is cognizable as an injury to the shareholder separate and distinct from that of the corporation or fund.   See, e.g., Blasberg v. Oxbow Power Corp, 934 F.Supp. 21, 26 (D. Mass. 1996) (stating that investors who were misled and defrauded into the purchase of their investment as a result of defendants actions suffer separate and distinct harm than corporation and thus has direct claim); In re Eaton Vance Mut. Funds Fee Litig., 380 F.Supp.2d 222, 235 n.5 (S.D.N.Y. 1995) (stating that material misrepresentations and omissions about the management of a fund which induced investors to continue to invest in the company was "an injury to the investors separate and distinct from any injury to the [funds] . . .").

it, in light of the fact that the Trust Instrument, which is the
source of plaintiff's contractual rights as a shareholder,
expressly authorizes the use of the procedure, see supra note 2,
and shareholders were not denied the opportunity to vote on any
proposed new advisory contract.[15]  Even assuming arguendo that
plaintiff's allegation that the Proxy Statement was in
contravention of both the ICA and Massachusetts law is correct,
plaintiff fails to articulate a theory by which the alleged harm
to shareholders which resulted from the misleading nature of the

---

[15]  Plaintiff asserts, inter alia, that "[t]he only practicable
means for CitiTrust beneficiaries to oppose the Citigroup-Legg Mason
transaction . . . was to withhold their vote.  By withholding their
vote, the beneficiaries could have prevented the requisite vote in
favor of approving the new advisory contracts or prevent the
attainment of a quorum."  Compl. ¶ 3; see also Tr. at 10 (plaintiff's
counsel asserting that plaintiff, along with other "rational
investors," deliberately withheld voting in favor of the transaction
in order to attempt to prevent a quorum from being formed and thus to
block approval of the new advisory contracts).  However, as defendants
point out, this assertion is factually incorrect.  As set forth in the
Proxy Statement, a "quorum" for the CitiTrust Fund is 30 percent of
the voting power entitled to vote.  See Proxy Statement at B-8.
However, under the voting rules established under the ICA, the new
contracts could only be approved by either (1) an absolute majority of
all outstanding shares (which, by definition, is more than a 30
percent quorum); or (2) 67 percent of the shares at a meeting, if more
than 50 percent of the shares are present at the meeting either in
person or by proxy.  See 15 U.S.C. §§ 80a-2(a)(42), 80a-15(a).  Thus,
under the ICA, the smallest number of shares that could theoretically
approve the new contract would be 33.5 percent of the outstanding
shares.  Since this amount is greater than the 30 percent quorum, the
presence of sufficient share to approve the contract will always be
greater than the quorum under the ICA.  Further, in light of the fact
that echo voting requires the service agent to vote the shares
proportionally to votes actually cast, a "no" vote by a shareholder
would increase the share of "no" votes cast by the service agent.
Consequently, a more "practicable means" to defeat the new contracts
would be by 50 percent of shares voting "no", as opposed to 70 percent
of shares abstaining as would be required to block the vote through
failure to attain a quorum.

Proxy Statement was separate and independent from the harm allegedly resulting to the Fund itself.  Accordingly, we dismiss claims II and III for plaintiff's failure to demand on the Board with respect to these claims.

### 3.   Whether Claims I and II Comply with Rule 9(b)

In the alternative, we also agree with defendants that Claims II and III fail to meet Rule 9(b)'s heightened standard of pleading for claims which sound in fraud.  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed.R.Civ.P. 9(b).  Plaintiff argues that fraud is not an element of either Claim II or III, and thus only a plain statement complying with Rule 8(a) is required.  However, the wording of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  Rombach, 355 F.3d at 171.  The complaint refers to no provisions in the Trust Instrument or the Funds' prospectuses that would prohibit echo voting, nor any explanation as to why echo voting violates ICA § 15(a) or Massachusetts law, nor points to any specific "diversion of assets".  Although we can glean plaintiff's theories of liability from their submissions in opposition to the motion, plaintiff was obligated to plead these theories in his complaint

with particularity and failed to do so.[16]    Accordingly, these
claims must be dismissed here.[17]

## CONCLUSION

For the reasons stated above, defendants' motion is granted
in its entirety, and the complaint in this case is dismissed.

**IT IS SO ORDERED.**

Dated:    New York, New York
          July 31, 2007

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[16]    Further, the complaint's failure to meet the dictates of Rule
9(b) provides another reason why discovery on the issues before us
would be inappropriate, since one of the fundamental purposes behind
Rule 9(b) is "to discourage the filing of complaints as a pretext for
discovery of unknown wrongs."  Madonna v. United States, 878 F.2d 62,
66 (2d Cir. 1989).

[17] We decline to decide whether echo voting in this context was in
fact illegal, and consequently whether the proxy statement was false
or misleading for its failure to note that echo voting was in
contravention of federal and Massachusetts law, especially in light of
our   conclusions   regarding   plaintiff's   failure   to   plead   with
particularity in the complaint reasons why the proxy statements were
fraudulent.    See infra.

        Copies of the foregoing Memorandum and Order have been
mailed on this date to the following:

    Counsel for Plaintiff

    Joel C. Feffer, Esq.
    Daniella Quitt, Esq.
    James G. Flynn, Esq
    Harwood Feffer LLP
    488 Madison Avenue, 8th Floor
    New York, NY 10022

    Counsel for Defendants

    Jeffrey A. Simes, Esq.
    Goodwin Procter LLP
    599 Lexington Avenue
    New York, NY 10022

    Matthew Hoffman, Esq.
    Michael K. Isenman, Esq.
    Goodwin Proctor LLP
    901 New York Avenue, N.W.,
    Washington, DC 20001

    James S. Dittmar, Esq.
    Goodwin Procter LLP
    53 State Street
    Boston, MA 02109

    Jonathan G. Kortmansky, Esq.
    Sullivan & Worchester LLP
    1290 Avenue of the Americas
    New York, NY 10104