UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

JOHN HALEBIAN, individually and on
behalf of all other similarly
situated trust beneficiaries and
derivatively on behalf of CITIFUNDS
TRUST III,

                         Plaintiff,

         - against -

ELLIOT J. BERV, DONALD M. CARLTON,          **MEMORANDUM AND ORDER**
A. BENTON COCANOUGHER, MARK T. FINN,
STEPHEN RANDOLPH GROSS, DIANA R.             06 Civ. 4099 (NRB)
HARRINGTON, SUSAN B. KERLEY, ALAN G.
MERTEN, and R. RICHARDSON PETTIT,

                         Defendants,

         - and -

CITIFUNDS TRUST III,

              Nominal Defendant.

----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

## I. Introduction

On July 31, 2007, in <u>Halebian v. Berv</u> ("<u>Halebian I</u>"), 631

F. Supp. 2d 284 (S.D.N.Y. 2007), we dismissed the complaint of

John Halebian ("plaintiff"), which was brought against nine

members of the board of trustees ("defendants") of CitiFunds

Trust III (the "Trust"), a business trust organized under the

laws of the Commonwealth of Massachusetts.  In his complaint,

plaintiff challenges defendants' decision in 2005 to continue to

employ the existing investment adviser to the mutual funds

comprising the Trust when the ownership of the investment adviser changed from Citigroup, Inc. to Legg Mason, Inc.

On August 29, 2007, plaintiff appealed from the judgment that we entered against him. In the intervening years, three appellate-court decisions have analyzed this case. In the last, the Second Circuit affirmed our judgment dismissing the complaint's second and third claims but vacated our judgment dismissing the complaint's first claim, a derivative claim. Remanding the case to us with specific instructions to convert the defendants' original motion to dismiss this derivative claim into one for summary judgment under Federal Rule of Civil Procedure 56, the Second Circuit directed us to make an express finding as to the independence of defendants under the provision of state law governing the dismissal of derivative proceedings. In addition to this task, pending before us are plaintiff's motions to amend his complaint and for discovery, both of which he filed following remand. Addressing these three motions in reverse order and for the reasons stated below, plaintiff's motions are denied and defendants' converted motion for summary judgment is granted.

## II. Background[1]

The general facts underlying this case are now well reported in four published opinions. See Halebian I, 631 F. Supp. 2d at 287-91; Halebian v. Berv ("Halebian II"), 590 F.3d 195, 199-203 (2d Cir. 2009); Halebian v. Berv ("Halebian III"), 457 Mass. 620, 621-24, 931 N.E.2d 986, 987-89 (2010); Halebian v. Berv ("Halebian IV"), 644 F.3d 122, 124-27 (2d Cir. 2011). Like the Second Circuit, "[w]e see no need to reiterate them here except insofar as we think it necessary to an understanding of our resolution" of the outstanding issues on remand. Halebian IV, 644 F.3d at 124. In light of the task with which the Second Circuit has charged us, however, we do set out facts here that have not been previously catalogued, particularly facts regarding defendants and their investigation of the alleged improprieties that underlie this case.

### A. The Citigroup-Legg Mason Transaction

On June 23, 2005, Citigroup, Inc. ("Citigroup") entered into an agreement to sell substantially all of its asset

---

[1] Unless otherwise noted, the facts recited here and in subsequent parts of this Memorandum and Order are drawn from the following sources: (1) the plaintiff's complaint ("Compl."); (2) the defendants' moving papers on their motion to dismiss ("Defs.' Br."); (3) the declaration of Mark T. Finn in support of defendants' motion ("Finn Decl."); (4) the plaintiff's opposing papers ("Pl.'s Opp'n"); (5) the declaration of Daniella Quitt in opposition to defendants' motion ("Quitt Decl."); (6) the defendants' reply papers ("Defs.' Reply"); (7) the plaintiff's moving papers on his motions for discovery and to amend the complaint ("Pl.'s Br."); (8) the declaration of Joel C. Feffer in support of plaintiff's motions ("First Feffer Decl."); (9) the defendants' opposing papers ("Defs.' Opp'n"); (10) the plaintiff's reply papers ("Pl.'s Reply"); and (11) the reply declaration of Joel C. Feffer in support of plaintiff's motions ("Second Feffer Decl.").

management business to Legg Mason, Inc. ("Legg Mason") (the "transaction").   Finn Decl. Exs. D ("Proxy Statement") 10, K ("Report") Ex. 17 (article announcing the transaction).   As of that date, Citi Fund Management Inc. ("CFM"), a subsidiary of Citigroup, served as the investment adviser to the six mutual funds--each of which has its own separate shareholders--that then comprised the Trust, which was at that time an investment company registered with the Securities and Exchange Commission (the "SEC").[2]   See Halebian I, 631 F. Supp. 2d at 287-88; Proxy Statement 9-10, App. A A-3, App. B B-8.   Under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1 et seq. (the "ICA"), the sale of the asset management business and in particular CFM triggered the termination of the existing investment advisory agreements between the mutual funds comprising the Trust and CFM (the "Old Agreements"), requiring these mutual funds to enter into new investment advisory agreements (the "New Agreements").   See Halebian I, 631 F. Supp. 2d at 288 (discussing applicable law).   Pursuant to the ICA, the New Agreements had to be approved by a majority of the members of the board of trustees who are not "interested persons" under the ICA and by a vote of a majority of the outstanding shares of each of the mutual funds.   See 15 U.S.C. § 80a-15(a), (c).

---

[2] In his complaint, plaintiff states that he is a shareholder of the Citi New York Tax Free Reserves Fund (the "N.Y. Tax Free Fund"), which is one of the six mutual funds comprising the Trust.   See Compl. ¶ 7.

**B. The Board**

At all relevant times, the board of trustees (the "board") of the Trust was composed of ten members.  R. Jay Gerken ("Gerken") was an acknowledged "interested person" under the ICA who served on the board and was also employed as a director and officer for multiple subsidiaries of Citigroup, including CFM. See Proxy Statement 50, 52.  In addition to overseeing the six mutual funds that comprised the Trust, Gerken also served on the governing boards for well over a hundred other mutual funds, which were all within the family of funds for which subsidiaries of Citigroup served as investment advisers.  See id. at 52.

Defendants occupied the remaining nine seats on the board. Like Gerken, defendants served on multiple governing boards within the Citigroup family of funds--between thirty-two and thirty-seven boards in each case at all relevant times--and so were involved as a result of the transaction in voting to approve new investment advisory agreements on behalf of many more mutual funds than only the six that comprised the Trust. See id. 50-52.  Unlike Gerken, defendants were not employees or otherwise acknowledged to be "interested persons" under the ICA of Citigroup, CFM, the Trust, or any other relevant individuals or entities.  See id.  We list defendants' names immediately below and note (i) the date on which they began serving as trustees or directors to mutual funds within the Citigroup

5

family of funds; (ii) the compensation they received for their service on the board in the calendar year ended December 31, 2004; and (iii) the overall compensation they received for their service as trustees or directors for mutual funds within the Citigroup family of funds in the calendar year ended December 31, 2004:

> Elliot J. Berv ("Berv") 1989/$4,663/$90,200;
> Donald M. Carlton ("Carlton") 1997/$4,797/$92,800;
> A. Benton Cocanougher "Cocanougher") 1991/$4,276/$83,400;
> Mark T. Finn ("Finn") 1989/$4,939/$95,400;
> Stephen Randolph Gross ("Gross") 1986/$4,959/$95,300;
> Diana R. Harrington ("Harrington") 1992/$4,646/$90,100;
> Susan B. Kerley ("Kerley") 1992/$6,259/$120,200;
> Alan G. Merten ("Merten") 1990/$4,239/$82,600; and
> R. Richardson Pettit ("Pettit") 1990/$4,699/$90,300.

Id. at 50-55.  During the years preceding the events in question here, the compensation that several defendants received for their service as trustees and directors amounted to a significant portion of their annual income (i.e. 25% to 50%). Report 33.  In addition, through their service as trustees and directors, defendants accrued retirement benefits as of the events in question here collectively worth $3,600,000.[3]

    In an apparent effort to confirm that defendants were still not "interested persons" under the ICA or otherwise subject to a

---

[3] The figure of $3,600,000 reflects the estimate of plaintiff's counsel, see First Feffer Decl. ¶ 6, Ex. B ¶ 20, which we presume is derived from information on defendants' compensation contained in the proxy statement. See Proxy Statement 55.  While our own calculations are slightly different from that of plaintiff's counsel, defendants' counsel has not contested the figure of $3,600,000, which we accordingly accept for the purposes of deciding the pending motions.

conflict of interest, defendants were asked to complete a questionnaire shortly prior to their approval and recommendation of the New Agreements (the "First Questionnaire"). In the First Questionnaire, defendants answered questions bearing on their backgrounds as well as their interests in and relationships to the Trust and the various individuals and entities related to it that were tied to Citigroup and Legg Mason in one manner or another.[4] In particular, defendants addressed sets of questions that were similarly posed to all of the directors and trustees serving within the Citigroup family of funds and that delved inter alia into (i) their ownership of securities in any of the mutual funds within the Citigroup family of funds;[5] (ii) their recent employment histories, see First Questionnaire 7-8; (iii) their relationships with any of the mutual funds within the Citigroup and Legg Mason families of funds as well as the directors, trustees, and officers of those mutual funds, see id. at 8-10; (iv) their relationships with any of the investment advisers or other financial service providers to the mutual funds within the Citigroup and Legg Mason families of funds as well as certain of their officers, see id. at 10-13; (v) their

---

[4] This questionnaire was referenced in the Demand Review Committee Report (the "report"). See Report 31. In response to our request, defendants' counsel provided us with electronic copies of this questionnaire and its exhibits as well as the answers of each of the defendants to it, which were circulated as attachments to letters dated June 19, 2012 and June 21, 2012 on which plaintiff's counsel was copied.

[5] The question addressed to defendants' securities holdings appeared on a single sheet, which was apparently appended to the First Questionnaire.

involvement in any pertinent legal proceedings, see id. at 15-17; (vi) their level of expertise with accounting and financial matters, see id. at 17-18; and (vii) their nomination to the governing boards on which they served.  See id. at 18-19.  At the conclusion of the First Questionnaire, defendants signed their names, attesting that "[t]he foregoing answers are correctly stated to the best of my knowledge, information and belief." Id. at 19.

The answers that defendants provided to these questions between July 15, 2005 and July 26, 2005,[6] reveal the breadth and depth of their professional experience: four defendants worked as professors at well-respected colleges and universities where two of them self-identified that they served as professors of finance, see, e.g., Cocanougher First Questionnaire 7 (reflecting employment history with Texas A&M University); six defendants worked in one or another capacity in finance, consulting, or accounting, see, e.g., Finn First Questionnaire 7 (reflecting employment history in investment management); and one defendant, Carlton, noted that he served on the board of directors of at least two large corporations (i.e. American

---

[6]  The one exception to this time period relates to the questionnaire associated with Harrington, which was completed on January 1, 2005 and which based on analysis we deduce was part of a prior round of questionnaires unrelated to the transaction between Citigroup and Legg Mason.  While defendants' counsel neglected to identify this discrepancy in the records that were provided to the Court, the issue proves immaterial in light of the subsequent questionnaire that Harrington as well as the other defendants completed, electronic copies of which were similarly submitted for our review.  See infra note 7.

Electric Power, Co., Inc. and National Instruments Corp.). Carlton First Questionnaire 7. All defendants confirmed their ability to read and understand financial statements, and many of them further indicated a considerable level of experience with assessing such statements and supervising their preparation and audit. See, e.g., Merten First Questionnaire 17-18 (reflecting service on the audit committees of several public companies). Six defendants disclosed their ownership of securities in mutual funds within the Citigroup family of funds. The only other answer of "yes" appearing in the questionnaires reflected that Cocanougher owned common shares valued at $136,213.00 of General Electric Co., which served as a sponsoring insurance company to the Citigroup family of funds. See Cocanougher First Questionnaire 10; First Questionnaire App. D.

In a subsequent questionnaire completed after the approval of the New Agreements and roughly contemporaneous to the circulation of plaintiff's demand letter (the "Second Questionnaire"), defendants answered similar questions now addressing their interests in and relationships to the Trust but with a primary perspective on the new nexus of ties to Legg Mason that resulted from its acquisition of CFM, which continued to serve as the investment adviser to the mutual funds within

the Trust, as discussed in Part II.C below.[7]   The questions included in the Second Questionnaire almost entirely mirror in their substance those in the First Questionnaire, and, as with the First Questionnaire, the Second Questionnaire inquires into various possible relationships with individuals and entities related to Legg Mason and those entities acquired by Legg Mason from Citigroup in the transaction.[8]   The answers that defendants provided between February 6, 2006 and March 1, 2006 to the Second Questionnaire are substantively identical to their prior answers to the First Questionnaire.   The lone exception involves Harrington, who identifies that she by this time held securities in a mutual fund that she oversaw within the Legg Mason family of funds, joining the six of her colleagues who previously indicated their ownership of securities and who now affirmed in the Second Questionnaire that their continued holdings were also in mutual funds that they oversaw.   See Harrington Second Questionnaire 10.[9]   As before, the only other answer of "yes"

_____

[7] Again, in response to our request, defendants' counsel provided us with electronic copies of this questionnaire and its exhibits as well as the answers of each of the defendants, which were circulated as attachments in letters dated May 21, 2012, June 19, 2012 and June 21, 2012 on which plaintiff's counsel was copied.   We note that the answers of each of the defendants were originally submitted together with defendant's motion to dismiss.   See Report Ex. 13.

[8] Among the minor differences between the two questionnaires, the Second Questionnaire only asks defendants whether they hold shares in mutual funds that they directly oversee as opposed to mutual funds merely within the broader family of funds now tied to Legg Mason.   See Second Questionnaire 9-10.

[9] According to the report, by June 29, 2006, the date on which the report was finalized, eight of the nine defendants then held securities in a mutual fund within the Trust.   See Report 32-33.   This final representation as to the

appearing in the questionnaires reflected Cocanougher's ownership of common shares of General Electric Co., which he now valued at $132,000.00. See Cocanougher Second Questionnaire 13; Second Questionnaire App. D.[10]

### C. The Approval and Recommendation of the New Agreements

The transaction between Citigroup and Legg Mason was formally disclosed to defendants on June 21, 2005--two days before the companies formally signed on to it--during an "all-boards" telephone meeting, one in which the members of all of the boards of trustees and directors within the Citigroup family of funds participated. See Report 44. Over the ensuing six weeks, defendants analyzed the transaction and determined whether to approve the New Agreements, participating in six in-

---

Trust is likely an error in the report because as reflected in the answers to the Second Questionnaire submitted a few months earlier, only one defendant, Kerley, held securities in a mutual fund within the Trust, whereas seven defendants, including Kerley, indicated their ownership of securities in a mutual fund which they oversaw but that was not within the Trust. See Kerley Second Questionnaire 10 (listing holdings valued at less than $10,000 in Citi Connecticut Tax Free Reserves). This issue is immaterial, and in any event, as the report confirms, in each case, the number of shares that defendants owned in a mutual fund which they oversaw was less than five percent of the outstanding voting shares of that mutual fund and so beneath the threshold set in the ICA at which a shareholder becomes an "affiliate" and so "interested person" of a mutual fund. See 15 U.S.C. § 80a-2(a)(3), (19).

[10] It further appears that in the course of the investigation undertaken by the Demand Review Committee, which is discussed in Part II.D below, Merten reported that he was originally invited to join the Board in 1990 by Sanford Weill ("Weill"), who was then the Chairman of "Primerica Financial Services," which it appears likely was as an investment adviser or other service provider to the Trust in one of its prior incarnations. See Report 33. As the report clarifies, Merten had come to know Weill through their mutual professional activities at Cornell University, where they came in contact two or three times a year until 1996. See id. While we do not perceive that this information materially bears on the independence of Merten, we detail it for the sake of completeness.

person and telephone board meetings as well as seven further executive sessions at which defendants met alone with their counsel, Sullivan & Worcester LLP ("S&W").  See id. at 42.[11] Occurring roughly simultaneously to this review, defendants also addressed the annual renewal of the Old Agreements.  See id. at 43-44.  On August 7, 2005, defendants voted unanimously to renew the Old Agreements and approve the New Agreements, demonstrating inter alia their support for CFM continuing to serve as the investment adviser to the mutual funds comprising the Trust after the transaction closed and CFM's acquisition by Legg Mason was completed.  See id. at 42, 56-57, Ex. 34 7.[12]

While defendants approved the New Agreements on August 7, 2005, they initially refused to permit the release of a proxy statement recommending shareholder approval of the New Agreements.  Among the issues that had attracted the concern of

---

[11] In his proposed amended complaint and reply papers, plaintiff emphasizes that defendants were not substantively briefed on the transaction until July 11, 2005, which he stresses was only twenty-seven days prior to August 7, 2005, the date on which defendants approved the transaction.  See Proposed Am. Compl. ¶ 58(a); Pl.'s Reply 5.

[12] The approval and termination of the various investment advisory agreements at issue here is something of a dense thicket into which we need not push too deep.  However, it appears from context that the Old Agreements with CFM were set to terminate in or about August 2005 at which time defendants approved their renewal.  See Report Ex. 24 2-3 (minutes of board meeting held on July 22, 2005 discussing renewal of Old Agreements and approval of New Agreements), Ex. 34 1-7 (minutes of board meeting held on August 7, 2005 approving renewal of Old Agreements).  The Old Agreements remained effective until December 1, 2005, when the transaction between Citigroup and Legg Mason closed, triggering their automatic termination.  See Report 59-60.  On this date, an interim investment advisory agreement became effective, bridging the gap to the subsequent date on which the New Agreements, which defendants had approved in August 2005, became effective after receiving the requisite shareholder approval.  See Defs.' Br. 3-5.

defendants during their review of the transaction was the
branding of the money-market mutual funds that comprised the
Trust.   See Report 54-59.   In particular, defendants believed
that it was in the best interests of shareholders of these
money-market mutual funds to secure the ongoing support of
Citigroup and the right to retain the "Citi" name for a period
of time following the transaction.   See, e.g., Report Ex. 31
(letter of August 2, 2005 from S&W to representatives of
Citigroup emphasizing "the [i]ndependent [t]rustees are
concerned about the money market funds, whether the [f]unds will
be branded with a 'Citi' name, and whether and how Citigroup and
its businesses and customers will support such [f]unds post-
closing of the proposed . . . transaction").   Following
indications that such an arrangement could be achieved,
defendants approved the New Agreements but specified that a
proxy statement to shareholders could not be mailed until the
branding issue was definitively resolved.   See Report Ex. 33 2
(minutes of board meeting held on August 5, 2005 noting
"Citigroup had made a proposal to Legg Mason for use of the
'Citi' brand"), Ex. 35 1 (email of August 10, 2005 from S&W to
representatives of Citigroup memorializing "the [i]ndependent
[t]rustees' request . . . that proxy materials not be mailed
. . . until [they] are apprised of the satisfactory resolution
of the branding matter").   On September 2, 2005, defendants

received confirmation that Citigroup had agreed to license "Citi" to the money-market mutual funds comprising the Trust and also to provide access to its distribution channels for their benefit for a period of three years.  See Report Ex. 38 (minutes of board meeting held on September 2, 2005).  Accordingly, defendants permitted the proxy statement conveying their recommendation of the New Agreements to be mailed to shareholders.  See id.

With defendants' consent secured, the proxy statement was filed with the SEC on the afternoon of September 2, 2005 and circulated to shareholders on September 3, 2005.  See Quitt Decl. ¶ 8; Proxy Statement 1.  The proxy statement advised shareholders of the procedures that would govern their vote on the New Agreements and specifically informed them:

> With respect to any shares for which a Citigroup-affiliated service agent (other than a broker-dealer) is the holder of record and for which it does not receive voting instructions from its customers, such service agent intends to vote those shares in the same proportion as the votes received from its customers for which instructions have been received.

Id. at 8.  This voting practice, commonly known as "echo voting," was expressly permitted pursuant to the Trust's operative charter and most recent prospectus.  See Halebian I, 631 F. Supp. 2d at 288 n.2 (discussing charter and prospectus provisions that advised shareholders of the use of echo-voting procedures).

### D. The Demand, the Complaint, the Investigation, the Report, and the Rejection of the Demand

Following defendants' and also shareholders' approval of the New Agreements, on February 8, 2006, plaintiff's counsel wrote a demand letter to the board (the "demand letter"), generally asserting that "[a] review of the lengthy discussion of the board's deliberations over the new advisory agreements set forth in the proxy statement fails to disclose that the board ever considered the best interests of the [N.Y. Tax Free Fund of which plaintiff is a shareholder]." Finn Decl. Ex. E ("Demand Letter") 1. In the demand letter, plaintiff's counsel continued to insist "that the board take action which would include, among other things, the institution of an action for breach of fiduciary duty against any and all persons who are responsible for the board's dereliction of its duties in connection with the . . . transaction" and that "appropriate remedial measures should be undertaken, including seeking bids for the advisory contract from other qualified investment advisers, negotiating new terms more favorable to the [N.Y. Tax Free Fund] with Legg Mason, or both." Id. at 2. As the Second Circuit noted in Halebian II, plaintiff's counsel also stated in a footnote that "'shareholder approval does not appear to have been obtained properly,'" which was "presumably a reference to the echo voting practices described in the proxy statement."

590 F.3d at 200 (quoting Demand Letter 1 n.1).   In the demand letter, plaintiff's counsel "did not, however, make a demand with respect to this purported impropriety because, [it] said, the impropriety 'gives rise to direct, rather than derivative, claims.'"   Id. (quoting Demand Letter 1 n.1).

Following receipt of the demand letter, as we detailed in Halebian I:

> On March 24, 2006, the [b]oard voted to appoint . . . [trustees] Finn and . . . Gross to serve as a Demand Review Committee ([the] "DRC"). . . . Gerken . . . abstained from this vote because he is an "interested person" under the ICA.   Thus, the vote was taken by the remaining nine [] trustees . . . .   The [DRC] retained independent counsel, Leboeuf, Lamb, Greene & MacRae L.L.P. ("LeBoeuf"), led by Ralph E. Ferrara, former General Counsel of the [SEC], to assist in the inquiry of [p]laintiff's demand, and counsel undertook a review of the adoption of the new advisory agreements.   During the investigation, Mr. Ferrara wrote to [Joel C. Feffer,] plaintiff's counsel, on April 10, 2006, to inform him of the appointment of the DRC and to invite him to provide any additional information which might support the assertions made in the [d]emand [l]etter.   [Mr.] Feffer, sent a response dated April 20, 2006 to Mr. Ferrara, noting that he was "unclear" about the DRC's mandate, members, and powers in light of "the obvious anomaly of appointing people to consider suing themselves or their colleagues."   After asking "[w]hat type of 'additional information or support' does the [DRC] believe could be either relevant or in my possession", Mr. Feffer declined to provide any further information. Accordingly, on April 28, Mr. Ferrara sent a letter enclosing the resolution appointing the DRC which was passed by the [b]oard . . . in response to the [d]emand [l]etter, and invited plaintiff and [Mr. Feffer] to meet with the DRC towards the end of the review process.   [Mr. Feffer's] response, dated May 3, 2006, again asked what "additional information or support" was necessary.   Mr. Ferrara's letter, dated

> May 9, 2006, once again invited plaintiff and counsel
> to meet with the DRC to discuss the demand.

631 F. Supp. 2d at 290 (internal citations omitted).

In response to this last piece of correspondence, plaintiff's counsel filed the complaint that initiated this action on May 30, 2006. The complaint consisted of three claims. Claim I, "styled as a derivative claim for breach of fiduciary duty, allege[d] that members of the [b]oard breached their fiduciary duties of good faith and loyalty under Massachusetts law in their consideration of the . . . transaction and in recommending the" New Agreements. <u>Halebian II</u>, 590 F.3d at 201 (internal quotation marks and brackets omitted). As the Second Circuit has summarized:

> The complaint allege[d] that the "[d]efendants limited
> their consideration to whether the . . . transaction
> would be worse for [the Trust's] beneficiaries than
> their current situation" and "made no effort to
> investigate whether a transaction could be fashioned
> which would benefit [the Trust's] beneficiaries,
> either with Legg Mason or another asset manager."

<u>Id.</u> (quoting Compl. ¶ 36) (second set of brackets and ellipsis in original).[13]   In particular, plaintiff "contend[ed] that the soft-dollar arrangements [for which the New Agreements provided] allow for the payment of 'higher than necessary brokerage

---

[13] As we stated in <u>Halebian I</u>, "[a]t oral argument [on defendants' motion to dismiss], plaintiff conceded that from a shareholder's perspective, the [New Agreements] were immaterially different from the [Old Agreements], and that the crux of [his] complaint centered around the failure of the Board to avail itself of the opportunity presented by the . . . transaction to have negotiated more favorable terms for its shareholders." 631 F. Supp. 2d at 289 n.3 (citing June 21, 2007 Oral Arg. Tr. 5).

commissions,'  . . .  referring  to  those  payments  as
'kickback[s].'" Id. (quoting Compl. ¶¶ 43, 44) (third set of
brackets in original).[14]  Claims II and III, styled as direct
claims on behalf of all beneficial interest holders in the Trust
as of August 22, 2005, alleged that the proxy statement violated
ICA  §  20(a)  and  unspecified  provisions  of  the  law  of
Massachusetts because the proxy statement failed to disclose to
shareholders  that  (i) the  echo-voting  procedures  used  in
securing  approval  of  the  New  Agreements  were  illegal  and
(ii) the  assets  of  the  Trust  were  being  diverted  to  benefit
others, "presumably via soft[-]dollar payments." Id.

Following  the  filing  of  the  complaint,  the  DRC  completed
its  investigation  on  June  20,  2006,  bringing  to  an  end  the
inquiry with which defendants charged it on March 24, 2006.  See
Report  113.   With  the  assistance  of  LeBoeuf,  the  DRC,  which
again  consisted  of  Finn  and  Gross,  examined  the  allegations  in
the  demand  letter  as  well  the  allegations  regarding  echo  voting

---

[14] In Halebian I, we described these "soft-dollar arrangements," stating:

> [T]he Proxy Statement noted the [New Agreements] in question,
> like  the  [Old  Agreements],  would  permit  the  [investment]
> advis[e]r to select brokers or dealers who provide both brokerage
> and  research  services  to  the  Funds,  even  though  the  commissions
> charged  by  such  brokers  or  dealers  might  be  higher  than  those
> charged by other brokers or dealers who provide execution only or
> execution  and  research  services--a  practice  known  as  the  payment
> of "soft dollars."

631 F. Supp. at 289 (citing Proxy Statement 11-12, 21).  As the Second
Circuit noted, the payment of "soft dollars" in this context is not per se
illegal.   See  Halebian II, 590 F.3d at 201 n.4 (discussing 15 U.S.C.
§ 78bb(e)(1) and interpretive guidance from the SEC thereto).

in the complaint. <u>See</u> <u>id.</u>  <u>See also</u> Finn Decl. Ex. J
("Resolution") ¶¶ B.2-B.3.  In order to permit this examination,
LeBoeuf, which operated at the direction of the DRC, expended
over 1000 hours gathering relevant facts.  Resolution ¶ B.4.  In
the course of the investigation, LeBoeuf interviewed twenty-one
individuals who were involved in the transaction and the
approval of the New Agreements, including (i) each defendant;
(ii) Gerken, as well as three other senior executives within the
investment-adviser subsidiaries of Citigroup; (iii)
representatives of Bingham McCutchen L.L.P. ("Bingham"), which
served as counsel to the Trust at all relevant times; and
(iv) representatives of S&W, which served as counsel to
defendants in their capacity as the "independent" trustees of
the Trust at all relevant times.  <u>See</u> Report 113-114, Ex. 48
(listing individuals other than counsel interviewed during
investigation).  LeBoeuf also collected and reviewed over 20,000
pages of both paper and electronic documents, the latter of
which were collected and reviewed with the assistance of a
discovery consultant, FTI Consulting.  <u>See</u> Resolution ¶ B.4;
Report 114-27 (discussing collection and review of documents
from defendants, S&W, Bingham, and representatives of
investment-adviser subsidiaries of Citigroup).  During the
course of the investigation, the DRC held at least seven
telephone meetings with LeBoeuf and participated in the

selection of interviewees as well as the questions posed in interviews.  See Resolution ¶ B.6.

In a meeting on June 20, 2006, the DRC deliberated and concluded in light of its investigation that inter alia (i) Gerken should recuse himself from the board's consideration of the demand letter; (ii) defendants--the members of the board --were independent with respect to the demand letter and formed a quorum of the board; (iii) defendants, therefore, should decide how to proceed as to the demand letter on behalf of the board; and (iv) the allegations in the demand letter and the complaint were without merit and, accordingly, the board should rebuff the requests in the demand letter.  See Resolution ¶¶ C.1-C.6; Report 16-18.  On June 29, 2006, the DRC finalized and disseminated to the board a report of considerable size (the "report"), which summarized the transaction and approval of the New Agreements as well as other events underlying the demand letter and the complaint, described the demand letter and the complaint, and laid out the facts developed in the investigation as well the DRC's recommendations in light of supporting legal analysis.  See Report 9 (discussing dissemination of the report to the board); Finn Decl. ¶ 21 (same).

On July 12, 2006, the board, less Gerken, met in person for a full day to review the report and underlying investigation of the DRC as well as the demand letter and the complaint.  See

Finn Decl. ¶ 22; Resolution ¶ D.1.  On July 18, 2006, after deliberating at the meeting and thereafter further considering the issues presented, the board adopted a resolution (the "Resolution"), in which it rejected the requests of the demand letter.  See Finn Decl. ¶ 23.  In particular, the board resolved pursuant to what it represented was its "good faith exercise of its business judgment" that inter alia (i) its members, aside from Gerken, were not interested persons under the ICA or otherwise impaired in considering the demand letter and the complaint; (ii) the investigation of the DRC, undertaken with the assistance of LeBoeuf, was thorough and could be relied upon by the board in acting in the best interests of shareholders; (iii) the allegations in the demand letter and the complaint were without merit; (iv) the balance of the Trust's interests weighed against taking the action that the demand letter requested;[15] (v) the board would decline to pursue the requests

---

[15] In particular, the board resolved that the balance of these interests weighed in favor of rejection of the demand letter because:

    a. [t]he contemplated litigation would distract senior management of the [New York Tax-Free Fund];
    b. [t]he contemplated litigation would damage the [New York Tax-Free Fund's] relationship with [its investment] advisers, generate negative publicity that could cause current shareholders to withdraw . . . and discourage potential shareholders from investing . . . , and damage the [New York Tax-Free Fund's] ability to attract and retain high quality [i]ndependent [t]rustees for its [b]oard;
    c. [a]ny potential recovery for the [New York Tax-Free Fund] was limited by the fact that [its] fees were low compared to comparable funds managed by other [investment] advisers and by the two year term of the [investment] advisory contract and would be offset by a diminution in the quality of services provided . . . as a result of lower fees; and

of the demand letter; and (vi) the complaint should be dismissed.  See Resolution ¶¶ 1-13.[16]

## E. The Four Prior Halebians

Following the board's adoption of the Resolution, on October 24, 2006, defendants' moved to dismiss the complaint in its entirety.  In Halebian I, we granted the motion to dismiss on July 31, 2007.  631 F. Supp. 2d at 303.  As to Claim I, the derivative claim asserting that defendants' breached their fiduciary duties, we held that § 7.44 of Chapter 156D of the Massachusetts General Laws, which provides a mechanism for dismissal of "derivative proceedings commenced after rejection of a demand," MASS. GEN. LAWS ch. 156D, § 7.44(a) (emphasis added), governed this case notwithstanding the fact that plaintiff's complaint was filed prior to the board's adoption of the Resolution.  See 631 F. Supp. 2d at 294-95.  We accordingly applied § 7.44, which states in relevant part that where a court finds upon a corporation's motion that a majority of independent directors representing a quorum of the board of directors has

---

    d. [t]he Trust would likely have to indemnify the [i]ndependent
    [t]rustees for any costs they incur in connection with the
    contemplated litigation and, given the uncertainty of recovery
    and the likelihood that the Trust would have to reimburse the
    [i]ndependent [t]rustees for any judgment or settlement they pay,
    the expense of reimbursing the [i]ndependent [t]rustees their
    litigation costs weighs against accepting the demand.

Resolution ¶ 9.
[16] The board also resolved by way of reassurance to the shareholders of the Trust that at the conclusion of the year it would reexamine the existing investment advisory agreement to determine whether Legg Mason had been able to achieve any "improved economies of scale" in which shareholders could benefit through reduced investment adviser fees.  Resolution ¶ 12.

determined in good faith after conducting a reasonable inquiry that maintenance of derivative proceedings is not in the best interests of the corporation that those proceedings shall be dismissed. MASS. GEN. LAWS ch. 156D, § 7.44(a), (b)(1). Because we found that "[p]laintiff neither pleads nor proffers any reason why the [b]oard's decision to reject the demand was illegitimate" and in particular that "plaintiff argues neither that the board was not duly constituted of independent directors at the time it made its decision, nor that they did not act in good faith after conducting a reasonable inquiry," we dismissed Claim I pursuant to § 7.44 and further denied plaintiff's request for discovery into these issues. 631 F. Supp. 2d at 296-98. As discussed in Part III.A below, we dismissed Claims II and III, which were styled as direct claims, because inter alia we found that they were in fact derivative in nature and that plaintiff had failed to make demand with regard to them prior to filing suit in violation of the universal demand requirement contained in § 7.42 of Chapter 156D of the Massachusetts General Laws. See 632 F. Supp. 2d at 301-303.

In Halebian II, the Second Circuit on December 29, 2009 certified the question of whether § 7.44 applied in the circumstances of this case to the Massachusetts Supreme Judicial Court, expressing some doubt as to our interpretation of the law. See 590 F.3d at 214. While approving in relative part of

our rationale described above for dismissing Claims II and III, the Second Circuit reserved decision on all issues pending the response of the Massachusetts Supreme Judicial Court.  See id. at 590 F.3d at 207-10, 215.

In Halebian III, the Massachusetts Supreme Judicial Court answered the certified question in the affirmative on August 23, 2010, agreeing with our conclusion that § 7.44 applied in the circumstances of this case.  457 Mass. at 633, 931 N.E.2d at 995.  In addition, the Massachusetts Supreme Judicial Court definitively held that Chapter 156D applied to business trusts, such as the Trust, as well as corporations.  See 457 Mass. at 623 n.4, 931 N.E.2d at 988 n.4.[17]

In Halebian IV, following the answer of the Massachusetts Supreme Judicial Court, the Second Circuit on May 6, 2011 affirmed our judgment dismissing Claims II and III but vacated our judgment dismissing Claim I.  See 644 F.3d at 133-34.  As further discussed in Part III.B and III.C below, the Second Circuit held that in Halebian I we had failed to affirmatively find whether the board was independent, as § 7.44 dictates, and that in order to make such a finding on remand we would necessarily have to entertain evidentiary submissions, requiring

---

[17] As the Massachusetts Supreme Judicial Court stated, "[b]ecause a business trust in practical effect is in many respects similar to a corporation, . . . the statute regulating derivative actions applies to a shareholder bring such a claim against a corporation or a business trust."  457 Mass. at 623 n.4, 931 N.E.2d at 988 n.4 (internal quotation marks omitted).

us to convert the defendants' motion to dismiss into one for summary judgment.  See id. at 127-33.  As further discussed in Part III.B, the Second Circuit instructed that on remand we should reevaluate any renewed application from plaintiff for discovery.  See id. at 133.  Following remand, plaintiff not surprisingly filed such a motion for discovery as well as a motion to amend his complaint, both of which we must now decide alongside defendants' converted motion for summary judgment.

And thus the stage is set for "Halebian the Fifth": once more unto the breach.

### III. Discussion

### A. Plaintiff's Motion to Amend

At the outset, we must decide whether plaintiff may amend his complaint pursuant to Federal Rule of Civil Procedure 15(a)(2), which provides that under the circumstances here "a party may amend its pleading only with the opposing party's written consent or the court's leave" before noting that "[t]he court should freely give leave when justice so requires."  FED. R. CIV. P. 15(a)(2).  "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).  Furthermore, it is well established that "a

motion to amend should be denied if there is an 'apparent or declared reason--such as undue delay . . . or futility of amendment." Dluhos v. Floating and Abandoned Vessel, Known as N.Y., 162 F.3d 63, 69 (2d Cir. 1998) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  As to undue delay, "[w]hen the moving party has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave, a court may exercise its discretion more exactingly." State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld, 921 F.2d 409, 418 (2d Cir. 1990).  "[A] busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." Id. (internal quotation marks omitted).  As to futility of amendment, it is typically the case that such futility is discussed in the context of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) where it is argued that a plaintiff's proposed amendment fails to state a claim upon which relief can be granted as a matter of law. See, e.g., Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002) ("[a]n amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)").  However, the principle is no less applicable in the context of a motion to amend brought while a motion for summary judgment is pending where "even if the amended complaint would state a valid claim on its

face, the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law under FED. R. CIV. P. 56(c)." Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001). See also Azurite Corp. v. Amster & Co., 844 F. Supp. 929, 939 (S.D.N.Y. 1994) (rejecting plaintiff's motion to amend where proposed amendment "would be futile because the factual foundations of [its] new allegations are insufficient, as a matter of law, to withstand defendants' motion for summary judgment"), aff'd, 52 F.3d 15 (2d Cir. 1995).

In support of his motion to amend, plaintiff has submitted his proposed amended complaint for our review. See First Feffer Decl. Ex. B ("Proposed Am. Compl."). As plaintiff describes in the letter submitted together with his moving papers, the "new material" in his proposed amended complaint largely concerns two broad issues. Pl.'s Mot. Letter of Sept. 19, 2011 1. First, one set of the new allegations is addressed to "demonstrating the [Demand Review Committee]'s lack of independence and good faith based solely on a careful reading of the materials submitted by defendants in support of their pending motion." Id. See Proposed Am. Compl. ¶¶ 2, 4, 20, 21, 55-59. Second, the other set of new allegations is intended to squarely raise "the legality of the 'echo voting' procedures employed to assist

Citigroup[] in completing its deal with Legg Mason, Inc." Pl.'s Mot. Letter of Sept. 19, 2011 1-2. Instead of challenging the legality of echo voting through a theory of non-disclosure, as in Claims II and III of the complaint, plaintiff now wishes to argue that defendants breached their fiduciary duties to plaintiff and other shareholders in permitting echo voting because the practice is illegal under federal and state law. See Proposed Am. Compl. ¶¶ 3, 4, 28, 30(a), 49, 50, 58(b), 66. In an effort to cover his proverbial bases, plaintiff explains that while he believes his refashioned echo-voting claim is direct he also pleads it in the alternative as derivative. See id. at ¶ 66.

Addressing these two sets of new allegations in reverse order, we are somewhat incredulous at plaintiff's efforts to revive his original echo-voting claims under a new theory of liability. Going back in time almost six years, in a pre-motion letter, dated September 29, 2006, defendants sought leave to file a motion to dismiss the complaint, identifying a number of reasons for dismissing Claims II and III, two of which are relevant here. See Defs.' Pre-Mot. Letter of Sept. 29, 2006 2-3. First, defendants argued that the claims must be dismissed because, contrary to plaintiff's characterization, they were derivative and plaintiff had expressly chosen not to address them in the demand letter to the board. See id. at 3. See also

Demand Letter 1 n.1 (observing "shareholder approval does not appear to have been obtained properly" before declaring that "as this issue gives rise to direct, rather than derivative, claims it will not be addressed in this letter").  Second, defendants asserted that the claims failed because the proxy statement was not misleading as a matter of law.  See Defs.' Pre-Mot. Letter of Sept. 29, 2006 3.  In particular, defendants stated, "the [p]roxy [s]tatement was not required to include legal conclusions regarding the validity of the voting system."  Id. Having been put on notice of these arguments, plaintiff chose not to amend the complaint either before defendants filed their motion to dismiss or afterwards as was still his right under Federal Rule of Civil Procedure 15(a)(1)(B).[18]

The ensuing decisions have vindicated defendants' position at the outset of this litigation.  In Halebian I, we dismissed Claims II and III because inter alia we agreed with defendants that the claims, though styled as direct, were actually derivative in nature and accordingly failed because plaintiff did not make a demand with regard to them prior to filing suit. See 632 F. Supp. 2d at 301-303.  On appeal, the Second Circuit considered this rationale and affirmed our dismissal of Claims II and III on that basis.  See Halebian IV, 644 F.3d at 125

---

[18] As even plaintiff acknowledges, albeit grudgingly, he "could have sought leave to amend his complaint during the pendency of defendant's motion to dismiss."  Second Feffer Decl. ¶ 8.

("[i]n Halebian II, we agreed with the defendants and the district court, classifying the second and third claims asserted in the plaintiff's complaint as derivative by looking to Massachusetts law").   In addition, the Second Circuit also seized on the other of the defendants' arguments discussed above, reasoning that because "the [b]oard was apparently not of the view, nor had it been told, that using a Citigroup-affiliated service agent other than a broker-dealer to echo vote shares violated the ICA or Massachusetts law, or indeed any law, its failure to inform shareholders to the contrary does not appear . . . to have been potentially false and misleading so as to be cognizable" as a non-disclosure claim "under Massachusetts or federal law."  Halebian II, 590 F.3d at 210.

While plaintiff begs to be excused from his "inartfully drafted initial complaint," under these circumstances, we easily exercise our discretion to deny the motion to reframe plaintiff's echo-voting claims.  First Feffer Decl. ¶ 7.  As the Second Circuit found in Halebian II, "[t]he essence of [plaintiff]'s [original] claim[s] [were] not that the defendants failed to inform him and others similarly situated that the voting procedures incorporated echo voting, but that echo voting [was] unlawful."  Id. at 209.  In the wake of having judgment entered against him and the dismissal of his echo-voting claims having been affirmed on multiple grounds that were brought to

his attention by defendants' prior to their moving to dismiss
the complaint, plaintiff cannot now raise again the central
thrust of his prior allegations (i.e. that echo voting is
illegal) merely draped in a different legal mantle that he now
thinks with the benefit of hindsight would have better withstood
judicial scrutiny.[19]  When viewed in this historical context, we
are not sympathetic whatsoever to plaintiff's protestations that
his motion to amend is not brought after undue delay.  See
McKinnon v. Hermes of Paris, Inc., No. 06 Civ. 1001 (NRB), 2007
WL 1098707, at *4 n.5 (S.D.N.Y. Apr. 10, 2007) (denying motion
to amend and stating "[p]laintiff was given notice of
defendant's intention to move for judgment on the pleadings by
defendant's letter to the Court dated September 29, 2006" in
which "defendant summarized why it believed these causes of
action were legally deficient" before concluding that "having
not availed herself of . . . opportunities [to amend her
complaint], and by requiring defendant to incur the legal fees--
and defendant's counsel to expend the time--required to file
this motion, plaintiff has forfeited her right to amend the
complaint").[20]

---

[19] To the extent that plaintiff proposed pleading his amended echo-voting
claim as a derivative claim, we further deny his motion to amend as futile in
light of his express decision not to make demand on the board of trustees
with regard to how shareholder approval of the New Agreements was obtained.
See Demand Letter 1 n. 1.
[20] At one point in his moving papers, plaintiff suggests that the law of
Massachusetts supports his position on the permissibility of amendment

As to the other set of new allegations in the proposed amended complaint that bear on the defendants' independence and/or their good faith in deciding after reasonable inquiry that maintenance of this action was not in the best interests of the Trust, we similarly exercise our discretion and deny plaintiff's motion to amend. As discussed in Part III.C.3 and 4, _infra_, these new allegations and the evidence that plaintiff brings to our attention in support of them do not alter our conclusion that defendant is entitled to summary judgment, rendering the contemplated amendment futile.

## B. Plaintiff's Motion for Discovery

We now turn to plaintiff's motion for discovery. In light of the direction from the Second Circuit to convert defendants' motion to dismiss into one for summary judgment, we analyze the plaintiff's application under Federal Rule of Civil Procedure 56(d), formerly 56(f), which provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may:
>     (1) defer considering the motion or deny it;
>     (2) allow time to obtain affidavits or declarations or to take discovery; or

---

insofar as § 7.44(d) "'explicitly contemplates an additional opportunity for the plaintiff to rebut--if he or she has not done so in the original complaint--the defendant's factual showings of independence, good faith, and reasonable inquiry, either through an amended complaint or some other "written filing with the court."'" Pl.'s Br. 4-5 (quoting Halebian IV, 644 F.3d at 131). This argument is plainly bogus as to the new set of allegations attempting to revive the echo-voting claims, which were brought as direct claims and dismissed on that basis for reasons wholly unrelated to § 7.44(d).

      (3) issue any other appropriate order.

FED. R. CIV. P. 56(d).  <u>See also</u> FED. R. CIV. P. 56 advisory committee notes (discussing 2010 amendments and noting "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f)").[21]  "Rule 56(f) is the safety valve that, when satisfied, prevents the entry of summary judgment against a party where there is good reason to believe that evidence sufficient to defeat the motion for summary judgment exists, but the non-moving party legitimately needs discovery to get that evidence."  <u>Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP</u>, 612 F. Supp. 2d 330, 363 (S.D.N.Y. 2009).  "[A]s [the Second Circuit] often ha[s] said, a party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts."  <u>Gurary v. Winehouse</u>, 190

---

[21]  We find it curious that nowhere in his moving or reply papers does plaintiff even cite Federal Rule of Civil Procedure 56(d).  This is despite the fact that in a letter, dated May 19, 2011, as well as in their opposition papers, defendants cite Rule 56(d) and articulate the standard in the Second Circuit for determining whether an applicant is entitled to discovery under it.  <u>See</u> Defs.' Letter of May 19, 2011 4; Defs.' Opp'n 3-6.  In a letter, dated May 24, 2011, plaintiff himself referenced Rule 56(d) and in a footnote even stated, "[i]f the Court requires an affidavit or declaration pursuant to Rule 56(d), plaintiff will provide one.  By now however, the discovery which will be sought is obvious."  Pl.'s Letter of May 24, 2011 3 n.2 (proceeding to list voluminous discovery in the most general of terms).

F.3d 37, 43 (2d Cir. 1999).  The requirement of a sufficient affidavit or declaration is a strict one.  See id. at 43-44 ("the failure to file such an affidavit is fatal . . . even if the party resisting the motion for summary judgment alluded to a claimed need for discovery in a memorandum of law"); Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994) ("[a] reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit").  Further, "a bare assertion that the evidence supporting plaintiff's allegations is in the hands of the moving party is insufficient to justify the denial of summary judgment."  Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 149 (2d Cir. 2009).  See also Emigra, 612 F. Supp. 2d at 363 ("Rule 56(f) requires far more than simply a claim that the non-moving party has not had or wants more discovery").  "Even where a Rule 56(f) motion is properly supported, a district court may refuse to allow additional discovery 'if it deems the request to be based on speculation as to what potentially could be discovered.'"  Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stroh Cos., Inc., 265 F.3d 97, 117 (2d Cir. 2001) (quoting Paddington, 34 F.3d at 1138).

With that said, it is only a rare case in which summary judgment may be granted against a plaintiff who has not been

permitted to conduct discovery.  Hellstrom v. U.S. Dep't of
Veterans Affairs, 201 F.3d 94, 97 (2d Cir. 2000).  However,
while such a case is rare, it is also true that "the party
opposing summary judgment is not automatically entitled to
discovery."  Seneca Beverage Corp. v. Healthnow N.Y., Inc., 200
F. App'x 25, 27 (2d Cir. 2006).  See also Haran v. Dow Jones &
Co., Inc., No. 99-9143, 2000 WL 777982, at *3 (2d Cir. 2000)
(unpublished opinion) (rejecting argument that district court
"erred in deciding the motion for summary judgment without
providing [plaintiffs] with an opportunity to conduct discovery"
because "mere references to the lack of discovery are
insufficient . . . plaintiffs failed to identify the specific
facts they needed to resist defendants' motion or how those
facts would have reasonably created a genuine issue of material
fact").  Moreover, "it is clear that a plaintiff cannot defeat a
motion for summary judgment by merely restating the conclusory
allegations contained in his complaint, and amplifying them only
with speculation about what discovery might uncover."
Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97,
107 (2d Cir. 1981) (affirming denial of Rule 56(f) motion and
grant of summary judgment motion).  "An opposing party's mere
hope that further evidence may develop prior to trial is an
insufficient basis upon which to justify the denial of the
motion" for summary judgment.  Id. at 107.  See also Tennenbaum

Capital Partners LLC v. Kennedy, No. 07 Civ. 9695 (LTS), 2009 WL
2913679, at *5 (S.D.N.Y. Sept. 11, 2009), aff'd, 372 F. App'x
180 (2d Cir. 2010) (citing Contemporary Mission and stating
"[nonmovant] proffers no good faith basis for [his] belief that
discovery would produce any information contrary to [movant]'s
declarations and the Court will not permit [nonmovant] to engage
in a fishing expedition based on mere speculation").

In moving for discovery, plaintiff repeats an application
that he originally made in the course of opposing defendants'
motion to dismiss.  See Pl.'s Opp'n 11-18 (arguing that
plaintiff was entitled to discovery).  In Halebian I, we denied
that application, stating "[a]bsent a specific allegation in the
complaint as to why the [b]oard was not disinterested, nor why
the demand was refused, and absent a specific argument from
plaintiff as to what more discovery would yield, we decline to
allow plaintiff to avail himself of a premature opening of the
floodgates to discovery in an effort to cure the deficiencies in
the complaint."  631 F. Supp. 2d at 298.  In Halebian IV, the
Second Circuit specifically addressed the question of discovery
in remanding this case to us, stating "[a]lthough [plaintiff]
contended in the district court, and does so again on appeal,
that he should have been afforded the opportunity to conduct
additional discovery in order to rebut the [b]oard's filing,
under both . . . Rule 56 and [§] 7.44, the availability of

further discovery is a matter within the district court's
discretion." 644 F.3d at 133. The Second Circuit continued to
observe:

> While we decline to decide the question, the district
> court may well have acted within its discretion in
> denying the plaintiff's request for discovery,
> particularly in light of the defendants' submission of
> "thousands of pages detailing the backgrounds of the
> directors at issue, as well as the extensive efforts
> made by the independent counsel in preparing its
> review of the demand for the committee and the
> [b]oard." Halebian I, 631 F. Supp. 2d at 298. We
> nonetheless think that a reevaluation of any such
> application by the plaintiff for more discovery in
> light of Rule 56 case law and procedures would be
> advisable on remand.

Id. With this direction from the Second Circuit in mind, we
turn to analyze plaintiff's renewed application.

We begin our analysis by considering the scope of the
discovery that plaintiff seeks. In a declaration accompanying
plaintiff's moving papers, plaintiff's counsel insists that
"[t]he discovery needed" on the issues of defendants'
independence, good faith, and reasonableness of inquiry
includes: (1) "all documents reviewed by or on behalf of the
DRC";[22] (2) "all minutes, notes, or transcriptions of DRC
meetings"; (3) "all notes or transcriptions of interviews, as
well as interview outlines and all communications between the

---

[22] As stated in the report and as already discussed in Part II.D above, "over
20,000 pages of paper documents and electronic documents were collected" in
the course of the investigation. See Report 5, 114-127 (discussing multiple
collection and review initiatives one of which involved seventy-three
custodians and 39,458 "potentially responsive emails and calendar items").

DRC or its attorneys and the interviewee or any person acting on behalf of the interviewee"; (4) "all drafts of the . . . report"; and (5) "depositions of the DRC members as well as at least some of the interviewees" whose identity "cannot be ascertained until after a review of documents." First Feffer Decl. ¶ 4. In addition, plaintiff's counsel suggests that it is necessary to "test" the independence of the DRC's retained counsel and implicitly the extent to which such retained counsel can buttress the independence of defendants and that he will accordingly require: (1) "time, expense, and billing records concerning the DRC engagement"; (2) "all documents sent to or received from the members of the DRC or any of the other defendants or their counsel; (3) "documents sufficient to establish the percentage of similar engagements in which a committee represented by counsel recommended that a derivative action continue"; and (4) "depositions from one or more of the attorney's working on the DRC engagement, as determined by plaintiff following document review." Id. at ¶ 5. Finally, plaintiff's counsel asserts that "[p]laintiff believes that the substance of plaintiff's claims is also an appropriate area of discovery" at this stage of the proceedings, possibly advancing this position, though it is not clear, on the theory that defendants' alleged breach of their fiduciary duties reflects on their independence. Id. at ¶ 6.

The discovery sought by plaintiff is facially unreasonable in its breadth and is not in any meaningful way tailored to the issues presented in defendants' converted motion for summary judgment: namely, whether defendants were independent and acted in good faith and after a reasonable inquiry in rejecting the requests of the demand letter. Without regard for the narrowness of these questions, plaintiff expressly seeks discovery on his underlying cause of action despite asserting that "[t]he discovery requested . . . is the <u>minimum</u> required to test defendants' independence, as well as the reasonableness and good faith of the [DRC]'s investigation." Pl.'s Reply 3 (emphasis added). The unreasonableness of plaintiff's application is further heightened in light of the considerable disclosure that defendants provided plaintiff in the form of the report and its dozens of exhibits, which together with the proxy statement provide considerable information regarding the background of defendants and their service as trustees, all of which is material to the threshold evaluation of their independence. <u>See, e.g.</u>, Report Ex. 13 (setting out defendants' answers to the Second Questionnaire). Plaintiff's general failure to specify the particular facts that he seeks from discovery--especially in light of the information that is already available to him--renders his application deficient as to the initial requirement for receiving relief under Rule

56(d), namely that the nonmovant show "what facts are sought." Gurary, 190 F.3d at 43.[23]

Plaintiff's apparent inability to identify the facts that he seeks with any particularity reveals that his motion for discovery is a de facto application for a fishing expedition. After articulating a number of arguments that are constructed from facts already in his possession and that are intended to assail defendants' independence, plaintiff merely asserts that he "expects discovery to uncover other examples of defendants putting the interests of Citigroup before those of the investors." Pl.'s Br. 5. In Part III.C below, we address these arguments and the others that plaintiff raises in his various submissions and find them insufficient to create a dispute as to a material fact sufficient to withstand the converted motion for summary judgment. In the absence of any facts or other than conclusory allegations from which to infer that defendants were not independent and that their decision to reject the requests in the demand letter was not made in good faith and after a reasonable inquiry, plaintiff's confidence that discovery will reveal any evidence favorable to him at all is merely

---

[23] Following receipt of the letters from defendants' counsel of May 21, 2012, June 19, 2012, and June 21, 2012, which circulated--pursuant to our request--electronic copies of the First and Second Questionnaires together with their exhibits and the answers of defendants, we note that plaintiff did not seek to renew his motion for discovery or otherwise seek to utilize the new information available to him with regard to both the First and Second Questionnaires.

speculation.   See Paddington, 34 F.3d at 1138 ("[a] court can reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered").

In arriving at this conclusion, we find a counterexample illuminating.   In Seneca Beverage Corp. v. Healthnow New York, Inc., 200 F. App'x 25, 28 (2d Cir. 2006), the Second Circuit vacated a grant of summary judgment against a plaintiff, which had not been afforded the opportunity to take any discovery, noting that "under Rule 56(f), all that is required is for [a plaintiff] to point to potential facts that might raise an issue of material fact, that it has been unable to obtain without discovery."   In support of its motion pursuant to Rule 56(f), the plaintiff in Seneca had submitted affidavits from two of its employees, who both asserted that they recalled discussions with defendant, in which at least one case the employee was personally involved, that could bear on the possible oral modification of a contract underlying plaintiff's claim.   See id.   Remanding the case to permit discovery about these negotiations, the Second Circuit found that the "testimony [of the two employees is] sufficient to show that [plaintiff]'s requested discovery is no mere fishing expedition."   Id.   Here, in contrast to Seneca, plaintiff's counsel merely identifies in

a declaration the legal issues that are implicated as a threshold matter in defendants' converted motion for summary judgment and then requests all discovery that is remotely likely to touch upon these issues.

In only one place in his moving papers does plaintiff actually identify any particular facts that he seeks to learn from discovery.  After listing and briefly exploring in his reply papers seven reasons to doubt the independence of the defendants, which reasons are based on inferences drawn from information in the proxy statement and/or the report, plaintiff asserts that he "is confident that discovery will uncover further proof that defendants are not independent and that the DRC's investigation was less than the vigorous examination contemplated under Massachusetts law."   Pl.'s Reply 5. Following this expression of confidence, plaintiff continues:

> For example, the [r]eport vaguely states that "several
> [defendants] reported that at some time in recent
> years, the compensation [they] received for their
> service . . . on the [b]oard constituted a significant
> portion (between 25% and 50%) of their annual income."
> . . . How many are "several"? What time period is "at
> some time in recent years"?  Does compensation mean
> only a defendant's share of the $860,000 paid
> currently for acting as trustee? Or does it include a
> defendant's share of the $3,600,000 in retirement
> benefits?

Id. at 5-6. As an initial matter, we set aside for the sake of argument the fact that plaintiff raises these questions in a memorandum of law and not an affidavit or declaration as

required under Rule 56(d), which is alone a sufficient reason to disregard them.  See Gurary, 190 F.3d at 43-44.  Proceeding arguendo, we interpret the passage as a request for discovery on three facts: (1) the number of defendants who stated that their compensation for serving as trustees constituted between 25% and 50% of their annual income; (2) the time period during which this was the case for each defendant; and (3) whether in answering this question defendants included their share of retirement benefits in their compensation.  This particular application, unlike the remainder of plaintiff's motion for discovery, obviously does not suffer from a lack of specificity as to the facts that are sought.  However, as discussed in Part III.C.3.d.i below, none of the possible answers to these questions would raise a dispute of material fact bearing on the only possibly relevant legal issue: whether the defendants are independent under the law of Massachusetts.  Accordingly, discovery into these issues would serve no purpose other than to delay these proceedings, which stretch into their seventh year, and is denied for that reason.

Finally, in exercising our discretion to decide whether plaintiff is entitled to discovery, we do not dispute his argument that federal law governs the inquiry.  See Pl.'s Opp'n 12 (citing Fagin v. Gilmartin, 432 F.3d 276, 285 n.2 (3d Cir. 2005) (holding "discovery in the demand-refused context is

43

procedural, so federal law applies")).  See also In re Boston
Scientific Corp. S'holders Litig., No. 02 Civ. 247 (AKH), 2007
WL 1696995, at *5 (S.D.N.Y. June 13, 2007) (citing Fagin).
However, in exercising our discretion under federal law to deny
plaintiff's application, we take some measure of confidence from
the fact that our decision is supported by state law, which
plainly contemplates that discovery need not occur in all cases
before a court may decide whether to allow a derivative suit to
proceed.   Section 7.44(d) provides that "[a]ll discovery
proceedings shall be stayed upon the filing by the corporation
of the motion to dismiss and the filing required by this
subsection until the notice of entry of the order ruling on the
motion" before articulating an exception whereby "the court, on
motion and after a hearing and for good cause shown, may order
that specified discovery be conducted." MASS. GEN. LAWS ch. 156D,
§ 7.44(d).   See also id. at cmt. 2 ("[d]iscovery is stayed
during the pendency of the motion to dismiss, subject to the
ability of the court to allow limited discovery for good cause
shown").   Indeed, in a very recent opinion, Justice Bernard
Fried of the New York Supreme Court, New York County, held that
the discovery provision of § 7.44 "is an integral part of the
Massachusetts statute governing derivative proceedings," thus
leading to its application in the forum court under the internal
affairs doctrine and resulting in a presumptive stay of all

discovery proceedings in the absence of good cause.  Curbow
Family LLC v. Morgan Stanley Inv. Advisors, --- N.Y.S.2d ----,
No. 651059-2010, 2012 WL 2942198, at *3 (N.Y. Sup. Ct. N.Y.
Cnty. July 18, 2012).  In fact, if state procedural law did
govern here, then we would find without hesitation that
plaintiff has failed to show good cause why he should be
permitted to conduct specified discovery, not least of all
because he has almost without exception failed to be specific.

### C. Defendants' Converted Motion for Summary Judgment

Having disposed of plaintiffs' motions to amend his
complaint and for discovery, we now address defendants'
converted motion for summary judgment.

### 1. Standard of Review

A motion for summary judgment is appropriately granted when
there is no genuine issue as to any material fact and the moving
party is entitled to judgment as a matter of law.  FED. R. CIV. P.
56(a).  In this context, "[a] fact is 'material' when it might
affect the outcome of the suit under governing law," and "[a]n
issue of fact is 'genuine' if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir.
2007) (internal quotation marks and citations omitted).  On a
motion for summary judgment, "'[t]he principles governing
admissibility of evidence do not change,'" although we are

45

afforded "'broad discretion in choosing whether to admit evidence'" into the record before us.  Presbyterian Church Of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 262 (2d Cir. 2009) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 65-66 (2d Cir. 1997)).[24]  "In assessing th[at] record to determine whether there is a genuine issue [of material fact] to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby,

---

[24] It follows from this proposition that "'only admissible evidence need be considered by [us] in ruling on a motion for summary judgment.'" Presbyterian Church, 582 F.3d at 264 (quoting Raskin, 125 F.3d at 66).  In both his moving and reply papers, plaintiff suggests in passing that we cannot grant defendants' converted motion for summary judgment because it is "supported entirely on the hearsay record."  Pl.'s Br. 1.  See also Pl.'s Reply 1 ("little, if anything, in defendants' voluminous submission, constitutes admissible evidence and, consequently, under controlling precedent, there is no basis for granting the motion").  Despite once more raising the issue in a perfunctory matter at oral argument, plaintiffs' counsel has never in any way particularized these blanket statements.  See May 11, 2012 Oral Arg. Tr. 8:17-20.  Pursuant to Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  FED. R. CIV. P. 56(c)(2) (emphasis added).  This provision, however, does not oblige a district court to consider an objection that is entirely lacking in particularity and directed to the entirety of the record before it, a task that would initially require the opposing party to advance all of the possible grounds for admission of each piece of evidence before imposing on the district court the task of first recognizing and then weighing the merit of all of the contrary grounds for exclusion, none of which the objecting party has deigned to bring to its attention.  Accordingly, we find that plaintiff's counsel's unsupported objection in entirely conclusory fashion to the entire record is insufficient and thus denied.  We further note that the lack of conviction with which plaintiff makes this objection reflects the apparent absence of any dispute concerning the authenticity of documents in the record or any substantive challenge to the majority of relevant facts alleged in those documents.  Finally, as an aside, we are also not certain given its contemplation of a "written filing with the court" that § 7.44(d) even requires a non-hearsay record. MASS. GEN. LAWS ch. 156D, § 7.44(d).

Inc., 477 U.S. 242, 255 (1986)).  In the context of a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'"  F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  Id. (citing Anderson, 477 U.S. at 249).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly and Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted).

### 2. § 7.44 and the Massachusetts Business Corporations Act

As the Massachusetts Supreme Judicial Court confirmed in answering the certified question posed in Halebian II, Massachusetts General Laws Chapter 156D § 7.44, as enacted by the Massachusetts Business Corporations Act, governs the derivative proceedings here.  See Halebian IV, 644 F.3d at 127. Summarizing the inquiry that we must now undertake on remand, the Second Circuit in Halebian IV stated:

> As applicable to this case after certification,
> [§] 7.44 provides that a derivative proceeding
> commenced either before or after rejection of a demand

"shall be dismissed by the court on motion by the corporation <u>if the court finds</u> that . . . a majority vote of <u>independent</u> directors present at a meeting of the board of directors . . . has determined in <u>good faith</u> after conducting a <u>reasonable inquiry</u> upon which its conclusions are based that the maintenance of the proceeding is not in the best interests of the corporation."  Mass. Gen. Laws ch. 156D, § 7.44(a), (b)(1) (emphases added).  Upon filing its motion to dismiss, the corporation must show by "a written filing with the court setting forth facts" that the corporation has established independence, good faith, and the conduct of a reasonable inquiry.  <u>Id.</u> § 7.44(d).  The court "shall" then "dismiss the suit <u>unless</u> the plaintiff has alleged with particularity facts . . . in its complaint or an amended complaint or in a written filing to the court" rebutting the corporation's filing.  <u>Id.</u> (emphasis added).  The statute further provides that if the independence requirement in subsection (a) is met, the plaintiff bears the burden of proving a lack of good faith and reasonable inquiry on the part of the directors; by contrast, if the independence requirement is not satisfied, the corporation must prove that those two elements are present.  <u>Id.</u> § 7.44(e).

644 F.3d at 127-28.  Having been faulted for previously assuming defendants' independence in <u>Halebian I</u>, we now expressly find on the expanded record now before us that defendants are independent and that plaintiff fails to establish a lack of good faith and reasonable inquiry.

### 3. Independence

### a. "Independent" Under § 7.44

As we previously discussed in <u>Halebian I</u>, "independent," as used in § 7.44(b)(1), which speaks of "a majority vote of independent directors," is not a statutorily defined term.  <u>See</u> 631 F. Supp. 2d at 295-96.  <u>See also</u> <u>Blake v. Friendly Ice Cream</u>

Corp. ("Blake I"), No. 03-0003, 2006 WL 1579596, at *12 (Super.
Ct. Hampden Cnty. May 24, 2006) ("[t]he statute contains no
definition of this critical term").   We are aware of only two
cases which squarely address this issue, both from lower state
courts in Massachusetts.   See Blake I, 2006 WL 1579596, at *12-
13; Blake v. Friendly Ice Cream Corp. ("Blake II"), No. 03-0003,
2006 WL 2714976, at *1-2 (Super. Ct. Hampden Cnty. Aug. 24,
2006) (denying motion for reconsideration of Blake I); Pinchuck
v. State St. Corp., No. 09-2930, 2011 WL 477315, at *11 (Super.
Ct. Suffolk Cnty. Jan. 19, 2011).

     Moreover, while § 7.44 does not define "independent," the
comments to the section do illuminate the intent of its drafters
as to the term's meaning.   See Halebian III, 457 Mass. at 624-
25, 931 N.E.2d at 989 ("[t]he comments to the [Massachusetts
Business Corporations] Act were prepared by the attorneys who
drafted the Act and were intended to be a valuable tool in
interpreting the Act").   In the first of these comments, the
drafters observed that "[o]ther jurisdictions 'examin[ing] the
qualifications of directors making the determination have
required that they be both "disinterested" . . . and
"independent."'" Pinchuck, 2011 WL 477315 at *11 (second set of
brackets and ellipses in original) (quoting MASS. GEN. LAWS ch.
156D, § 7.44 cmt. 1).   The drafters explicate "disinterested" in
this sense to mean "not having a personal interest in the

transaction being challenged as opposed to a benefit which devolves upon the corporation or all shareholders generally" and "independent" to mean "not being influenced in favor of the defendants by reason of personal or other relationships." Mass. Gen. Laws ch. 156D, § 7.44 cmt. 1 (citing Aronson v. Lewis, 473 A.2d 805, 812-16 (Del. 1984)). While § 7.44(b)(1) only states that "a majority vote of independent directors" is required to shift the burden of disproving good faith and reasonable inquiry to plaintiff, the commentary makes clear "[o]nly the word 'independent' has been used . . . because it is believed that this word necessarily also includes the requirement that a person have no interest in the transaction." Mass. Gen. Laws ch. 156D, § 7.44(b)(1), § 7.44 cmt. 1. Consistent with this comment, one of the two courts analyzing independence under the statute has asserted that "[d]irectors are considered independent if they are in a position to base their decision on the merits of the subjects before the board rather than being governed by extraneous considerations and influences." Blake I, 2006 WL 1579596, at *13. See Pinchuck, 2011 WL 477315, at *11 (citing Blake II, 2006 WL 2714976, at *1 and "noting [the] lack of Massachusetts appellate case law elucidating the standard for independence under . . . § 7.44") (internal quotation marks omitted).

Section 7.44 also expressly sets out three facts "none of [which] shall by itself cause a director to be considered not independent for the purposes of this section":

> (1) the nomination or election of the director by a person who is a defendant in the derivative proceeding or against whom action is demanded;
> (2) the naming of the director as a defendant in the derivative proceeding or as a person against whom action is demanded; or
> (3) the approval by the director of the act being challenged in the derivative proceeding or demand if the act resulted in no personal benefit to the director.

MASS. GEN. LAWS ch. 156D, § 7.44(c). But see Blake I, 2006 WL 1579596, at *12 ("[t]hese factors do not support the conclusion that the [l]egislature intended to set a low threshold for the standard of independence").

Applying the straightforward standard of § 7.44, we find that defendants have made "a written filing . . . setting forth facts [that] show . . . a majority of the board of [trustees] was independent at the time" that they determined that "the maintenance of the derivative proceeding [was] not in the best interests of the [Trust]." MASS. GEN. LAWS ch. 156D, § 7.44(a), (d). First, defendants lacked a personal interest in the money-market mutual funds that comprised the Trust, as the defendants' answers to the Second Questionnaire and the further investigation documented in the report confirm. Indeed, it appears likely that the only conceivable interest belonged to

Kerley, who held securities in one of these money-market mutual funds valued at less than $10,000.  See supra note 9.  Such an ownership interest, however, is not a basis to question independence because it could only lead to a possible benefit to the trustee that equally devolves on all shareholders in the particular money-market mutual fund.  See MASS. GEN. LAWS ch. 156D, § 7.44 cmt. 1 ("'disinterested' in the sense of not having a personal interest in the transaction being challenged as opposed to a benefit which devolves upon . . . all shareholders generally").[25]

Second, defendants lacked "a relationship, personal or otherwise, with any of the parties who are the focus of [p]laintiff['s] demand" letter and complaint, as again the defendants' answers to the Second Questionnaire and the further investigation documented in the report confirm.  Pinchuck, 2011 WL 477315, at *12.  There were for instance no active relationships whatsoever between any defendants and the officers or directors of Citigroup, Legg Mason, or any of their subsidiaries whose interests were directly implicated in the earlier decision to approve the New Agreements and so allow the transaction to proceed.  And "[n]or does the fact that

---

[25] Strangely, plaintiff appears to suggest in the proposed amended complaint that the independence of defendants is somehow brought into doubt because they were not personally invested in the Trust, a suggestion that we find frankly baffling.  See Proposed Am. Compl. ¶¶ 20-21 (discussing defendants' compensation before noting "[e]ight of the nine individual defendants had no investment in [the Trust] and one [Kerley] had only a nominal investment").

[defendants] are defendants in this derivative action negate their independence." Id. (citing MASS. GEN. LAWS ch. 156D, § 7.44(c)(2)). We further find it significant in evaluating whether defendants were free from extraneous considerations and influences in reaching their determination to reject the demand letter that each of them possessed a certain level of familiarity with financial statements and that a number of them also had considerable experience in corporate governance. In addition, each defendant was employed outside their service on the board at the time of their determination and possessed past and current employment experience relating to finance, consulting, or accounting. These characteristics of defendants make them considerably less prone to domination by potentially sophisticated and motivated actors within the world of investment management and clearly well-suited to their roles as the fiduciaries of investing shareholders.

Finally, while we are only concerned with the defendants' disinterest and independence at the time that they determined that maintenance of the derivative proceedings was not in the best interests of the Trust, we do take additional confidence from the fact that defendants' answers to the First Questionnaire submitted immediately prior to their approval of the New Agreements are substantively identical to their answers to the Second Questionnaire and so demonstrate the defendants'

statutory independence at all points during the time period underlying this case.

### b. The Relationship Between § 7.44, § 2B, and the ICA

Having reached this conclusion on independence within the confines of § 7.44, we turn to consider a fact that differentiates this case from the precedent of Pinchuck and Blake I and II. In those cases, the individuals who rejected a plaintiff's demand served as directors on the board of directors of a corporation. See Pinchuck, 2011 WL 477315, at *1; Blake II, 2006 WL 2714976, at *1. In this case, defendants served as trustees on the board of trustees of a trust. Both parties are in agreement that defendants' role, as members of the board of trustees of a trust, directs that §2B of Chapter 182 of the Massachusetts General Laws provides the proper point of departure for interpreting "independent" in § 7.44.[26] By its own terms, § 2B applies "to a trust that is an investment company, as defined in the [ICA], and that is registered thereunder with the [SEC]" (i.e. CitiFunds Trust III). MASS. GEN. LAWS ch. 182,

---

[26] Defendants have advanced this position from the outset of this litigation in their papers. See Defs.' Br. 14-15 (applying § 2B). In his reply papers, plaintiff set out the statutory structure for analyzing independence, referencing the relevant provisions of the ICA to which § 2B leads without citing § 2B itself. See Pl.'s Reply 4 n. 2. In order to confirm the parties' respective positions, we asked at oral argument whether we were "correct that you both agree that . . . [§] 2B provides the starting point from which we must analyze the independence of the defendants and that this provision of state law leads us to the [ICA]?" May 11, 2012 Oral Arg. Tr. 2:10-16. In response, plaintiff's counsel simply stated, "I agree," a sentiment that defendants' counsel repeated, albeit at greater length. Id. at 2:19, 2:21-3:11.

§ 2B.   Further, § 2B provides that "[a] trustee of a trust who with respect to the trust is not an interested person, as defined in [the ICA], shall be deemed to be independent and disinterested when making any determination or taking any action as a trustee." Id.

In dismissing derivative suits brought under the law of Massachusetts against trustees of an investment company, several recent decisions have analyzed the independence of these trustees pursuant to the ICA in reliance on § 2B. See, e.g., Alexander v. Allianz Dresdner Asset Mgmt. of Am. Holding, Inc., 509 F. Supp. 2d 190, 196-97 (D. Conn. 2007); Forsythe v. Sun Life Fin., Inc., 417 F. Supp. 2d 100, 109-12 (D. Mass. 2006); In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp. 2d 222, 239-40 (S.D.N.Y. 2005).   However, these cases were commenced prior to July 1, 2004, the date on which the Massachusetts Business Corporations Act became effective, and accordingly are not governed by § 7.44. See Forsythe, 417 F. Supp. 2d at 109 n.13 (noting the prospective change in the law).   Instead, these cases address the independence of trustees and follow § 2B's cross-reference into the ICA in the context of analyzing demand futility--a now extinct legal issue under the law of Massachusetts given the adoption of a universal demand requirement in the Massachusetts Business Corporations Act.   Our research has not identified any precedent that considers the

55

step from § 7.44 to § 2B under the current regime governing derivative proceedings, nor did the parties address the issue, rather simply assuming that § 2B applied.

After consideration of the issue, however, we agree with the parties that it does not seem unreasonable to interpret "independent" pursuant to § 7.44 in light of § 2B and in turn the ICA.  While § 7.44 speaks in terms of corporations and their directors, the Massachusetts Supreme Judicial Court has left no doubt that the section applies as well to business trusts and their trustees, including business trusts that are also investment companies under the ICA.  See supra note 17 and accompanying text.   Further, while § 2B sets out the circumstances in which a trustee will be deemed "independent" and "disinterested" and § 7.44(b)(1) speaks only of the term "independent," the two provisions actually align perfectly because as already discussed above § 7.44's use of "independent" is intended to encompass both "independent" and "disinterested." Because under the facts of this case these two provisions both address the same substantive issue--the independence of the trustees of an investment company--reading them together is consistent with the norms of statutory interpretation.  See Alliance to Protect Nantucket Sound, Inc. v. Dep't of Pub. Utils., 461 Mass. 166, 184, 959 N.E.2d 413, 429 (2011) ("[w]here possible, we construe statutes on the same subject matter

together, so as to constitute a harmonious whole consistent with the legislative purpose") (internal quotation marks omitted). Thus, we will undertake an alternative analysis of independence pursuant to § 7.44 with the added insight of § 2B and the ICA. We emphasize that our decision to resort to § 2B and the definitional maze of the ICA actually carries no significance here because this alternative analysis that plaintiff and defendants urge us to pursue does not alter the conclusion that we already reached as to the independence of defendants pursuant to § 7.44 alone.

### c. "Independent" Under § 7.44, § 2B, and the ICA

The additional framework of § 2B and the ICA merely provides further fixed guideposts for what constitutes independence under the law of Massachusetts in the context of a business trust that is also an investment company under the ICA. These guideposts are not in tension with § 7.44.  As already discussed, § 2B provides that "[a] trustee of a trust who with respect to the trust is not an interested person, as defined in [the ICA], shall be deemed to be independent and disinterested when making any determination or taking any action as a trustee."  MASS. GEN. LAWS ch. 182, § 2B.  In turn, the ICA provides in relevant part that an "'[i]nterested person' of another person means . . . (A) when used with respect to an investment company . . . (i) any affiliated person of such

company . . . [and] (B) when used with respect to an investment adviser of . . . any investment company . . . (i) any affiliated person of such investment adviser . . . ."  15 U.S.C. § 80a-2(a)(19).[27]  In relevant part, an "'[a]ffiliated person' of another person means (A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person . . . (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person [and] (D) any officer, director, partner, copartner, or employee of such other person . . . ."  15 U.S.C. § 80a-2(a)(3). Finally, "'[c]ontrol' means the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company."  15 U.S.C. § 80a-2(a)(9).  Significantly, the ICA elaborates on the meaning of "control" and in particular "controlled" with the further provision that "[a] natural person shall be presumed not to be a controlled person" but that "[a]ny such presumption may be rebutted by evidence."  Id.[28]  As the

---

[27]  The definition of "interested person" incorporates the overall caveat "[t]hat no person shall be deemed to be an interested person of an investment company solely by reason of . . . his being a member of its board of directors or . . . an owner of its securities."  15 U.S.C. § 80a-2(a)(19)(A).
[28]  Defendants' counsel brought to our attention the following caveat that appears after the phrase "[a]ny such presumption may rebutted by evidence" in the statutory provision: "but except as hereinafter provided, [such presumption] shall continue until a determination to the contrary made by the [SEC] by order either on its own motion or on application by an interested person."  15 U.S.C. § 80a-2(a)(9).  However, defendants' counsel failed to

Second Circuit has observed, however, "a plaintiff's burden to overcome this presumption is a heavy one." Amron v. Morgan Stanley Inv. Advisors Inc., 464 F.3d 338, 344 (2d Cir. 2006) (internal quotation marks omitted).

Here, as the answers to the Second Questionnaire demonstrate and the further investigation documented in the report confirms, no defendant held securities that rendered him or her an "interested person" pursuant to the ICA of any of the relevant entities. Further, as we essentially already found within the confines of § 7.44 alone, there are no relationships or other circumstances that render any defendant an "affiliated person" and so an "interested person" of any relevant individuals or entities. This conclusion is particularly evident in the context of § 2B and the ICA when the presumption incorporated into the ICA's definition of control is applied.

### d. Plaintiff's Rebuttal Arguments

In reaching these conclusions about the independence of defendants, we have also considered plaintiff's rebuttal arguments and found none of them availing. Whether analyzed pursuant to § 7.44 alone or the broader framework of § 7.44, § 2B, and the ICA, these arguments fail to "allege[] with

inform us that it is well established that "the 'non-control' presumption may be rebutted without SEC involvement." Verkouteren v. Blackrock Fin. Mgmt., Inc., 37 F. Supp. 2d 256, 259 (S.D.N.Y. 1999 (citing Sec. and Exch. Comm'n v. S&P Nat'l Corp. 360 F.2d 741, 749 (2d Cir. 1966) (discussing longstanding position of the SEC that it does not have to be first in deciding this issue if a prima facie case for relief can be made out in court proceedings)).

particularity facts rebutting the [trust's] filing" as to the independence of defendants pursuant to § 7.44(d). MASS. GEN. LAWS ch. 156D, § 7.44(d). We now consider plaintiff's various rebuttal arguments, which we draw from his several submissions.

### i. Compensation

In his proposed amended complaint, plaintiff suggests that defendants' compensation for their service on the board compromises their independence. See Proposed Am. Compl. ¶ 20 (asserting "defendants' compensation from the funds managed by Citigroup subsidiaries during the fiscal year immediately preceding the events at issue aggregated $840,000" and noting "defendants [also] accrued retirement benefits, payable by the funds managed by Citigroup subsidiaries, aggregating $3,600,000"). In his reply papers, as discussed above in Part III.B, plaintiff asserts that further discovery is merited to determine (1) the number of defendants who stated during the investigation that their compensation for serving as trustees constituted between 25% and 50% of their annual income; (2) the time period during which this was the case for each defendant; and (3) whether in providing this information defendants included their share of retirement benefits in their compensation. See Pl.'s Reply 5-6. It appears that plaintiff premises his argument that defendants' compensation compromises their independence on the related theories that defendants are

within the meaning of the ICA (i) controlled by the Trust and/or its investment adviser[29] and (ii) <u>de facto</u> employees of the Trust.  <u>See</u> Pl.'s Reply 4 n.2.

As an initial matter, plaintiff's argument is unsupported by any allegation, let alone evidence, that either the Trust or its investment adviser held the power to set defendants' compensation or to remove defendants from their positions on the board.  We agree with the observation in <u>Verkouteren v. Blackrock Financial Management, Inc.</u>, 37 F. Supp. 2d 256, 259 (S.D.N.Y. 1999) that where allegations of control are premised on the compensation of directors, information about that compensation "would only be relevant were it to be accompanied by the additional assertion that [the investment adviser, or in this case the Trust and its investment adviser] ha[ve] the power to set the compensation of the non-employee directors, or that [they] ha[ve] the authority to remove them."  In affirming another decision in which this same logic was redeployed to dismiss an amended complaint filed in the same action as <u>Verkouteren</u>, the Second Circuit observed, "while the [amended c]omplaint makes allegations about the initial appointment of

---

[29] While plaintiff articulates his "control" argument with reference to the Trust and Citigroup, we assume that the reference to Citigroup is intended as a reference to CFM, the investment adviser to the Trust, which at the relevant time was a subsidiary of Legg Mason, not Citigroup.  Pursuant to § 7.44(d) we are concerned with "whether a majority of the board of [trustees] was independent at the time of the determination" that maintenance of the derivative proceedings was not in the best interests of the Trust. MASS. GEN. LAWS ch. 156D, § 7.44(d).  At that time, Citigroup bore a remote, if any, connection to the Trust.

the independent directors and the amount of their compensation, it does not allege that the re-election of [the] independent directors was, in fact, controlled by [the investment adviser] . . . [or] that [the investment adviser] had the power to set the amount of director compensation that . . . shareholders voted to approve." Verkouteren v. Blackrock Fin. Mgmt., Inc., 208 F.3d 204, 2000 WL 298255, at *2 (2d Cir. 2000) (unpublished opinion). Here, nothing in the proposed amended complaint bears on this collection of issues and no supportive record facts have been brought to our attention. From our review of the proxy statement, it is moreover clear that shareholders themselves periodically elected defendants to the board. See Proxy Statement 29, 33, 49-55 (discussing shareholder election of defendants and providing information for shareholders to consider in voting). Without even the assertion that defendants' level of compensation or continued position on the board was determined by the Trust, CFM, or Legg Mason, there is no logical basis from which we could infer from their level of compensation that defendants were indeed being controlled by one or more of these entities or individuals associated with them.

In addition and in the alternative, plaintiff's argument squarely collides with precedent in the law of Massachusetts as well as the Second Circuit bearing on the impact of compensation on independence. In Harhen v. Brown, 431 Mass. 838, 730 N.E.2d

859 (2000), the Massachusetts Supreme Judicial Court "held that the receipt of 'usual and customary director's fees and benefits' does not render a director interested." Forsythe v. Sun Life Fin., Inc., 417 F. Supp. 2d 100, 111 (D. Mass. 2006) (quoting Harhen, 431 Mass. at 843 n.5, 730 N.E.2d at 864 n.5). And in Amron v. Morgan Stanley Investment Advisors Inc., 464 F.3d 338, 345 (2d Cir. 2006), the Second Circuit affirmed dismissal of a complaint bringing claims against an investment adviser and held that under the ICA the allegation that "the five directors of the [mutual funds in question] each receive[d] compensation in excess of $150,000[ and] retirement benefits, [as well as] serve[d] on the boards of many other mutual funds, businesses, and charitable organizations" was "insufficient as a matter of law" to draw into question their independence.  In numerous other decisions interpreting the law of Massachusetts and also the ICA, federal courts have similarly found that trustees and directors in the context of mutual funds were not "interested" as a result of receiving compensation akin to or greater than that earned by defendants here under otherwise not dissimilar circumstances.[30]  This precedent forecloses any

---

[30] In our research we have identified similar decisions from multiple courts, an illustrative sample of which we set out here.  See, e.g., Migdal v. Rowe Price-Fleming Int'l., Inc., 248 F.3d 321, 329-330 (4th Cir. 2001) (affirming dismissal of complaint and finding under the ICA that directors were not interested due to service on between twenty-two and thirty-eight boards in the same family of funds and annual receipt of between $65,000 and $81,000); Forsythe, 417 F. Supp. 2d at 110-111 (dismissing complaint in relevant part

argument that defendants' compensation is sufficient on its own to compromise their independence.  It is clear from <u>Amron</u> as well as the other cases that we have identified, <u>see</u> <u>supra</u> note 30, that defendants' compensation level is not outside a range repeatedly found permissible during the relevant time period and is thus usual and customary pursuant to <u>Harhen</u>.[31]  Because each defendant's overall level of compensation is within a range that has been established as acceptable under both the law of Massachusetts and the ICA,[32] we find that even if all of the defendants earned 50% of their annual income from their service

---

and finding that under the law of Massachusetts and the ICA trustees were not interested due to service on multiple boards in the same family of funds and annual receipt of "substantial compensation" of between $100,000 and $200,000); <u>Strougo v. BEA Assocs.</u>, 188 F. Supp. 2d 373, 377-78, 382 (S.D.N.Y. 2002) (granting summary judgment and finding under the ICA that directors were not interested due to service on between three and eight boards in the same family of funds and annual receipt of between $40,500 and $107,250 reflecting approximately 15% of their annual income "[i]n view of their outside employment"); <u>Krantz v. Prudential Invs. Fund Mgmt. LLC</u>, 77 F. Supp. 2d 559, 561-64 (D.N.J. 1999), <u>aff'd</u>, 305 F.3d 140 (3d Cir. 2002) (dismissing complaint and finding under the ICA that directors were not interested due to service on multiple boards in the same family of funds, annual receipt of between $45,000 and $135,000, and accrual of as much as $143,909 in deferred compensation).  <u>See also</u> <u>Krantz v. Fidelity Mgmt. & Research Co.</u>, 98 F. Supp. 2d 150 (D. Mass. 2000) (dismissing complaint in relevant part and finding under the ICA that trustees were not interested due to annual receipt of between $220,000 and $273,500 notwithstanding the fact that it was alleged that "[t]heir compensation exceed[ed] the amounts paid to other, similarly situated trustees").

[31] This proves the case even if defendants' retirement benefits are roughly apportioned as annual income over the years in which those benefits were accrued.  Depending on which one of two conceivable approaches are taken to apportioning these retirement benefits the maximum increase to annual compensation is $45,000 for Carlton or $50,000 for Kerley, resulting in annual compensation for these trustees of $137,800 and $170,200, respectively, both of which figures are comfortably within the range found acceptable in for instance <u>Forsythe</u>.  <u>See</u> Proxy Statement 50-55.

[32] It is noteworthy that plaintiff's counsel, Joel C. Feffer, unsuccessfully pressed this same compensation argument in many of the cases on which we rely here, including <u>Amron</u>, <u>Migdal</u>, <u>Strougo</u>, and both of the cases entitled <u>Krantz</u>.

on the board in all of the years preceding their decision to reject the requests of the demand letter (i.e. plaintiff's best-case scenario) that this fact would not undermine their independence such that plaintiff could successfully resist summary judgment.[33]   This is true whether plaintiff's rebuttal argument is premised on a control or employment theory.[34]

### ii. Method of Determination

Plaintiff faults defendants for the method that they chose pursuant to § 7.44 to determine that this action was not in the best interests of the Trust, suggesting that defendants' decision to review the derivative proceeding themselves as provided in § 7.44(b)(1) reflects their lack of independence.[35] In particular, plaintiff states:

---

[33] In reaching this conclusion, we therefore moot plaintiff's most well-formed request for discovery.  In this respect, we do not understand the relevance of determining whether in quoting the range of 25% to 50% of their annual income defendants were including accrued retirement benefits.  In either case, the answer would not change the percentage provided, and as stated above, the annual level of compensation, even including an apportionment of retirement benefits, does not exceed an acceptable range.

[34] As to the latter theory, plaintiff sketches it in only basic terms without citing any precedent for the proposition that a trustee might be deemed a de facto employee due to their level of compensation and thus an "affiliated person" and "interested person" under the ICA.  See Pl.'s Reply 4 n.2.  In at least one of the complaints at issue in Amron, plaintiff's counsel advanced essentially this same line of argument, which was found insufficient as a matter of law to even state a claim premised on lack of independence.  See Amron, 464 F.3d at 342.

[35] In his reply papers, plaintiff lists this factor among others in support of his "claim of lack of independence."  Pl.'s Letter of Nov. 22, 2011 2 n.1 (citing Pl.'s Reply 3-6).  However, the method of determination facially appears more relevant to the analysis of whether defendants' determination was made in good faith and after a reasonable inquiry than whether defendants were independent.  Whatever strategic considerations may have influenced plaintiff's decision to press this point here, we consider all of his rebuttal arguments bearing on independence, including this one, in assessing

> Defendants declined to follow the customary practice
> of appointing one or more new trustees, who would be
> free of the taint of taking part in the contested
> events, to conduct the investigation. Instead, and
> without any explanation for the course they chose,
> they proceeded to investigate themselves. Nor did the
> defendants did [sic] avail themselves of . . .
> § 7.44(f) [of Chapter 156D of the Massachusetts
> General Laws] which permitted them to ask a court to
> appoint a truly independent person to review
> plaintiff's demand.

Pl.'s Reply 4. <u>See also</u> Proposed Am. Compl. ¶¶ 2, 57. Regardless of plaintiff's arguments, the fact remains that defendants chose to make the determination under § 7.44(b), one of the permissible statutory options. Therefore, we agree with defendants' counsel that there is absolutely no inference whatsoever to be drawn from their choice irrespective of whether or not it comports with plaintiff's conception of customary practice. <u>See</u> May 11, 2012 Oral Arg. Tr. 18:14-19:8.

### iii. Duration of Investigation

Plaintiff also argues that "[t]he review [of the DRC] was disproportionately longer than the actual decision-making" process through which defendants approved the New Agreements, concluding that the disparity "is more indicative of struggling to rationalize a prior improper decision than an independent investigation." Pl.'s Reply 5 (asserting 27 days were taken to approve the New Agreements and 141 days were taken to review the approval). <u>See also</u> Proposed Am. Compl. ¶¶ 55, 58(a). This

---

the good faith and reasonableness of defendant's inquiry and find them equally unavailing in both contexts.

particular argument is built on mere speculation and is insufficient to raise a genuine dispute as to the defendants' independence. We also observe that there is a marked irony in plaintiff criticizing defendants for the length of the investigation undertaken in response to the demand letter and the complaint when we are certain that had the DRC less thoroughly reviewed the underlying allegations in a shorter amount of time plaintiff would be asking us to draw a similarly negative though equally speculative inference from their "haste."

### iv. Inconsistency Between Proxy Statement and Report

Insisting that the proxy statement and the report are "mutually inconsistent," plaintiff draws to our attention that "[t]he former is silent on 'compliance issues,' while the latter stresses their importance" in explaining the defendants' decision to approve the New Agreements. Pl.'s Reply 5. Apparently because defendants did not ask for an explanation of this alleged inconsistency, plaintiff would have us conclude that they were not independent. See id. See also Proposed Am. Compl. ¶ 58(a) ("[d]efendants do not explain how their memories improved during the six-to-nine-month period between the issuance of the [p]roxy [s]tatement and the [r]eport").

As an initial matter, the very first of the fifteen factors that are listed in the proxy statement as among those that the

board and all of the other boards in the then Citigroup family
of funds considered in reviewing the New Agreements is "the
<u>reputation</u>, financial strength and resources of Legg Mason and
its investment advisory subsidiaries." Proxy Statement 15
(emphasis added). This same factor was listed in the minutes of
the board meeting on August 7, 2005 as among those that
defendants' considered in deciding to approve the New
Agreements. <u>See</u> Report Ex. 34 App. B. On August 1, 2005, only
six days earlier, defendants had attended a presentation from
the general counsel of Legg Mason which began with an emphasis
on Legg Mason's compliance culture as emanating from an
"[a]ppropriate '[t]one at the [t]op'" and discussed how Legg
Mason's investment advisers had largely avoided recent
regulatory problems. Report Ex. 29 4-5. In light of the
emphasis placed in this presentation and earlier communications
from representatives of Legg Mason on the corporation's
compliance culture,[36] it seems not unreasonable to us to conclude
that "reputation" actually encompasses the compliance
considerations that plaintiff alleges are absent from the proxy
statement.

Furthermore, we do not understand plaintiff's insistence
that the proxy statement perfectly align with the report. In

---

[36] For instance, earlier in the summer, on July 11, 2005, defendants had heard
from the chairman, president, and chief executive officer of Legg Mason who
in his opening remarks "noted that regulatory compliance is a primary concern
of his." Report Ex. 21 8.

listing the fifteen factors, the proxy statement noted that these factors were "[a]mong other things" that were considered. Proxy Statement 15-16.  By its own terms, the list of factors in the proxy statement is thus not intended to be exhaustive and therefore there is no facial inconsistency in the fact that the report chose to give emphasis to the importance of a factor not explicitly discussed in the proxy statement, namely Legg Mason's compliance culture.  See, e.g., Report 44-45, 53, 68-72 (discussing defendants' "high regard for [Legg Mason's] reputation" for "a solid compliance record" and a presentation from Legg Mason's general counsel on the corporation's "compliance culture" before emphasizing the importance of this culture to defendants' decision-making process).

Thus we seriously question the premise of plaintiff's argument but also find that the conclusion that he draws from within the confines of that premise is simply too weak to support the considerable inferential leap that is necessary in order to question defendants' independence on this basis.

### v. Approval of Soft-Dollar Payments

Taking issue with the fact that the New Agreements permit soft-dollar payments, which plaintiff argues are indefensible in the context of the money-market mutual funds that comprise the Trust and that he alleges can be operated without any research, plaintiff asks us to infer that defendants' were not independent

at the time that they determined this derivative action was not in the best interests of the Trust.  See Pl.'s Reply 5; Proposed Am. Compl. ¶ 58(d).  We find this rebuttal argument wanting for a number of reasons, two of which we briefly detail here. First, we agree with defendants' counsel that this argument is entirely based in the underlying allegations of plaintiff's claim that defendants' breached their fiduciary duties and in no way is directly tied to the later time at which defendants decided not to pursue the derivative claim, which is the focus of our assessment of their independence.  See May 11, 2012 Oral Arg. Tr. 19:19-20:7.  In raising this argument, plaintiff is attempting to litigate the merits of his case.  While this is to some degree permissible, plaintiff cannot divert the focus of the threshold inquiry in § 7.44 away from independence.  Second, as we noted in Halebian I, the terms of the New Agreements, unlike the terms of the Old Agreements, though again permitting soft-dollar payments, "specifically allowed the [b]oard to adopt polic[ies] and procedures to modify and restrict the [investment] adviser's use of such payments."  631 F. Supp. 2d at 289 (citing Proxy Statement App. D D-3).  If there is any inference to be drawn from the comparative terms on soft-dollar payments and the board's approval of this aspect of the New Agreements, therefore, it is that defendants were more energetic

than before in their fiduciary role and therefore more likely to have been acting free from improper influences.

### vi. Approval of Echo Voting

Finally, plaintiff again raises the issue of echo voting, arguing, remarkably, that "[t]he impropriety of echo voting was actually presented [at a board meeting] to all [defendants], including the two . . . members [of the DRC], before the proxy materials were disseminated." Pl.'s Reply 5. See also Proposed Am. Compl. ¶ 58(b). As the Second Circuit stated in Halebian II on the basis of the same record before us now, "[t]here is no indication that the alleged unlawfulness of echo voting under . . . the ICA or Massachusetts law was called to the attention of the [b]oard by [plaintiff] or anyone else prior to the institution of this lawsuit." 590 F.3d at 210. Plaintiff's contention to the contrary here and citation to the minutes of a board meeting on September 2, 2005 simply misrepresents both the relevant facts and the applicable law. See Proposed Am. Compl. ¶ 58(b) (quoting Report Ex. 38 4).

*          *          *

To the extent that plaintiff raises further rebuttal arguments regarding defendants' independence, we have considered them and found them meritless.[37]

---

[37] One final rebuttal argument alleging bias in the report bears mention only because it indicates plaintiff's surprising lack of understanding for the transaction that he has assailed for over six years.  In his proposed amended

## 4. Good Faith and Reasonableness

Because we have found that "a majority of the board . . . consist[ed] of independent [trustees] at the time the determination was made" that this action is not in the best interests of the Trust, MASS. GEN. LAWS ch. 156D, § 7.44(e), "[t]he business judgment [doctrine] accordingly applies" to shield this determination. Pinchuck, 2011 WL at *14 (citing MASS. GEN. LAWS ch. 156D, § 7.44 cmt. 2).[38] As the drafters of § 7.44 explained, it is the threshold showing of independence that provides the justification for application of the business judgment doctrine and its "presumption of validity." MASS. GEN. LAWS ch. 156D, § 7.44 cmt. 2. Pursuant to § 7.44(e), plaintiff can only avoid application of the business judgment doctrine and thus the dismissal of this action if he can carry "the burden of proving"

_____

complaint, plaintiff asserts that the report's "reasoning is nonsensical" because it for instance states that defendants were concerned with avoiding "'the disruption in services and lack of continuity in management'" that would have followed from a change in the investment adviser to the Trust. Proposed Am. Compl. ¶ 58(e). Plaintiff finds this statement absurd in light of his assumption that it was "inevitable" as a result of the transaction between Citigroup and Legg Mason that the investment adviser to the Trust would change. Id. This argument of course overlooks the fundamental fact that CFM remained as the investment adviser to the mutual funds comprising the Trust immediately following the transaction, albeit as a subsidiary of Legg Mason and not Citigroup. See June 21, 2007 Oral Arg. Tr. 22:4-23:10 (noting the "complete continuity" in the operation of the Trust following the transaction which "didn't even involve a change of the investment adviser").

[38] In Halebian III, the Massachusetts Supreme Judicial Court drew a distinction between the "the 'business judgment doctrine,'" which it explained "protects the determination of a board to terminate a derivative action," and "the 'business judgment rule,'" which "'shields individual directors from liability for damages stemming from decisions.'" Wiener v. Eaton Vance Distribs., Inc., Civ. Action No. 10-10515-DPW, 2011 WL 1233131, at *5 n.5 (D. Mass. Mar. 30, 2011) (quoting Halebian III, 457 Mass. at 627 n.11, 931 N.E.2d at 991 n.11). As noted in Wiener, prior precedent does not always observe this distinction, which we attempt to observe here. See Wiener, 2011 WL 1233131, at *5 n.5.

that defendants did not make the determination "in good faith
after conducting a reasonable inquiry." MASS. GEN. LAWS ch. 156D,
§ 7.44(a), (e).[39]

We find that plaintiff has failed to carry his burden.
Aside from a conclusory allegation that Finn and Gross, the two
members of the DRC, were not independent and engaged in a
"rubber stamping" of an investigation that "was neither
[undertaken] in good faith nor reasonable," Proposed Am. Compl.
¶ 56, plaintiff can only be understood to repeat the same
rebuttal arguments bearing on independence with regard to
defendants' good faith and the reasonableness of their
investigation. See Pl.'s Reply 3-5 (listing rebuttal arguments
to defendants' independence and then stating "[p]laintiff is
confident that discovery will uncover further proof that
defendants are not independent and that the DRC's investigation
was less than the vigorous examination contemplated under
Massachusetts law") (emphasis added). None of these arguments
fare any better in this context.

Indeed, putting to one side plaintiff's various aspersions,
we find there is no evidence whatsoever that impugns the

---

[39] In adopting this particular standard for § 7.44, see MASS. GEN. LAWS ch.
156D, § 7.44 cmt. 2, its drafters analogized in relevant part to Harhen v.
Brown, 431 Mass. 838, 847, 730 N.E.2d 859, 867 (2000), in which the
Massachusetts Supreme Judicial Court held, "where the majority of the board
is disinterested, the long-standing rule in Massachusetts is that the
business judgment [doctrine] applies, absent a showing of bad faith or lack
of investigation into the demand."

reasonableness of the defendants' investigation or their good faith. Defendants empowered the DRC to investigate the underlying allegations, and the DRC in turn retained counsel led by the former general counsel of the SEC to assist with this discrete task. Under the supervision of the DRC, which was actively involved in the investigation through multiple meetings, Leboeuf conducted numerous interviews with defendants as well as others and reviewed thousands of pages of relevant documents. In the resulting report of this investigation, the DRC presented a detailed account of the defendants' approval of the New Agreements, which the board then considered and following an in-person meeting and a further opportunity to reflect on the issues relied upon in adopting the Resolution.

## IV. Conclusion

For the reasons stated above, plaintiff's motion to amend and motion for discovery are denied, and we find that plaintiff has failed to raise a genuine dispute as to a material fact bearing on defendants' independence or the good faith or reasonableness of their inquiry in response to the demand letter and the complaint and that accordingly defendants are entitled to summary judgment dismissing plaintiff's remaining derivative claim pursuant to § 7.44.

Dated:   New York, New York
         July 20, 2012

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

75

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Attorneys for Plaintiff:
Joel C. Feffer, Esq.
Harwood Feffer L.L.P.
488 Madison Avenue
New York, NY 10022

Attorneys for Defendants:
James S. Dittmar, Esq.
Goodwin Procter L.L.P.
Exchange Place
53 State Street
Boston, MA 02109
-  -  -
Michael K. Isenman, Esq.
Goodwin Procter L.L.P.
901 New York Avenue, NW
Washington, DC 20001